Robert Tauler (SBN 241964)
rtauler@taulersmith.com
Tauler Smith, LLP
626 Wilshire Boulevard, Suite 510
Los Angeles, California 90017
Tel: (310) 590-3927

Attorneys for Plaintiff
ENTTech Media Group LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

ENTTECH MEDIA GROUP LLC

Plaintiff,

v.

OKULARITY, INC., *et al.*

Defendants.

Case No. 2:20-cv-06298-RGK (Ex)

Assigned to Hon. R. Gary Klausner
Courtroom 850

**PLAINTIFF ENTTECH MEDIA GROUP LLC'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS [26]**

Hearing Date:     September 28, 2020
Time:               9:00 a.m.
Place:             ***None noticed***

Hon. R. GARY KLAUSNER

[Request for Judicial Notice Filed Concurrently]

---

ENTTECH'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ii

I. FACTS ALLEGED ........................................................................................ 1

    A. Defendants' Scheme to Defraud. ............................................................ 2

    B. Defendants' Abuse of the DMCA. ......................................................... 2

    C. Defendants' Enterprise. .......................................................................... 4

    D. Defendants' Extortionate Demands.. ..................................................... 5

    E. Okularity's Intent to Mislead Instagram.. .............................................. 6

    F. Defendants' Continued Misconduct.. ..................................................... 6

II. ARGUMENT ............................................................................................... 7

    A. ENTTech Alleges the Misrepresentation Plausibly and with
    Particularity.. ............................................................................................... 7

    B. The Noerr-Pennington Doctrine Does Not Apply. .............................. 13

    C. The DMCA Claim Is Otherwise Plausible. .......................................... 15

    D. The RICO Claim Is Otherwise Plausible. ............................................ 15

    E. The FAC Pleads a Pattern. .................................................................... 17

    F. The FAC Pleads an "Enterprise." ......................................................... 17

III. CONCLUSION ......................................................................................... 18

CERTIFICATE OF SERVICE ........................................................................ 19

# TABLE OF AUTHORITIES

<u>Cases</u>

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)............... 1, 12

*Bly-Magee v. Cal.*, 236 F.3d 1014 (9th Cir. 2001) ...........................................................8

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed.
   2d 1012 (2008) ..............................................................................................................8

*California Motor Transp. Co. v. Trucking Unlimite*d, 404 U.S. 508, 514 (1972)............ 14

*Campbell*, 510 U.S. at 579, 114 S.Ct. 1164 .....................................................................3

*Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008) ................................ 16

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) .................................................................4

*Cooper v. Pickett*, 137 F.3d 616 (9th Cir. 1997) ............................................................. 10

*Curtis v. Shinsachi Pharm. Inc.*, 45 F. Supp. 3d 1190 (C.D. Cal. 2014) ..........................8

*DCD Programs, Ltd. v. Leighton*, 833 F.2d 183 (9th Cir. 1987)..................................... 11

*Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) .................................................................. 16

*Durment v. Burlington Ins. Co.,* No. LACV1305934JAKEX, 2013 WL 12142632,
   at *2 (C.D. Cal. Oct. 31, 2013) .................................................................................. 11

*First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89 (S.D.N.Y. 1993).......... 17

*Garlock Sealing Techs., LLC v. Shein*, 2015 WL 5155362, at *3 (W.D.N.C.
   Sept. 2, 2015)............................................................................................................. 14

*Hall Amer. Ctr. Assoc. L.P. v. Dick*, 726 F. Supp. 1083 (E.D. Mich. 1989)................... 14

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*,
   295 F. Supp. 3d 927 (N.D. Cal. 2018)........................................................................ 16

*In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843 (9th Cir. 2003)..................................... 10

ENTTECH'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Infinity Broad. Corp. v. Kirkwood,* 150 F.3d 104 (2d Cir. 1998) ...................................... 3

*Kruse v. Repp*, 2020 WL 1317479, at *20 (S.D. Iowa Mar. 20, 2020)........................... 14

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)................................................. 10

*Lemelson v. Wang Labs., Inc.*, 874 F. Supp. 430 (D. Mass. 1994) ................................... 14

*Lenz v. Universal Music Corp.*, 815 F.3d 1145 (9th Cir. 2016) ................................... 9, 15

*Lustiger v. United States*, 386 F.2d 132 (9th Cir. 1967)................................................... 16

*McCartin v. Norton*, 674 F.2d 1317 (9th Cir. 1982) ........................................................ 11

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012) ...................................... 3

*Murphy v. Millenium Radio Grp. L.L.C.*, 650 F.3d 295 (3d Cir. 2011 ............................. 3

*Neubronner v. Milken*, 6 F.3d 666 (9th Cir. 1993)........................................................... 12

*Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007)................................................... 16

*Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783 (9th Cir. 1992) ............................... 16

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020) .......... 1

*Polich v. Burlington N., Inc.*, 942 F.2d 1467 (9th Cir. 1991) ........................................... 10

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741 (9th Cir. 2006) ...................... 10

*Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640 (7th Cir. 1995)................................... 17

*Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343
    (9th Cir. 2014) ............................................................................................................. 15

*Salas v. Int'l Union of Operating Engineers*, 2015 WL 728365, at *3 (C.D. Cal.
    Feb. 18, 2015)............................................................................................................... 8

*Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006) ..................................................... 13

ENTTECH'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Transfresh Corp. v. Ganzerla & Assoc.*, 862 F. Supp. 2d 1009 (N.D. Cal. 2012) ........... 13

*United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244 (9th Cir. 1992) ................................................................................................. 10

*United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016) .......................................................................................... 7, 8, 9, 10

*United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010) ....................................................... 16

*United States v. Bohonus*, 628 F.2d 1167 (9th Cir. 1980) ............................................. 16

*United States v. Munoz*, 233 F.3d 1117 (9th Cir. 2000) ................................................ 16

*United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) ................................................... 16

*Wool v. Tandem Computers, Inc.*, 818 F.2d 1433 (9th Cir. 1987) ................................. 10

Statutes

17 U.S.C. § 512(c) ............................................................................................................ 4

17 U.S.C. § 512(f) ........................................................................................................... 15

Other Authorities

5A Charles Alan Wright & Arthur R. Miller, *et al. Federal Practice and Procedure*, § 1298 (3d ed. 2016) ................................................................................................. 9

Rules

Fed. R. Evid. 201 ............................................................................................................ 10

ENTTECH'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**OPPOSITION TO MOTION TO DISMISS**

By making false statements to a third-party so that Defendants might impede access to a valuable asset – namely, the right of access by Plaintiff ENTTech Media Group, LLC to its social media account with Instagram – Defendants have engaged in fraud and extortion under RICO. Those same misrepresentations violated § 512(f) of the DMCA. The First Amended Complaint in this case alleges those violations, plausibly and with particularity. *See* Dkt. 23 (the "FAC"). The Motion to Dismiss by Defendants Okularity, Inc. and Jon Nicolini, which the other three named Defendants also join, should therefore be denied. *See* Motion (Dkt. 26) and Joinder (Dkt. 28). All five of the Defendants have jointly submitted their "Defendants' Joint Memorandum of Points & Authorities in Support of Motion to Dismiss" (Dkt. 27). Contrary to those joint arguments, this case should be allowed to proceed, so that further light may be shed upon Defendants' ongoing use of sophisticated software to defraud, under the auspices of copyright law and the DMCA.

## I.   FACTS ALLEGED

"The facts are taken from the complaint. For purposes of this decision we must assume them to be true." *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1066 n.2 (9th Cir. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)). As alleged here, all five of the named Defendants have engaged (and they still are engaging) in an illegal scheme to defraud ENTTech of its assets by unlawfully manipulating the take-down notice provisions of the DMCA. *See* FAC ¶ 12. The scheme to defraud was orchestrated by Okularity and involved other members including Nicolini, who is the CEO of Okularity, joined by Defendants Backgrid, USA, Inc., Splash News and Picture Agency, LLC, and Xposure Photo Agency, Inc. – who acted together as an enterprise to carry out their intent to defraud ENTTech and thereby damage ENTTech's flagship property, the online and print magazine called *Paper*. FAC ¶¶ 18, 48, 49.

**A.     Defendants' Scheme to Defraud.**

Defendants engaged in a scheme to deprive *Paper* of its digital assets (specifically, Paper's  Instagram account) through a pattern of fraudulent statements made in DMCA notices that were issued to intentionally disable *Paper's* Instagram account and to effectively transfer control of the Instagram account to the enterprise; this was done, so that Okularity, through its CEO Jon Nicolini, could demand extortionate sums from *Paper* in exchange for having *Paper's* valuable Instagram account reinstated. FAC, ¶¶ 12, 18, 28.  In fact, the scheme was specifically set up so that *Paper* had to first reach out to Okularity, in a state of desperation, to retrieve its valuable asset (Instagram business account) that Okularity held hostage by virtue of false statements to Instagram.  FAC, ¶ 28.

**B.     Defendants' Abuse of the DMCA.**

The DMCA provides a rapid procedure for copyright owners to protect the widespread proliferation of their digital content.  FAC, ¶ 13.  A DMCA notice requires a signed statement under penalty of perjury that the submitting party has a good faith belief that the content identified in the notice is infringing on a copyright, together with "[a] statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law" under § 512(c)(3)(A)(v) of the DMCA.  FAC ¶¶ 13, 51.  Okularity did not do any investigation or legal analysis prior to filing the notices, as required by the DMCA, nor did it send a cease-and-desist letter to *Paper* concerning any of the 48 images it reported. FAC, ¶ 15.  Those DMCA notices were automatically generated and submitted to Instagram with Okularity's proprietary software, without any attorney supervision, or any analysis as to the fair use of the image, licensing, registration of the image or applicable statute of limitations, prior to filing. FAC, ¶¶ 27, 40, 51.  Defendants knew that the DMCA notices were false, and did not have a "good faith" basis for believing that *Paper's* uses of the images were unauthorized. FAC, ¶ 51.

