Robert Tauler (SBN 241964)
rtauler@taulersmith.com
Tauler Smith, LLP
626 Wilshire Boulevard, Suite 510
Los Angeles, California 90017
Tel: (310) 590-3927

Attorneys for Plaintiff
ENTTech Media Group LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENTTECH MEDIA GROUP LLC | Case No. 2:20-cv—06298-RGK (Ex) |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR:** |
| v. | |
| OKULARITY, INC.; JON NICOLINI; BACKGRID USA, INC.; SPLASH NEWS AND PICTURE AGENCY, LLC; AND XPOSURE PHOTO AGENCY, INC. | **(1) VIOLATIONS OF DIGITAL MILLENIUM COPYRIGHT ACT ("DMCA") (17 U.S.C. § 512(F));** |
| Defendants. | **(2) VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) (18 USC § 1962(C)); AND** |
| | **DEMAND FOR TRIAL BY JURY** |

Plaintiff ENTTech Media Group LLC ("Plaintiff") by and for its Second Amended Complaint, alleges on personal knowledge as to its own actions, and upon information and belief as to the actions of others, as follows:

## THE PARTIES

1.      Plaintiff ENTTech Media Group LLC is a Delaware limited liability company with a primary place of business in New York, New York.

2.      Defendant Okularity, Inc. ("Okularity") is a Wyoming corporation with a primary place of business in Beverly Hills, California.

3.      Defendant Jon Nicolini ("Nicolini") is an individual who, on information and belief, has a primary place of business in Beverly Hills, California.

4.      Defendant BackGrid USA, Inc. ("BackGrid") is a California corporation with a primary place of business in Redondo Beach, California.

5.      Defendant Splash News and Picture Agency, LLC ("Splash") is a Nevada limited liability company with a primary place of business in Los Angeles, California.

6.      Defendant Xposure Photo Agency Inc. ("Xposure") is a California corporation with a primary place of business in Beverly Hills, California.

7.      Defendants Backgrid, Splash and Xposure are referred to herein as the "Clearinghouse Defendants"

8.      Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1-10, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by the aforementioned defendants.

**JURISDICTION**

9. The Court has jurisdiction over the Plaintiff's claims under 28 U.S.C. § 1331 because they arise under a federal statute, the Digital Millennium Copyright Act ("DMCA") 17 U.S.C. 512(f) and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d).

10. The Court has personal jurisdiction over Defendants because they reside in this district and engaged in the conduct detailed herein in this district.

11. The Court further has personal jurisdiction over all members of the Okularity Enterprise detailed herein under 18 U.S.C. § 1965(b), which provides for nationwide service of process in RICO actions.

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

12. Defendants are engaged in a scheme to deprive Plaintiff and similar digital media companies of their assets by unlawfully manipulating the take-down notice provisions of the Digital Millennium Copyright Act ("DMCA"). Specifically, Defendants have created software for the express purpose of disabling valuable commercial accounts on social media platforms (in this case Instagram) so that they can then demand extortionate sums (in this case over a million dollars) from the account holders to have the accounts restored.

13. The scheme operates in the shadows of the Copyright Act and the DMCA. The DMCA provides a rapid procedure (referred to herein as a "DMCA Notice") so that copyright owners can protect the widespread proliferation of their content digitally. A DMCA Notice requires a statement under penalty of perjury that the submitting party has a good faith belief that the content identified in the notice is infringing on a copyright and that the submitting party is either the copyright owner or an authorized agent of the copyright owner.

14. Most social media platforms, including Instagram, have policies whereby accounts are disabled once a certain amount of DMCA Notices have been submitted on

a particular account.  Once an account reaches this threshold, Instagram will not reinstate the account until the underlying copyright "dispute" is resolved.  Because of the work associated with the identification and investigation of copyright claims, as well the DMCA's penalties for misstatements, it is generally unlikely that owners of legitimate copyrights would abuse this system.