Okularity, through Nicolini, submitted at least 19 identical, boilerplate statements to Instagram, in which he declared that the images *Paper* posted to their account were not fair use:

> As you should know, the Post does not qualify for fair use. The Post lacks significant commentary, if any, which works against a fair use defense. See *Murphy v. Millenium Radio Grp. L.L.C.*, 650 F.3d 295, 307 (3d Cir. 2011) ("("The absence of any broader commentary--whether explicit or implicit--significantly undercuts the argument that [defendant's] use gave any new meaning to the Image. Instead, it appears that [defendants] did not want to go to the trouble of creating their own eye-catching photo but simply appropriated the Image.").
>
> Even if it were the case the Post had used the photographs for a different purpose than how they were published legitimately, the use would still not be transformative. See *Monge v. Maya Magazines, Inc*., 688 F.3d 1164, 1176 (9th Cir. 2012) ("But even an infringer's separate purpose, by itself, does not necessarily create new aesthetics or a new work that 'alter[s] the first [work] with new expression, meaning or message.' *Infinity Broad. Corp. v. Kirkwood,* 150 F.3d 104, 108 (2d Cir. 1998) (quoting *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164). A 'difference in purpose is not quite the same thing as transformation, and Campbell instructs that transformativeness is the critical inquiry under this factor.' *Id*."). Further, the minimal cropping of the photograph and inclusion of most or all of the work in the Post is not fair use. "Qualitatively, the minimal cropping of each picture demonstrates that the 'heart' of each individual copyrighted picture was published. *Elvis Presley Enters*., 349 F.3d at 630 (courts should 'look to see whether the heart of the copyrighted work is taken.')." See *Monge*, 688 F.3d at 1178.

Finally, the Second Circuit has ruled "an accused infringer has usurped the market for copyrighted works, including the derivative market, where the infringer's target audience and the nature of the infringing content is the same as the original." *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) cert. denied 134 S. Ct. 618 (2013). Since the photograph has been used in the same manner, to the same audience, and with the same purpose as Backgrid London Ltd. or its clients use them, the use herein is not fair.

*See* RJN Exhibit 1 at 104, 108, 110, 112, 114, 117, 121, 124, 126, 129, 132, 134, 136, 138, 140, 142, 144, 146, 149) (part of Exhibit C to the Dkt. 22 pleading in the Second Case). That same boilerplate was repeated verbatim in every single one of the 19 notices. Nicolini (who is not an attorney) went on to declare:

"We have fulfilled all elements of notification as defined by § 512(c)(3)(A) of the Digital Millennium Copyright Act, so please remove the Post *and take action against the user immediately*. If you do not, Instagram may be ineligible for the safe harbor from copyright infringement liability provided by 17 U.S.C. § 512(c)."

*Id.* at page 104, 108, 110, 112, 114, 117, 121, 124, 126, 129, 132, 134, 136, 138, 140, 142, 144, 146, 149 (emphasis added).

## C.   Defendants' Enterprise.

The Okularity enterprise scheme is operated using Okularity's proprietary software that automatically generates and submits DMCA notices to Instagram to report images on Instagram as (purportedly) infringing the (purported) copyrights that have been registered by Backgrid, Splash News and Xposure Photo. FAC ¶ 15. Backgrid, Splash News and Xposure Photo are clearinghouse websites that use Okularity (run by and Nicolini) to act as their copyright agent. FAC, ¶ 49. BackGrid, Splash News, and Xposure Photo provide Okularity access to their photograph databases and engage Okularity (which Nicolini controls) to extort companies with Instagram accounts through DMCA notices.

ENTTECH'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

FAC, ¶ 49.  All the Defendants worked together in the scheme with the intent to share in the proceeds of their scheme.  FAC, ¶ 15, n.1.  Instagram requires (under its own policies) to disable any account that is deemed a "repeat" copyright infringer, solely for having numerous DMCA notices submitted to Instagram claiming copyright infringements.  FAC, ¶¶ 14, 39.  Under those internal policies, Instagram does not reinstate the account of a "repeat infringer" until the underlying copyright "dispute" is resolved.  FAC, ¶ 14, 39.  As such, Okularity now effectively has taken control over when *Paper*'s access to the Instagram account gets reinstated.  FAC, ¶¶ 12, 16.

**D.    Defendants' Extortionate Demands.**

On at least 48 instances in 2019 and 2020, the FAC alleges that Defendants willfully, knowingly and materially made third-party §512(f) misrepresentations to Instagram stating that the images posted to *Paper*'s Instagram account, some over three years old, were infringing intellectual property rights owned by one of the Defendants. FAC, ¶ 37.  On July 8, 2020, *Paper* discovered their Instagram account was disabled. That was when Instagram notified *Paper* that it was being treated as a repeat copyright infringer under Instagram's policy, solely because Okularity had issued to those notices. FAC, ¶¶ 22, 29, 39.  At the same time, Instagram provided *Paper* with the contact information of the person who issued all of the DMCA notices – namely Nicolini, the CEO of Okularity.  FAC, ¶ 29. When *Paper* contacted Nicolini to ask about the DMCA notices, Nicolini emailed back, saying "please cut to the chase with your settlement offer," and demanded *Paper* to acknowledge that each purported copyright infringement could fetch up to $150,000, for a total of $4.65 million in "damages" under the Copyright Act.  FAC, ¶ 30.  Sixteen minutes later, Nicolini announced his authority to communicate on behalf of his "clients" – expressly invoking Rule 408 of the Federal Rules of Evidence – to settle with *Paper* for $1.01 million. FAC, ¶ 31.  In exchange for the million dollar "settlement," Okularity, through Nicolini, offered to retract their DMCA notices, thereby offering to induce Instagram to reinstate *Paper*'s Instagram account.  FAC, ¶ 23.  *Paper*