15.    However, given the massive financial incentives provided to mercenary litigants by the Copyright Act, would-be claimants have leveraged advances in technology to create economies of scale in pursuing claims.  Specifically, Okularity has developed software that crawls the internet for images that infringe on allegedly protected works.[1]  Through its proprietary software, Okularity automatically generates and submits DMCA Notices to any social media platform, including Instagram, containing an image in Okularity's database.  Okularity does this without any of the investigation, warning, or legal analysis required by the DMCA, let alone any demand letter to the alleged infringer.

16.    Rather, Okularity lies in wait while DMCA Notices accumulate to the point where Instagram disables the account.  Only then does Okularity begin to negotiate "settlement" for the alleged copyright claims.  Okularity operates this way because Okularity knows that Instagram is the lifeblood of any digital media company, particularly one like Plaintiff Paper, which primarily is engaged in the business of reporting and commentary of popular culture news and, as such, targets a young demographic that uses Instagram as its primary source of media consumption.  Okularity knows that if a business like Paper has its Instagram account disabled, it has a metaphorical gun to the head of the target company, since it also knows that Instagram will not reinstate the account without a resolution of the "dispute."  With this type of leverage, Okularity (and in turn the Clearinghouse Defendants) can demand sums that

---

[1] Okularity is provided access to photographs by clearinghouse websites like BackGrid, Splash, and Xposed who, on information and belief, have entered into profit-sharing contracts with Okularity, whereby the parties all share in the exploits of their scheme.

they would never be able to demand with a straight face otherwise, putting owners of even large businesses like Plaintiff in a life-or-death situation.

17. The problem with Okularity's scheme, however, is that it is illegal. By automatically generating and submitting DMCA Notices, Okularity has failed to follow the terms of the DMCA.

18. More concerning, however, is that Defendants (1) are engaged in a scheme to deprive Plaintiff of its digital assets through a pattern of fraudulent statements made in DMCA Notices and directly to Plaintiff, (2) have intentionally interfered with Plaintiff's business by taking a course of action that they knew was substantially likely to deprive them of one of their primary digital assets prior to asserting any legal claim for settlement; and (3) are using unfair, fraudulent and illegal methods to carry out their scheme, further detailed herein.

**Plaintiff Paper Magazine**

19. Plaintiff is a New York City-based independent magazine focusing on fashion, popular culture, nightlife, music, art and film. Paper has gained popular renown for its online magazine and for its commentary on social media regarding current events on social media platforms like Instagram. Paper's Instagram account had over one million followers, generated after years of providing content, before their account was disabled on July 8, 2020.

20. Like many businesses based in New York, Plaintiff has faced unprecedented disruption resulting from the devastating impact of COVID-19, including dramatically reduced production capacity, lay-offs, and strict budgetary measures, among them a reduction in personnel managing content.

21. Adding to the managerial changes, since the closure of its physical office space on March 16, 2020, Plaintiff has integrated a new management structure that operates social media accounts remotely and by necessity without the pre-COVID training and procedures that existed prior to the crisis.

22.    Plaintiff first learned the objective of Defendants scheme on July 8, when it was informed by Instagram that it would be disabling Plaintiff's account due to Okularity's repeated DMCA Notices.

23.    Plaintiff's CEO immediately contacted Defendants, and was faced with the extortionate demand of $4.6 million dollars, in exchange for informing Instagram that the dispute was resolved so that Plaintiff could get its asset back.

**Defendants**

24.    Okularity, which is not a law firm, purportedly "represents" the "Clearinghouse Defendants" with respect to their Copyright "claims."  Okularity's "CEO" Jon Nicolini, created the software Okularity deploys to file DMCA Notices, and negotiates "settlements" with victims of the scheme once they contact Okularity. Nicolini, who is not an attorney, implies that he is an attorney to victims by interpreting the application of the Copyright Act to images, engaging in damages analysis regarding "claims" of his "clients," and by negotiating resolution of legal claims on their behalf.