ENTTECH'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

did not accept Nicolini's million-dollar offer, and requested to see all of Okularity's

DMCA notices to further assess their claims.  FAC, ¶ 33. But, Nicolini has refused to

send *Paper* copies of the DMCA notices, in the absence of a "non-disclosure agreement."

*Id*.

**E.     Okularity's Intent to Mislead Instagram.**

Nicolini is not an attorney, but, as part of the scheme to defraud Instagram and

thereby injure *Paper*, he misleadingly implied he was an attorney representing certain

copyright owners. FAC, ¶¶ 30-32.  Nicolini purported to assert legal claims on behalf of

his copyright owner clients, interpreted the application of the Copyright Act to images,

engaged in "damages" analysis regarding legal copyright infringement claims of his

"clients," and negotiated resolution of legal claims on his clients behalf under FRE 408 in

the context of a copyright lawsuit.  *Id*.  Defendants know that Instagram is the lifeblood

of any digital media company, particularly *Paper*, which primarily is engaged in the

business of reporting and commentary of popular culture news and, as such, targets a

young demographic that uses Instagram as its primary source of media consumption.

FAC, ¶ 16.  Defendants knew Instagram's policies, and knew that those policies afforded

them leverage over *Paper*.  FAC, ¶ 14.  As Defendants intended, *Paper* has been injured

because Defendants' numerous DMCA notices caused Instagram to disable *Paper*'s use

of its valuable Instagram business account, which was, and continues to be, its main

source of revenue at the time the account was disabled.  FAC, ¶ 55.  *Paper* currently has

various business arrangement that include *Paper*'s publication on Instagram, and these

business transactions are threatened by Defendants' misconduct.  FAC, ¶ 38.

**F.     Defendants' Continued Misconduct.**

The Clearinghouse Defendants have recently continued their conduct of the

Okularity Enterprise by filing a second, separate lawsuit (Case No. 2:20-cv-06803),

which seeks to enjoin *Paper*'s use of the images identified in the DMCA notices on

Instagram – again, purposely without regard to the truth or falsity of the allegation that

any of *Paper's* uses of the photographs was prohibited by law. FAC, ¶ 53. (See Request for Judicial Notice, Exh. 1.)  Defendants are aware that Instagram's policy is to prohibit access to a disabled account when a claim for injunctive relief is filed and that the only effect of their claim for injunctive relief in the Second Case is so that *Paper's* Instagram account will remain disabled. FAC, ¶ 53. The Second Case requests injunctive relief– seeking removal of the images from Instagram, however, *Paper* cannot remove any images from its Instagram account because it cannot obtain access to the account under Instagram's policies. FAC, ¶ 53. Again, all the Defendants are aware of this, and they have continued to refuse to allow *Paper's* access to its Instagram account so that it can remove the subject images. FAC, ¶ 53.

Instead, Defendants have continued to make extortionate demands to *Paper* based on the leverage they obtained solely from their own misconduct – such as offering explicitly "to withdraw our request for injunctive relief and the [Instagram] account can go back up," but only if *Paper* were to concede liability on the unfounded copyright infringement claims of the Clearinghouse Defendants in the Second Case and submit to arbitration concerning the claimed "damages." FAC, ¶ 54

## II.   <u>ARGUMENT</u>

### A.   ENTTech Alleges the Misrepresentations Plausibly and with Particularity.

The FAC here pleads more than sufficient particulars for each of its two claims for relief:  Violation of DMCA § 512(f) (FAC, ¶¶ 35-43), and Violation of RICO (FAC, ¶¶ 44-57).  To satisfy Rule 9(b)'s requirement of particularity, a pleading grounded in fraud "must allege 'the who, what, when, where, and how of the misconduct charged … including what is false or misleading … and why it is false.' "  *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (citations and internal quotation marks omitted).  On the other hand, "[o]ther than fraud, RICO predicate acts need not be pled with particularity but must be sufficiently pled to give [d]efendants notice of the factual basis of the claim."  *Salas v. Int'l Union of Operating*