25.    Defendant Backgrid actively solicits members of the public, including persons with whom it has no relationship and about whom it has no knowledge, to upload to it photos which Backgrid will then ostensibly "license" (for payment) others to display and otherwise exploit.  Backgrid then uses software to automatically generate copyright management information ("CMI") so that it can track whenever an image is used.  Since Backgrid conducts no due diligence of images uploaded to its website for exploitation, and the corollary opportunity for abuse, Backgrid itself has been sued by actual copyright holders for copyright infringement.[2]

26.    Defendant Splash is similarly a clearinghouse for photographs with a checkered past.  In 2018, Splash was sued by athletic star Odell Beckham for its "predatory and distasteful" tactics, which included demanding payment from Mr. Beckham for posting a picture of himself (taken by a paparazzo) on his very own social

---

[2] See, e.g. *Dlugolecki v. Backgrid*, Case 2:18-cv-09400  (C.D. Cal.)

SECOND AMENDED COMPLAINT

media account.  *Beckham v. Splash*, Case 2:18-cv-01001-JTM-JCW (E.D. La.).
Counsel for Beckham viewed the $40,000 demand as an attempt to "extort."

27.    Okularity's new business model pre-empts such lawsuits by using DMCA
Notices instead of demand letters. However, since the DMCA Notices are automatically
generated and submitted without any attorney supervision, Okularity does not engage in
any analysis prior to generating and filing DMCA take-down notices as it should.

28.    Rather, Nicolini operates the scheme with the sole objective to disable
social media accounts.  Not only is no demand letter needed, the scheme makes it so that
its victims come to Okularity, often in a state of desperation, once they realize their asset
is being held hostage. This is precisely what occurred in the instant case.

### Okularity's Conduct Against Paper

29.    It was only after Okularity filed forty-eight (48) DMCA take-down notices
against Paper that Instagram disabled Paper's account.  The same day, July 8, 2020
Paper was provided with the contact information of Nicolini, who immediately began
negotiating the "claims."

30.    Nicolini suggested that Paper was facing $4.65 million in damages under
the Copyright Act. Nicolini curiously added that it was not his "first rodeo."[3]   A
screenshot of the email is below:

---

[3] Indeed, Mr. Nicolini has been engaged in the development of copyright trolling
software since at least 2012, when he worked as "Chief Technological Officer" for a
similar scheme that scraped bit torrent websites for information about users downloading
copyrighted pornographic material. The software was used to obtain IP addresses for the
individuals who downloaded the material, and who were subsequently threatened with a
public lawsuit if they did not pay Mr. Nicolini's former employer their extortionate
demands.  That "rodeo" ended with the attorney mastermind being sentenced to 14 years
in prison:  https://www.startribune.com/judge-throws-the-book-at-minneapolis-lawyer-
who-ran-a-porn-trolling-scheme/511302022/?refresh=true

SECOND AMENDED COMPLAINT

**From:** Jon Nicolini <jon@okularity.com>
**Date:** Wednesday, July 8, 2020 at 5:56 PM
**To:** Tom Florio <tom@paperentertainment.com>
**Cc:** Lily Kwong <lily@paperentertainment.com>, Chris Dudley <chris@okularity.com>
**Subject:** Re: PAPER

FRE 408

Tom,

We don't have settlement authority yet, but please cut to the chase with your settlement offer, hopefully acknowledging that each copyright infringement where a timely registered work exists could fetch up to $150,000, for a total of $4.65 million.

Your brand and magazine are world-renowned, so it would help immensely to show the rightsholders your alleged dire financial straits by way of financial statements, P&Ls, etc. This isn't our first rodeo, and we've often been lied to and deceived in the past.

We are a small operation and I'm in the throes of familial illness and a close friend passing away today, but I will make every effort to ensure a swift reactivation provided we can get this settled.

All rights reserved.

Thanks,
Jon

31.     Sixteen minutes later Nicolini responded, this time with apparent authority to communicate on behalf of his "clients" under Federal Rule of Evidence 408 to settle for $1.01 million:

**From:** Jon Nicolini <jon@okularity.com>
**Date:** Wednesday, July 8, 2020 at 6:12 PM
**To:** Tom Florio <tom@paperentertainment.com>
**Cc:** Lily Kwong <lily@paperentertainment.com>, Chris Dudley <chris@okularity.com>
**Subject:** Re: PAPER

FRE 408

Tom,

Thank you for your email and wishes. We have authority as follows—

BackGrid - $650k ($30k per registered, $5k per unregistered)
Splash - $315k (same as above)
Xposure - $45k (same as above)

All rights reserved.