*Engineers*, 2015 WL 728365, at *3 (C.D. Cal. Feb. 18, 2015) (citation and quotation marks omitted). Thus, "extortion claims should be evaluated against the more lenient pleading standards of Rule 8(a)." *Ibid.*  It is also far from clear that Rule 9(b)'s particularity requirement even applies to a DMCA claim under § 512(f) – since, none of the cases cited by Defendants have reached such a conclusion – but even if it does, Rule 9(b) also provides that knowledge of a misrepresentation in a defendant's DMCA notice "may be alleged generally." *Curtis v. Shinsachi Pharm. Inc.*, 45 F. Supp. 3d 1190, 1199 (C.D. Cal. 2014).  Regardless, ENTTech's allegations are more than "specific enough to give defendants notice of the particular [alleged] misconduct" as required by Rule 9(b) for claims of fraud, "so that they can defend against the charge." *Swoben*, 848 F.3d at 1180 (quoting *Bly-Magee v. Cal.*, 236 F.3d 1014, 1019 (9th Cir. 2001)).  In fact, three of the Defendants are *already* defending against the charges, by alleging affirmatively – in the Second Case – that ENTTech's allegations here in the First Case supposedly are incorrect.  *See* RJN Exh. 1, ¶¶ 17-20 (at page 9).  According to their own affirmative allegations, Backgrid, Splash News and Xposure Photo contend that "EntTech filed suit against the Photo Agencies" here in this action, but "[o]f course," they say, "all of the Photo Agencies' actions were lawful and expressly prescribed by the DMCA." *Id.,* ¶ 20. Where (as here) a predicate offense is mail or wire fraud, the plaintiff must allege facts to show that "someone" – not necessarily ENTTech – relied on the defendants's misrepresentations.  *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008).  That happened here, as the FAC alleges, when Instagram disabled *Paper*'s account access in reliance upon the false statements of "good faith" in the DMCA notifications.  In fact, this was not only *foreseeable*, but it was the *intended* result, as Nicolini expressly requested:

> "*** PLEASE NOTE we've already sent 13 [and various other numbers, at
> different times] takedown notifications for the account in question:
> papermagazine.  The Instagram Terms of Use clearly state: "If you

repeatedly infringe other people's intellectual property rights, we will

disable your account when appropriate." Thus, we strongly urge you to

disable this account immediately. ***

RJN, Ex. 1 at 104, 107, 112, 114, 117, 120, 123, 126, 129, 132,  134, 136, 138, 140, 142, 146, 149.

The FAC details the false statements of "good faith" that Okularity and Nicolini made on behalf of the Backgrid, Splash News and Xposure Photo.  The DMCA notices "contained a statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law," which the FAC alleges was false.  FAC ¶ 51 (internal quotations omitted).  Those statements were misrepresentations, because (in fact) no investigation or analysis was undertaken by an attorney (or other human being) to determine the factual veracity of the claims asserted.  FAC ¶ 40.  Despite the rote recitations of identical boilerplate concerning "fair use" in the notices themselves – repetitively stating, "[a]s you should know, the Post does not qualify for fair use" (*see* RJN Exhibit 1 at 104, 108, 110, 112, 114, 117, 121, 124, 126, 129, 132, 134, 136, 138, 140, 142, 144, 146, 149) – the Motion by Defendants now does not assert that any analysis of "fair use" was actually undertaken prior to sending the take down notices, as required.  FAC ¶ 41.  Plausibly and with particularity, that suffices to show that the Defendants "knowingly misrepresented in the takedown notification that [they] had formed a good faith belief the [photographs] were not authorized by the law, *i.e.*, did not constitute fair use."  *See Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1154 (9th Cir. 2016).

Contrary to Defendants' principal argument (*see* Dkt. 27 at 8), the Rule 9(b) standard " 'does not require absolute particularity or a recital of the evidence,' " *see Swoben*, 848 F.3d at 1180 (quoting 5A Charles Alan Wright & Arthur R. Miller, *et al.*, *Federal Practice and Procedure*, § 1298 (3d ed. 2016)), and thus, "a complaint need not allege 'a precise time frame,' 'describe in detail a single specific transaction' or identify

9

the 'precise method' used to carry out the fraud." *Id.* (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).  Specifically, the FAC states that Okularity "filed forty-eight (48) DMCA take-down notices against Paper that Instagram disabled Paper's account."  FAC, ¶¶ 29, 37.  As it also alleges, Nicolini has refused to provide copies of those notices to ENTTech itself.  FAC, ¶ 33.  Consequently, there is no Rule 9(b) requirement that ENTTech plead any more specifics concerning those notices.  *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987) (" 'the rule may be relaxed as to matters peculiarly within the opposing party's knowledge' "; quoting the 1969 edition of Wright & Miller, *supra* § 1298, n.95).