Thanks,
Jon

SECOND AMENDED COMPLAINT

32.     However, Nicolini is not an attorney and is therefore unable to assert legal claims on behalf of his "clients," and likewise cannot negotiate and enter into agreements on their behalf in the context of a copyright lawsuit.

33.     Needless to say, this offer was unable to be accepted.  In further effort to reach a resolution, the undersigned requested Mr. Nicolini provide the DMCA notices so that Plaintiff could assess the claims at issue.  Nicolini has refused to do in the absence of a "non-disclosure agreement."  When asked why a "non-disclosure agreement" would be needed, Nicolini had no answer.

34.     Thus, Plaintiff brings the following claims against Defendants so that their conduct can be abated, so the court can enjoin Defendants' unlawful business practices, and so that Plaintiff could have its account restored.

## COUNT ONE

## (VIOLATION OF DMCA §512(f))

35.     Plaintiff repeats and reincorporates the foregoing paragraphs as though set forth fully herein.

36.     17 U.S.C. §512(f) provides that "[a]ny person who knowingly materially misrepresents under this section ... that material or activity is infringing ... shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer ... who is injured by such misrepresentation, as the result of ... relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing[.]

37.     On at least 48 instances in 2019 and 2020 Defendants willfully, knowingly and materially made third-party §512(f) misrepresentations to Instagram stating that Plaintiff's images, some over three years old, were infringing intellectual property rights owned by one of the Clearinghouse Defendants.

38.     In reliance on Defendants' misrepresentations, Instagram disabled Plaintiff's account on July 8.  At the time, Paper's Instagram account has over a million

8

followers, and was a large source of revenue for Paper.   Paper currently has various business arrangement that include Paper's publication on Instagram, and these business transactions are threatened by Defendants' misconduct.

39.    Defendants are aware that social media platforms like Instagram use algorithms to disable accounts after any given account receives a certain amount of DMCA notices.  Once this threshold is met, Instagram's policy is to not restore a user's account "until those [copyright] claims have been fully resolved by a court."  Instagram publishes its policies publicly.

40.    Defendants' misconduct includes its failure to take into consideration "fair use" as a defense to their alleged claims.  Such consideration is particularly needed when the DMCA notices are aimed at disabling a social media account that is in the business of commenting on popular news and culture.

41.    Not only did Defendants fail to consider fair use, they never sent any demand letter to Plaintiff until after Instagram disabled Plaintiff's account.  Nor is it clear that Okularity has any right to send DMCA notices on behalf of BackGrid, Splash, or Xposure.

42.    In this regard, Defendants have been unwilling to provide to Plaintiff evidence of their right to file DMCA notice or any evidence of their representation of any claims.

43.    Plaintiff seeks damages and attorneys' fees for Defendants' bad-faith conduct under 17 U.S.C. §512(f)

## COUNT TWO

### (Violation of RICO)

44.    Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

45.    18 USC § 1962(c) provides in relevant part:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…

46.     18 USC § 1961(1)(A) defines "racketeering activity" in pertinent part as "any act or threat involving … bribery, [or] extortion…which is chargeable under State law and punishable by imprisonment for more than one year…"  Extortion also includes anyone who "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce," 18 USCS § 1951

47.     Racketeering activity also includes any scheme using the mails or wires in furtherance of a scheme to defraud. The fraudulent statements themselves need not be transmitted by mail or wire; it is only required that the scheme to defraud be advanced, concealed or furthered by the use of the U.S. mail or wires. See 18 U.S.C. §§ 1341, 1343

48.     At all relevant times, Okularity, Nicolini, Backgrid, Splash, and Xposed were "persons" under the meaning of 18 U.S.C. § 1961(3), because they are all "capable of holding a legal or beneficial interest in property."