Despite these details, Defendants assert that the DMCA notices are not alleged "with any specificity at all."  Dkt. 27 at 7.  That is untrue, as just shown.  Furthermore, copies of 19 of the fraudulent notices were actually filed by Backgrid, Splash News and Xposure Photo as an exhibit to their own pleading in the Second Case.  *See* RJN Exh. 1, at the attached Exhibit C (Dkt. 22-13 in the Second Case) to their own pleading.  That pleading is a matter of public record, and therefore, not subject to reasonable dispute. *See* Fed. R. Evid. 201; *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (noting that courts may take judicial notice of "court filings" as they are "readily verifiable, and therefore, the proper subject of judicial notice"); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992).[1]  If the Court deems it necessary to plead more specifics about them here, then ENTTech respectfully requests leave to amend its allegations relating to those 19 notices, with any greater particularity that might be required.  "Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment."  *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 845 (9th Cir. 2003) (quoting *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991)).  In other

---

[1] On the other hand, judicial notice would not be appropriate for the purported truth of the allegations by Backgrid, Splash News and Xposure Photo in the Second Case – which ENTTech disputes. *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

ENTTECH'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

words, leave to amend should be "liberally granted where from the underlying facts or circumstances, the plaintiff may be able to state a claim." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (quoting *McCartin v. Norton*, 674 F.2d 1317, 1321 (9th Cir. 1982)).[2]

As the FAC further alleges, any DMCA notice must have "contained '[a] statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.' " FAC, ¶ 51.  In fact, the Exhibit C copies of some of the Notices (the 19 that are alleged in the Second Case) contain exactly this verbatim, cut-and-paste statement: "We have a good faith belief that use of the content described above, in the manner we have complained of, is not authorized by the copyright owner and/or its exclusive licensee, its agent, or the law."  RJN Exhibit 1 at 104, 108, 110, 112, 114, 117, 121, 124, 126, 129, 132, 134, 136, 138, 140, 142, 144, 146, 149.  Because Okularity used automation to generate the DMCA notices, "Defendants knew that this statement was false (which is, in fact, the reason why they are concealing their DMCA notices from Plaintiff)."  FAC, ¶ 51.  Thus, when Okularity (acting through Nicolini), submitted the DMCA notices to Instagram (on behalf of their principals, the Backgrid, Splash News, and Xposure Photo), Nicolini knew (and

---

[2] Defendants did not sufficiently meet and confer pursuant to Local Rule 7-3 prior to filing this Motion to Dismiss the FAC. As discussed in Plaintiff's Objection and Request to Strike Motion to Dismiss and Joinder in Motion to Dismiss (Dkt. 32). Defendants acted in bad faith because they did not discuss thoroughly "any potential resolution" nor did they request Plaintiff to amend the FAC, despite LR 7-3's requirements. (See Tauler Declaration, Dkt. 32 at 4.) Further, the only phone conference concerning the FAC took place on August 18, which violates LR 7-3 because it was less than seven days prior to the filing of the motion to dismiss (August 24). Plaintiff was prejudiced by Defendants' violation of LR 7-3 because it could have avoided the time and money spent opposing this motion by amending its FAC instead. (See *Durment v. Burlington Ins. Co.*, No. LACV1305934JAKEX, 2013 WL 12142632, at *2 (C.D. Cal. Oct. 31, 2013)(need showing of prejudice or that a longer time period would have led to a different result for LR 7-3 violation.) Based on this reason alone, Defendants' Motion to Dismiss should be denied.

ENTTECH'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

thus, Okularity and all of its principals also knew) that no "good faith" basis existed for believing that Plaintiff's uses of the images were unauthorized.  FAC ¶ 51.  On the face of those factual allegations, they simply are not (as Defendants contend) merely "a 'threadbare recital' of claim elements that the Supreme Court has instructed should be disregarded."  *See* Dkt. 27 at 8 (quoting *Iqbal*, 556 U.S. at 678).  Rather, Defendants' own invocation of the "threadbare recital" rule is (itself) just a threadbare recital of the rule, utterly untethered to the actual allegations of the FAC against them.  And, as their own allegations in the Second Case make abundantly clear – by alleging (in reference to this very action) that "all of the Photo Agencies' actions were lawful," *see* RJN Exh. 1, ¶ 20 – the FAC is very obviously more than "specific enough to give defendants notice of the particular misconduct which is alleged to constitute fraud."  *See Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993).

Notably, the RICO claim is asserted as to Defendants' entire scheme to defraud, not just the Notices by themselves.  As the FAC alleges, Nicolini actively solicit members of the public, including persons with whom it has no relationship and about whom it has no knowledge, to upload photos which Backgrid will then ostensibly "license" (for payment) to others to display and otherwise exploit.  FAC ¶¶ 25-26; 51.  The "Clearinghouse Defendants" (namely, Backgrid, Splash News and Xposure Photo, *see* FAC ¶ 7) then engage Okularity (and Nicolini) as their "copyright agent" for the purpose of sending automated DMCA notices.  FAC ¶ 49.

Nicolini is the CEO of Okularity.  (FAC ¶ 24).  Okularity uses software solely to take down social media accounts so that it can have those accounts taken down by companies like Instagram (FAC ¶ 15).  Okularity, through Nicolini, then negotiates extortionate demands on behalf of itself and the Clearinghouse Defendants. (FAC ¶ 16).  Nicolini is not an attorney, but engages in fraudulent acts on behalf of the enterprise, including asserting legal claims on behalf of his "clients," and negotiating resolution of legal claims on their behalf. .  (FAC ¶ 32).  Nicolini applies law to facts when

ENTTECH'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

negotiating, and deploys the lexicon of a licensed attorney (i.e. "FRE 408" "all rights reserved") to give the false impression that he a lawyer. *See* FAC ¶¶ 30-31 (screenshots). Nicolini and Okularity's acts of (1) advocating copyright "claims" for "clients," (2) negotiating settlements under FRE 408 on behalf of its "clients" and (3) reserving "rights" on behalf of his "clients" are all intended to deceive, and are an integral part of the scheme.