49.     Okularity was associated with the association-in-fact enterprise described herein as the "Okularity Enterprise," because it was the vehicle upon which the scheme to defraud predicated its scheme of extortion.   Plaintiff is informed and believes that the Clearinghouse Defendants participated in the conduct of the enterprise by designating Okularity (and thus, Nicolini) as their "copyright agent" and by accepting a share of the unlawful profits of the enterprise.

50.     Okularity sent fraudulent DMCA notices to Instagram, ostensibly on behalf of the Clearinghouse Defendants, with the purpose to defraud Instagram into disabling Plaintiff's account with Instagram.  Okularity did so numerous times in June 2020. Each time, Nicolini requested:

10

SECOND AMENDED COMPLAINT

1       \*\*\* PLEASE NOTE we've already sent 13 [and various other numbers, at

2       different times] takedown notifications for the account in question:

3       papermagazine. The Instagram Terms of Use clearly state: "If you repeatedly

4       infringe other people's intellectual property rights, we will disable your account

5       when appropriate." Thus, we strongly urge you to disable this account

6       immediately. \*\*\*

7 Doing so was objectively unreasonable, and it was subjectively a sham, because

8 Okularity and Nicolini knew that they had not undertaken a good faith assessment of

9 whether Plaintiff's use of any images was not authorized by the law.  This knowledge is

10 imputed to their principals, namely, the Clearinghouse Defendants.  In fact, the

11 Clearinghouse Defendants had no right to issue DMCA notices.  This is because the

12 Clearinghouse Defendants did not possess exclusive rights in the photos.  To the

13 contrary, the authors of the photographs had previously granted licenses (express or

14 implied) that allowed others to publish or promote them.  At least one of the photos (and

15 possibly more than one) had been posted on Instagram, thereby affording Instagram an

16 express license (under the Instagram terms of use) to publish it.  For instance:

17

18

19

20 

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT

The Clearinghouse Defendants attached the same photograph as part of an exhibit to their fraudulent and extortionate complaint in the Second Action (Docket No. 1-5 at Page ID #57).  Many (if not all) of the photos were also distributed widely across other internet sites, thereby implicitly licensing the public at large to use them.  For instance:



SECOND AMENDED COMPLAINT

The Clearinghouse Defendants exhibit a partly-cropped copy of the same photograph as an exhibit to their sham complaint in the Second Action (Docket No. 1-4 at Page ID #38-39).  In some of those instances, the publishers expressly gave "photo credit" to other entities – other than these Clearinghouse Defendants – such as "SPW" and "THEREALSPW."

51.     Those DMCA notices were fraudulent because they each contained "[a] statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law."  Plaintiff does not actually *know* with *certainty* whether all of the notices contained this statement – because, Defendants have disregarded its requests to see copies of the notices – but such a statement is required by § 512(c)(3)(A)(v) of the DMCA, which makes it highly likely that each of the notices did contain exactly this statement.  Defendants knew that this statement was false (which is, in fact, the reason why they are concealing their DMCA notices from Plaintiff).  When Okularity (acting through Nicolini), submitted the DMCA notices to Instagram (on behalf of their principals, the Clearinghouse Defendants Backgrid, Splash, and Xposure), Nicolini knew (and thus, Okularity and all of its principals also knew) that no "good faith" basis existed for believing that Plaintiff's uses of the images were unauthorized.  Rather, the Defendants all knew that the notices were based solely on the results of a software application created to scan the internet for copies of images in which copyrights had been claimed – without any inquiry (much less, a good faith inquiry) into whether the uses of those images were "authorized by the copyright owner, its agent, or the law." *See generally Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1151-56 (9th Cir. 2016).

52.     The Okularity Enterprise and its members also engaged in multiple acts of extortion, as defined under 18 USC § 1951.  After bombarding Instagram accounts belonging to victims like Plaintiff with improper DMCA Notices, Okularity and Nicolini lie in wait until Instagram eventually disables the victim's account.  Only then

do Okularity and Nicolini begin to negotiate settlement of their "copyright claims."  In operating in this way, Okularity and Nicolini "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce," under 18 USC § 1951.