The FAC meets the burden of specificity under Rule 9(b) because it states specific statements, the source of the statements, where they can be found (in possession of Defendants) and explains why the statements are false or misleading. As such, the Motion should be denied as to Rule 9(b). *Transfresh Corp. v. Ganzerla & Assoc.*, 862 F. Supp. 2d 1009, 1019 (N.D. Cal. 2012) (finding that a plaintiff met Rule 9(b)'s pleading requirements where it identified specific statements, the source of the statements, where they can be found, and included allegations explaining why the statements are false and misleading).

## B.    The Noerr-Pennington Doctrine Does Not Apply

The *Noerr-Pennington* doctrine derives from the First Amendment's Petition Clause and immunizes those who petition the government from statutory liability for their petitioning conduct. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). There are four elements to a defense of immunity under *Noerr-Pennington*: (1) whether defendants' conduct constitutes a petitioning activity; (2) whether the proposed liability burdens that activity; (3) if so, whether a doctrinal exception applies, and (4) if no exception, whether the statute—here, RICO—must be construed to include the protected activity; if not, the court find the defendant immune from the statutory liability and the claim non-actionable. See Mercer, 2012 WL 12863934, at *3.

First, the automatic generation and dispatch of false materials, without attorney review let alone sent by an attorney – cannot amount to "pre-litigation activity." Rather, the fraudulent letters to Instagram were sent for sole, improper motive to have Instagram

13

shut down Plaintiff's social media account, so that Jon Nicolini, who, again, is not an attorney, could negotiate a settlement of over a million dollars.  No demand letter was ever sent to Plaintiff.  (FAC ¶ 51)   Indeed, no litigation was ever contemplated as no effort was made to resolve any legal claims by an attorney.  Thus, there was no "petition activity" that forms the basis of Plaintiff's claims.

Second, since there is no petitioning activity, neither ENTTech's statutorily authorized lawsuit under Section 512(f) of the DMCA nor the RICO claim burdens any lawful activity.

 Third, Defendants are alleged to have violated Section 512(f) of the DMCA and federal criminal statutes as predicates for the RICO claim.  "First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." *California Motor Transp. Co. v. Trucking Unlimite*d, 404 U.S. 508, 514 (1972).

Even if Defendants' claims were asserted by attorneys instead of by software and unlicensed CEO Jon Nicolini, it widely accepted that there "is no broad shield from RICO for advocacy, including in the litigation context." *Kruse v. Repp*, 2020 WL 1317479, at *20 (S.D. Iowa Mar. 20, 2020) (noting that attorney defendants furthered a RICO scheme in creating an LLC); *Garlock Sealing Techs., LLC v. Shein*, 2015 WL 5155362, at *3 (W.D.N.C. Sept. 2, 2015) ("the Court agrees with Plaintiffs that there exists no broad shield from RICO for attorney advocacy") (quotation omitted); *Lemelson v. Wang Labs., Inc.*, 874 F. Supp. 430, 434 (D. Mass. 1994) (upholding a RICO claim where plaintiff allegedly extorted millions of dollars in settlements through a pattern of litigation involving infringement claims based on fraudulently obtained patents); *Hall Amer. Ctr. Assoc. L.P. v. Dick*, 726 F. Supp. 1083, 1097 (E.D. Mich. 1989).

Courts have similarly rejected application of *Noerr Pennington* when defendants, as here, assert copyright claims when they are aware that they lack exclusive licensing rights. *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 352 (9th

Cir. 2014) (defendant's knowledge that it did not have exclusive licensing rights when it sent cease-and-desist letters threatening copyright infringement would satisfy the objectively baseless prong of sham exception).  The copyright authors here have extended licensing rights to both the Clearinghouse Defendants and Okularity.  Thus, neither has "exclusive licensing rights" to the subject images and neither cannot assert viable copyright claims on behalf of the authors.

**C.     The DMCA Claim Is Otherwise Plausible.**

As alleged in FAC ¶ 36, the DMCA creates a specific statutory cause of action like the one pleaded here.  Under § 512(f) of the statute, that "[a]ny person who knowingly materially misrepresents under this section ... that material or activity is infringing ... shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer ... who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing[.]"  *See* 17 U.S.C. § 512(f).  Defendants "face[ ] liability if [they] knowingly misrepresented in the takedown notification that [they] had formed a good faith belief the [photographs] were not authorized by the law, *i.e.*, did not constitute fair use."  *See Lenz*, 815 F.3d at 1154.  The FAC alleges, "the DMCA Notices are automatically generated and submitted without any attorney supervision" and that "Okularity does not engage in any analysis prior to generating and filing DMCA take-down notices as it should."  FAC, ¶ 27.  This fact that no attorney was involved is (alone) a specific and plausible basis for alleging that Okularity knew it was not acting in good faith when it issued a takedown notice – because, no non-attorney (let alone software) could engage in a "fair use" analysis under copyright law as Okularity was required to do.