53.    The Clearinghouse Defendants have recently continued their conduct of the Okularity Enterprise by filing a second, separate lawsuit on July 29, 2020 (Case No. 2:20-cv-06803, or the "Second Action"), which sought to enjoin Plaintiff's use of the images identified in the DMCA Notices on Instagram – again, purposely without regard to the truth or falsity of the allegation that any of Plaintiff's uses of the photographs was prohibited by law.  This was done for a purpose that the Clearinghouse Defendants subjectively understood was improper.  Defendants are aware that Instagram's policy is to prohibit access to a disabled account when a claim for injunctive relief is filed – without regard for whether such a claim is believed subjectively to be valid, and without regard to whether it is objectively invalid.  Their alleged claim for injunctive relief in the Second Action Case was a sham, because the Clearinghouse Defendants never even moved for any injunctive relief at all.  Thus, the only effect of their claim for injunctive relief in the Second Action was that Plaintiff's Instagram account remained disabled, pursuant to Instagram's internal policy, and so that the Clearinghouse Defendants can continue with the same fraudulent and extortionate scheme commenced by Okularity and Nicolini.

54.    The Court in the Second Action dismissed the complaint without prejudice, and that case is now closed.  Among other reasons, the prayer for injunctive relief in the Second Action – seeking removal of the claimed images from Instagram – was objectively a sham, because it had the intended and the perverse effect of ensuring that Plaintiff cannot remove any images from its Instagram account, for the simple fact that they cannot obtain access to the account under Instagram's policies.   Again, all the Defendants are aware of this, and they have continued to refuse to allow Plaintiff access to its Instagram account so that it might remove the subject images.  Instead, they have

continued to make extortionate demands based on the leverage they obtained solely from their own misconduct – such as one of their attorneys offering explicitly "to withdraw our request for injunctive relief and the [Instagram] account can go back up," but only if Plaintiff were to concede liability on the unfounded copyright infringement claims of the Clearinghouse Defendants in the Second Case and submit to arbitration concerning the claimed "damages."  An executive of Defendant Backgrid subsequently emailed Plaintiff's CEO, offering a purported "discount" off the earlier extortionate demands – while adding, "[a]s soon as every party has signed to acknowledge agreement with these terms, I'll tell my attorneys to allow your website [*sic*] to go back up while they prepare a formal settlement agreement."  None of the Defendants has any plausible legal right to control Plaintiff's access to its disabled Instagram account, and they all consciously know this.

55.    Plaintiff was injured by Defendants' scheme to defraud and extort because it caused Instagram to disable Plaintiff's use of Instagram, which is its main source of revenue at the time the account was disabled.  Defendants knowingly obstructed Plaintiff's ability to engage in commerce through improper means, which has caused, and will continue to cause Plaintiff significant damage, as yet to be ascertained.

56.    On information and belief, the above scheme has been continuous since 2018.

57.    Plaintiff seeks compensatory damages, treble damages, and its reasonable expenses (including attorney's fees) under the RICO statute.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.    For general damages in an amount to be proven at trial;

2.    For pre-judgment interest;

3.    For treble damages under Count 2;

4.    For attorneys' fees under Count 1 and Count 2;

15

1    5.    For costs of suit; and

2    For such other and further relief as the court deems just and proper.

3

4

5    DATED: October 16, 2020                    TAULER SMITH LLP

6

7
                                      By:    /s/ Robert Tauler
8                                            Robert Tauler
                                             Attorneys for Plaintiff
9                                            ENTTech Media Group LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                      16

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2020, copies of the foregoing document were served to all counsel of record through the Court's CM/ECF system.

DATED: October 16, 2020                    TAULER SMITH LLP


By:    /s/ Robert Tauler
       Robert Tauler
       Attorneys for Plaintiff
       ENTTech Media Group LLC

SECOND AMENDED COMPLAINT