**D.     The RICO Claim Is Otherwise Plausible.**

"There has been some judicial resistance to RICO, manifested in narrow readings of its provisions by lower federal courts. In four notable cases, the Supreme Court has

ENTTECH'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

corrected these narrow readings." *Odom v. Microsoft Corp.*, 486 F.3d 541, 545 (9th Cir. 2007). If a scheme is devised with the intent to defraud, and the mails [or wires] are used in executing the scheme, the fact that there is no misrepresentation of a single existing fact is immaterial. It is only necessary to prove that it is a scheme reasonably calculated to deceive, and that the mail service of the United States was used and intended to be used in the execution of the scheme. *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003) (quoting *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967)) (emphasis added).

Put another way, [t]he fraudulent nature of the 'scheme or artifice to defraud is measured by a non-technical standard. Thus, schemes are condemned which are contrary to public policy or which fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society *Id.* (quoting *United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980)) (internal quotation marks and citations omitted); *see also United States v. Ali*, 620 F.3d 1062, 1070–71 (9th Cir. 2010) (quoting *United States v. Munoz*, 233 F.3d 1117, 1131 (9th Cir. 2000)) ("Under the mail fraud statute the government is not required to prove any particular false statement was made. Rather, there are alternative routes to a mail fraud conviction, one being proof of a scheme or artifice to defraud, which may or may not involve any specific false statements.")

To successfully plead a RICO injury, Plaintiffs must satisfy two requirements. *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 957 (N.D. Cal. 2018). First, they must plausibly allege "a harm to a specific business or property interest." *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc). Second, they must plausibly allege that their injury has resulted in "concrete financial loss." *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008) (quoting *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc)), abrogated on other grounds by *Diaz*, 420 F.3d 897.

ENTTECH'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Both elements are pled in the FAC, which details Plaintiff was injured by Defendants' scheme to defraud by making false statements to Instagram to obtain control over the disposition of Paper's asset so that it could extort Paper. Put another way, Defendants "caused Instagram to disable Plaintiff's use of Instagram, which is its main source of revenue at the time the account was disabled. Defendants knowingly obstructed Plaintiff's ability to engage in commerce through improper means, which has caused, and will continue to cause Plaintiff significant damage, as yet to be ascertained." (FAC ¶ 55)

**E.  The FAC pleads a pattern.**

The FAC states that Okularity "filed forty-eight (48) DMCA take-down notices against Paper that Instagram disabled Paper's account." (FAC ¶¶ 29, 37) Some of the notices date back over three years. (FAC ¶ 37) Defendants scheme has been continuous since 2018 (FAC ¶ 56) A pattern has been adequately pled.

**F.  The FAC Pleads an "Enterprise."**

As the moving papers note, a properly pleaded enterprise requires (1) names of people or entities comprising it; (2) its structure, purpose, function, course of conduct; (3) information on whether defendants are employed by it; (4) statement on whether defendants are associated with it; and (5) statement on whether defendants are separate from, members of, or are the enterprise). Courts have not hesitated to dismiss RICO claims for failure to clearly identify the RICO enterprise. *E.g., Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645-46 (7th Cir. 1995); *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993)

First, the FAC alleged the names of the persons and entities (Defendants).

Second, the structure is explained in great detail. The Clearinghouse Defendants, engage Okularity (and Nicolini) as their "copyright agent" for the purpose of sending automated DMCA notices (FAC ¶ 49). Okularity uses software solely to take down social media accounts so that it can have those accounts taken down by companies lke

Instagram (FAC ¶ 15).  Okularity, through Nicolini, then negotiates extortionate demands on behalf of itself and the Clearinghouse Defendants. (FAC ¶ 16).

Third, the FAC adequately details the parties' relationships.  Nicolini is the CEO of Okularity.  (FAC ¶ 24).  The Clearinghouse Defendants actively solicits members of the public, including persons with whom it has no relationship and about whom it has no knowledge, to upload to it photos which Backgrid will then ostensibly "license" (for payment) others to display and otherwise exploit.  (FAC ¶¶ 25-26; 51).

Fourth (and fifth), the association between the conspirators is pled as an association in fact enterprise. (FAC ¶ 24).

# III.   CONCLUSION.

DATED: September 4, 2020                          TAULER SMITH LLP


By:   /s/ *Robert Tauler*
                                                 Robert Tauler
                                                 Attorneys for Plaintiff
                                                 ENTTech Media Group LLC

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 4, 2020, copies of the foregoing document were served by the Court's CM/ECF system to all counsel of record in this action.

Dated:  September 4, 2020                    **TAULER SMITH, LLP**


By: /s/ Robert Tauler
      Robert Tauler

Counsel for Plaintiff
ENTTECH MEDIA GROUP LLC