1  Robert Tauler (SBN 241964)
2  rtauler@taulersmith.com
   Tauler Smith LLP
3  626 Wilshire Boulevard, Suite 510
   Los Angeles, California 90017
4  Tel: (310) 590-3927

5  Attorneys for Plaintiff
   ENTTech Media Group LLC,

6

7

8  ## UNITED STATES DISTRICT COURT

9  ## CENTRAL DISTRICT OF CALIFORNIA

10 | ENTTECH MEDIA GROUP LLC | Case No. 2:20-cv-06298-RGK (Ex) |

11 |           Plaintiff, | Assigned to Hon. R. Gary Klausner Courtroom 2 |

12 |      v. | |

13 | OKULARITY, INC., *et al*. | **PLAINTIFF ENTTECH MEDIA GROUP LLC, TAULER SMITH LLP, AND ROBERT TAULER, ESQ.'S RESPONSE TO ORDER TO SHOW CAUSE RE SANCTIONS UNDER RULE 11(c)(3) OF THE FEDERAL RULES OF CIVIL PROCEDURE [DKT. 54]** |

14 |      Defendants. | |

15

16

17 |  | Hearing Date:  February 11, 2021 |

18 |  | Time:          9:00 a.m. Place:         By videoconference |

19 |  | Hon. R. Gary Klausner |

20

21

22

23

24

25

26

27

28

---

OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS

1

# **TABLE OF CONTENTS**

2 | TABLE OF AUTHORITIES ............................................................................... ii

3 | I. OVERVIEW ............................................................................................ 1

4 | II. FACTS .................................................................................................. 3

5 | A. Okularity's Actions and Mr. Tauler's Background Investigation ........................... 3

6 | B. In Deposition, Nicolini Confirmed that he Lacks An Understanding of Fair
7 | Use and Could Not Have Conducted a Sufficient Analysis ......................................... 6

8 | C. Nicolini Confirms at his Deposition that Okularity Employs an Automated
System to Request Instagram Account Deactivation ................................................ 10

9 | D. Nicolini's Self-Serving and Conclusory Declaration does Nothing to Avail
His Ignorance of Fair Use ........................................................................... 10
10

11 | III. ARGUMENT ......................................................................................... 11

12 | A. Defendants' Motion is a Thinly Veiled and Improper Discovery Device .............. 11

13 | B. The TAC Accurately Alleges Okularity's Deficient Fair Use Analysis ................. 13

14 | C. The TAC Properly Alleges Defendants' Scheme ............................................ 15

15 | D. The True Amount of Takedown Notices Cannot be Known Without
Discovery ............................................................................................ 15

16 | E. Defendants Improperly Attempt to Turn this Motion into a Summary
17 | Judgment Motion .................................................................................... 16

18 | F. ENTech's Prior Complaints are Superseded by the TAC and Irrelevant ................ 18

19 | IV. CONCLUSION ...................................................................................... 18

20 | CERTIFICATE OF SERVICE ......................................................................... 20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Cases

*Almeida v. Bennet Auto Supply, Inc.*, 335 F.R.D. 463 (S.D. Fla. 2020)...........................11

*Bullen v. De Bretteville*, 239 F.2d 824 (9th Cir. 1956)................................................16, 17

*Donaldson v. Clark*, 819 F.2d 1551 (11th Cir. 1987).......................................................10

*Fathers & Daughters Nev., LLC v. Lingfu Zhang*, 284 F. Supp. 3d 1160 (D. Or. 2018) ................................................................................................................................15

*Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169 (2d Cir. 2018) ..........................12

*Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542 (9th Cir. 1989) ................................................................................................................................16

*Holgate v. Baldwin*, 25 F.3d 671, 676 (9th Cir. 2005) ....................................................10

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 244 F.R.D. 70 (D. Me. 2007) ................................................................................................................................10

*L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924 (9th Cir. 2002) ...............................12

*Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012)..................................................16

*Lenz v. Universal Music Corp.*, 815 F.3d 1145 (2015) .............................................12, 14

*Lichtenstein v. Consolidated Serv. Group, Inc.*, 173 F.3d 17 (1st Cir. 1999) .................10

*Loux v. Rhay*, 375 F.2d 55 (9th Cir. 1967).......................................................................16

*Marble Bridge Funding Grp. v. Liquid Capital Exch., Inc.*, 2016 U.S. Dist. LEXIS 75545 (N.D. Cal. June 8, 2016).......................................................................................10

*Pacific & S. Co. v. Duncan*, 744 F.2d 1490 (11th Cir. 1984) .........................................12

*Righthaven LLC v. Hoehn* , 716 F.3d 1166 (9th Cir. 2013)..............................................15

*Ross v. Mukasey*, 2009 U.S. Dist. LEXIS 130020 (D. Colo. Nov. 24, 2009) .................15

*Safe-Strap Co., Inc. v. Koala Corp.*, 270 F. Supp. 2d 407 (S.D.N.Y. 2003)...................15

*Thomas v. Capital Security Servs., Inc.*, 836 F.2d 866 (5th Cir. 1988)...........................10

Statutes

17 U.S.C. § 107.............................................................................................................8, 12

Rules

Federal Rules of Civil Procedure 11(c)(2) ....................................................................3, 17

Other Authorities

5A Wright & Miller, *et al.*, *Federal Practice and Procedure: Civil* § 1335 (4th ed. & Supp. 2020)..................................................................................................9

Fed. R. Civ. P. 11, Notes of Advisory Committee on 1983 Amendments......................10

Fed. R. Civ. P. 11, Notes of Advisory Committee on 1993 Amendments.................10, 17

William W. Schwarzer, Sanctions Under the New Federal Rule 11 – A Closer Look, 104 F.R.D. 181, 204 (1985) ......................................................................10

Plaintiff ENTTech Media Group LLC ("Plaintiff" or "ENTTech") hereby submits its brief in response to the Order to Show Cause (Dkt. 74) with respect to Defendants Jon Nicolini ("Nicolini"), Okularity, Inc. ("Okularity"), BackridUSA, Inc. ("Backgrid"), Splash News and Picture Agency, LLC ("Splash"), and XPosure Photo Agency, Inc. ("Xposure") [1] (collectively, "Defendants").

## I.   OVERVIEW

ENTTech's allegations are not, as Defendants portray, about the simple reproduction of images by Plaintiff. Rather, ENTTech's allegations stem from Defendants' manipulation of the DMCA by using automated processes for the sole purpose of disabling ENTTech's Paper Magazine Instagram account. Defendants do this only so that they can then demand exorbitant sums to restore ENTTech's Instagram account, which is a valuable asset for ENTTech, who is in the business of reporting on popular culture news.

It is not disputed that Defendants transmitted more than thirty DMCA notices over s span of less than a month using automated software.  The complaints all allege that Defendants did this without any fair use analysis, which has since been confirmed by Nicolini himself who testified that the fair use statements made in Defendants DMCA Notices were automatically generated and therefore identical in every respect.

The evidence also demonstrates that no investigation as to the allegedly infringing images was ever undertaken by Nicolini, the so-called "copyright agent" of the Clearinghouse Defendants, who testified that he "targeted" Paper Magazine using his software for express purpose of finding photos similar to those in the Clearinghouse Defendants' database.  No investigation was undertaken as to who actually owned the photos (several were owned by companies other than the Clearinghouse Defendants) and no investigation was done as to whether the images were licensed (or sublicensed) to Paper Magazine.

---

[1] All five defendants shall be referred to herein collectively as "Defendants." Backrid, Splash News and XPosure shall be referred to collectively as the "Clearinghouse Defendants."

No analysis by Nicolini was needed to advance Defendants' objective of disabling ENTTech's Instagram account. The DMCA Notices automatically generated a demand "strongly urg[ing]" Instagram to take down ENTTech's account. When asked why this demand was part of the software, Nicolini had no answer, but the truth is evident. Defendants demanded that the account be taken down before ever contacting ENTTech directly so that they could negotiate while holding ENTTech's asset hostage. Defendants knew that they had the ability to give the asset back, and so they demanded **over a million dollars** initially to restore the account. The reality is that some of the images have zero value to Plaintiffs, because they don't have the rights they have allegesd. While other photos at issue have a value close to zero – this is according to the testimony of Backgrid's owner who haplessly suggested that a three year old paparazzi photo of Rihanna could have obtained $2,500-$5,000 if it were licensed to Plaintiff (Exhibit I, Ginsberg Depo at 53:24-54:).

The allegations in the Third Amended Complaint (the "TAC," Dkt. 57) summarize in more detail Defendants' scheme, which was uncovered as a result of extensive background research by ENTTech's counsel Robert Tauler ("Tauler") (with the assistance of attorneys and paralegals at his law firm "Tauler Smith") and direct communication by Tauler with Nicolini, Chief Executive Officer of Defendant Okularity who designed the software at issue. In total, Tauler Smith spent more than 58.30 hours researching the facts of this case, including Defendants' past pattern and practices, as well as researching the legal basis for the original complaint. As demonstrated below, the facts uncovered before filing the original complaint far exceed the requirements of Rule 11.

The underlying facts were confirmed during the December 28, 2020 deposition of Nicolini, which focused only on his sworn declaration in support of Defendants Motion for Rule 11 sanctions that stated he and he alone conducted a fair use analysis of all images subject to the DMCA Notices (Dkt. 39-7). Contrary to the implications of his declaration, Nicolini displayed a thorough lack of understanding of copyright fair use.

Nicolini did not know the various elements of fair use and did not understand various factors courts consider for the simple reason that he stated he doesn't read, let alone apply, any cases dealing with fair use. Nicolini's testimony by itself, detailed below, provides ample support for the allegations in the TAC.

There is no objectively reasonable factual basis to invoke Rule 11 or any of the alternative grounds cited by Defendants. Rather, the only sanctions warranted are the attorney's fees that ought to be awarded to ENTTech as the "prevailing party," under Rule 11(c)(2) – because, the Defendants' requests for sanctions are themselves objectively frivolous, and brought in bad faith. Largely, this is because Defendants and their counsel knew, or should have known, that they failed to conduct the investigation demanded when filing a motion, particularly a motion that calls into question the integrity of opposing counsel. Defendants motion is objectively unreasonable, and as such it should be denied. Moreover, the Court should award Plaintiff its attorneys' fees under Rule 11(c)(2).

## II.   FACTS

### A. Okularity's Actions and Mr. Tauler's Background Investigation

As alleged in the TAC, on July 8, 2020, ENTTech discovered their Instagram account was disabled. That was when Instagram notified ENTTech that it was being treated as a repeat copyright infringer under Instagram's policy, solely because Okularity, through Nicolini, had issued a barrage of DMCA notices. TAC, ¶¶ 22, 29, 39. Each DMCA Notice contained the following statement:

> PLEASE NOTE we've already sent [___] takedown notifications for the account in question: papermagazine. The Instagram Terms of Use clearly state: "If you repeatedly infringe other people's intellectual property rights, we will disable your account when appropriate." Thus, ***we strongly urge you to disable this account immediately.***
>
> (Dkt 53-13 at pages 943, 946, 951, 953, 956, 959, 962, 965, 968, 971, 973, 975, 977, 979, 981, and 988)(emphasis added)

The blank space in the above form statement are part of a "template" used by Okularity's software. (Declaration of Robert Tauler ["Tauler Dec."] Ex. C [selected portions of deposition of Jon Nicolini] at 40:13-41:3) The software automatically generates a number for each DMCA Notice after the third submission to a targeted account (Tauler Dec., Ex. C at 42:2-43:25).

Okularity's software "searches for offending photographs" then "compare[s] it against the photographs owned by the photo agencies" (Tauler Dec., Ex. C at 36:6-). As to Paper Magazine, Nicolini made it so that "each time Paper posts [on Instagram], the software will look at the post and determine whether or not it matches a photograph owned by a photo agency" (Tauler Dec., Ex. C at 31:14-19) From there, the software engages what is known as a "command-line-driven script" to automatically generate and submit notices, such that Nicolini does not even need to hit "send." (Tauler Dec., Ex. C at 95:15-96: 4)

ENTTech had no reason to suspect its Instagram was being targeted by Okularity using automated processes as just described. Nicolini never made any attempt to notify ENTTech of the alleged infringement claims despite demanding that their Instagram be taken down on dozens of occasions because it "never occurred" to him. (Tauler Dec., Ex. C at 79:13-21) Eventually, ENTTech's Paper Magazine Instagram account was disabled because of Defendants DMCA Notices (TAC ¶ 29).

Stunned at the prospect of losing their asset, ENTTech reached out to Nicolini asking what it would take to get their asset back. *Id.* Nicolini suggested that thirty-one photos then at issue could "fetch" $150,000 each, for a total of $4.65 million in "damages" under the Copyright Act. TAC, ¶ 30. Sixteen minutes later, Nicolini announced his authority to communicate on behalf of his "clients" – expressly invoking Rule 408 of the Federal Rules of Evidence – to settle with ENTTech for $1.01 million. TAC, ¶ 31. In exchange for the million dollar "settlement," Okularity, through Nicolini, offered to induce Instagram to reinstate ENTTech's Instagram account. TAC, ¶ 23.

The same day, Tauler was retained to investigate.  From July 8 until July 15, when the original complaint was filed, Tauler Smith spent a total of 57.80 hours researching and developing the case according to billing records maintained by the firm.  (Tauler Dec., Ex. G)   Westlaw records indicate that over 150 factual and legal documents and searches were conducted.  Legal records were discovered as part of this research reviewing Defendants' previous copyright disputes. (Tauler Dec., ¶  2).   This research led to the discovery of numerous facts pertinent to the claims in this case..

First, Tauler learned that, despite its designation as a copyright "agent," Nicolini and Okularity have no formal legal training. Tauler discovered a 2012 declaration which provided insight into his qualifications. (Tauler Dec., ¶ 3, Ex. B [the "Nicolini 2012 Dec."]) That declaration was filed by Nicolini in a litigation matter in the U.S. District Court, District of Massachusetts. *Id*. In the 2012 declaration, Nicolini described his background and prior role as "Chief Technology Officer" of something called "Copyright Enforcement Group, LLC" ("CEG"). (Nicolini 2012 Dec. ¶ 1). Nicolini described in this 2012 declaration  how CEG developed an automated system of issuing DMCA notices, which he supervised. *Id.* ¶ 32.   Again, Nicolini never stated, and does not now claim, to have any legal training whatsoever, let alone any training as to what constitutes "fair use." Westlaw research also revealed Okularity's role in advancing copyright claims brought by Backgrid by sending demand letters and filing repeated lawsuits.(Tauler Dec., ¶ 2.

In addition to using Westlaw, Tauler downloaded at least two online articles about Okulaity that bear date-stamps of when they were downloaded.  The first, downloaded July 9, 2020, stated that Okularity is "a company whose business it is to find copyright protected images and video through special software." (Tauler Dec., ¶ 5 Ex. D)

The second article, from InStyle Magazine, titled  "Hundreds of Instagram Accounts Have Been Shut Down Over Photos Like This," downloaded on July 9, 2020, refers to the growing phenomenon of social media account take-downs based on Copyright claims and explicitly states "Accounts like these started getting deleted when

BackGrid started outsourcing its copyright enforcement to Okularity, a company that scans the Internet for the like when fan accounts share paparazzi photos they don't own the rights to — which led to hundreds of accounts getting deleted last summer." (Tauler Dec., ¶ 6 Ex. E)

Okularity's own website (downloaded July 12, 2020) states that it is "an image company" that has "spent years perfecting software designed to accurately and reliably and, match, and ultimately secure your likeness, images, photography, and video at little cost to you" (Tauler Dec., ¶ 7 Ex. F)

Despite already conducting the above due diligence, Tauler spoke to Nicolini and his counsel Peter Perkowski on the phone on July 14th.  (Tauler Dec., ¶ 10 ) Counsel inquired whether Okularity's DMCA Notices are automatically generated by software. (Tauler Dec., ¶ 10 ) Perkowski deferred to Nicolini to answer because he did not want to answer as he was not involved.  Contrary to Mr. Nicolini's declaration, but consistent with his deposition, Nicolini confirmed that indeed Okularity used software to take down Paper Magazine's Instagram account.

All of the above factual research made it abundantly clear that Nicolini did not and *could not* make a good faith effort to review ENTTech's Instagram posts in a manner compliant with the DMCA he relied completely on software to determine ownership and fair use, among other things.  Even if Nicolini assessed each photo for fair use before submitting DMCA notices (which is not alleged) his lack of legal training would make him inadequate for the task, considering he does not reference any legal materials or obtain any assistance from any third party when conducting his purported "analysis." (Dkt 63-1, Nicolini Dec. ¶¶ 4-5).

Tauler also reviewed a spreadsheet provided by Nicolini to ENTTech. (Tauler Dec. ¶ 9). That spreadsheet is referenced in Nicolini's declaration, filed in support of Defendants' motion (Dkt. 39-7, ¶8). The spreadsheet itself makes clear that DMCA notices were transmitted on behalf of companies that do not appear to possess the exclusive rights to the images references in the notices.

**B. In Deposition, Nicolini Confirmed that he Lacks An Understanding of Fair Use and Could Not Have Conducted a Sufficient Analysis**

In deposition, Nicolini's testimony confirmed Tauler's observations that Nicolini does not possess even a minimal understanding of fair use and could not have adequately made a fair use determination in this case. When asked to summarize his understanding of fair use, Nicolini was at a complete loss. Nicolini could not name the elements of fair use.

> Q   Okay.  Do you know any of the four elements?
> A   Yes.
> Q   Can you name one?
> A   A commercial use.
> Q   Okay.  So you believe commercial use is one element of fair use?
> A   Whether or not the use is commercial?
> Q   Okay.  So that's one element.  Do you know any others?
> A   The purpose.
> . . .
> Q   Isn't that the same element?
> A   I think how a photograph would be used.
> Q   Okay.  Anything else?
> A   How much of it is used.
> Q   Anything else?
> A   Off the top of my head, no.

(Tauler Dec. ¶ 4, Ex. C at 9:18-10:11)

When asked about Nicolini's education related to fair use, he could not recall a single judicial opinion he had read or any legal research he conducted:

> Q   Have you ever looked at a legal opinion with respect to fair use in the copyright law?
> A   From a judge?
> Q   Yes.
> A   I believe I have.
> Q   Do you remember when that was?
> A   No.
> Q   So five years ago?  Ten years ago?
> A   I think it would be more recent than five years ago.
> Q   Do you remember what the case was?
> A   It was about fair use.
> Q   Do you remember the name of the case?
> A   No.
> Q   Do you remember where the court was?
> A   I would think it was either the Ninth Circuit or a court here, locally.
> Q   Do you remember what the case was about?
> . . .
> A   No.

---

7

1  *Id*. at 14:1-14

2      Nicolini had only a vague recollection of reading fair use literature in the past, but

3  could not recall a single specific document that he read. *Id*. at 14. Nicolini attempted to

4  engage in a fair use analysis at his deposition, and his lack of ability was laid bare when

5  he attempted a fair use analysis in real time regarding an image at issue in this case,

6  which was a popular meme several years ago:



22  When questioned, Nicolini's analysis was lacking:

23  Q    Okay.  So what fair use analysis did you undertake for this photo?

24  A    Minimal commentary.  The heart of the photo is there.  Zendaya.  The whole

25  photo was used.  It's an exact copy of the photograph.  And it's on a -- it's on a

26  Instagram account used to make money.

27  (Tauler Dec. ¶ 4, Ex. C at 58:18-23)

28

Nicolini is dead wrong of course, since courts have held that posting an image on a different platform is itself transformative and grounds alone to establish a complete fair use defense. *Perfect 10, Inc. v. Amazon.com, Inc.* (9th Cir. 2007) 508 F.3d 1146, 1164 (use of images was a fair use primarily based on the transformative nature of a search engine platform).   Worse though is that Nicolini did not hit any of the four factors. Plainly Plaintiff posting a meme of Zendaya on its Instagram serves a different market function than paparazzi photographs sold to tabloids, which primarily depend on scarcity and timeliness for their value.  Social media platforms on the other hand are designed to facilitate engagement and sharing of information, making use of photos in the manner used by Plaintiff fair use.  Other cases have seen the matter similarly and granted a fair use defense as a matter of law for similar reasons. *Peterman v. Republican National Committee* (D. Mont. 2019) 369 F.Supp.3d 1053, 1063 ("absent a complete suspension of common sense, it must be assumed that the [claimants] would have welcomed reposts, retweets, and other forms of appropriation by other [] social media users");

Moreover, Nicolini did not consider here – or as to any image, whether Plaintiffs use of the image had any "demonstrable effect upon the potential market for, or the value of, the copyrighted work" *Sony Corp. of Am. v. Universal City Studios, Inc*., 464 U.S. 417, 450, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984).  Nicolini never communicated with the Clearinghouse Defendants about the value of the images – the Clearinghouse Defendants don't even know what images were at issue in this case because they deal with "millions of images."  (Exhibit I, Ginsberg Depo at 19:17-21).  The Clearinghouse Defendants based their settlement offers only on the fact that they had the power to give Plaintiff it's asset back if they paid an arbitrary sum, not on market value or artistic merit of the images.  (Exhibit I, Ginsberg Depo at 33:24-34:7; 35:10-36:2).  Nicolini obviously could not have considered the impact on the market for any photo because he did know, and did not have access to any information regarding the value of the photos.

1    Nicolini's consideration of fair use is woefully inadequate for a purported

2  designated copyright agent. Shown above, Nicolini could not have performed a sufficient

3  fair use analysis before certifying each DMCA notice.

4    **C. Nicolini Confirms at his Deposition that Okularity Employs an Automated**

5      **System to Request Instagram Account Deactivation**

6    Nicolini also confirmed in deposition that Okularity employs an automated computer

7  system to generate takedown notices and include language to request Instagram

8  deactivation. According to Nicolini, the system automatically includes language

9  requesting account deactivation after sending three notices relating to the same account:

10         Q   So this is all a template, right?
           A   The notices work off of a template.  We insert relevant data points.
11   . . .
            Q   Well, it sounds here like they've only infringed four photos and you already
12         want their account taken down.  Right?
           A   No.
13         Q   How many had they infringed at this point?
           A   Four.
14   . . .
           A   That language is included if there's more than three.
15         Q   Automatically, the system generates it, correct?
           A   After I direct the system to generate it, yes.
16         Q   Well, you -- you -- you created this system, correct?
           A   Most of it, yes.
17         Q   So you just stated that the system automatically generates this after three
           submissions. My question to you is why did you add that as a feature to the
18         software?
           A   I'm not -- I don't recall.  It may have been an instance where Instagram wasn't
19         removing content.

20  (Tauler Dec. ¶ 4, Ex. C at 41:4-43:13)

21    **D. Nicolini's Self-Serving and Conclusory Declaration does Nothing to Avail His**

22      **Ignorance of Fair Use.**

23    Nicolini submitted a declaration on September 25, 2020. Nicolini's testimony in

24  this declaration forms the basis of Defendants' motion. (Dkt. 39-7). As part of that

25  Declaration, Nicolini states:

26      [B]efore sending each of the 35 DMCA takedown notices, I considered

27      whether ENTtech's use of the photos may be fair use. In each instance, I

28

concluded that fair use did not apply to any of the infringements by ENTtech

for which I sent a notice.

(Dkt. 39-7, ¶ 6).

The declaration is entirely conclusory, as Nicolini does not describe what he means by "fair use." Notably absent from the Declaration is any foundation of Nicolini's understanding of fair use, education on the subject, or background relating to his ability to make such determinations.

The declaration does not provide any detail as to the analysis Nicolini conducted to reach his conclusion. Nicolini fails to describe a single reason why he concluded any one of the 35 photographs did not qualify for fair use. As with the July 14, 2020 phone call with Tauler, and confirmed in his depositions, Nicolini's declaration paints a broad generalization of the Instagram posts pictures without any meaningful fair use analysis to any of them.

## III.   ARGUMENT

### A. Defendants' Motion is a Thinly Veiled and Improper Discovery Device

"Rule 11 should not be used to raise issues as to the legal sufficiency of a claim or defense that more appropriately can be disposed of by a motion to dismiss, a motion for judgment on the pleadings, a motion for summary judgment, or a trial on the merits."  5A Wright & Miller, *et al.*, *Federal Practice and Procedure: Civil* § 1335 (4th ed. & Supp. 2020) (footnote omitted).  Accordingly:

Courts should, and often do, defer consideration of certain kinds of sanctions motions until the end of [the litigation] to gain a full sense of the case and to avoid unnecessary delay of disposition of the case on the merits.  This is a sensible practice where [as here] the thrust of the sanctions motion is that institution of the case itself was improper.

*Lichtenstein v. Consolidated Serv. Group, Inc.*, 173 F.3d 17, 23 (1st Cir. 1999); *see also Thomas v. Capital Security Servs., Inc*., 836 F.2d 866, 878 (5th Cir. 1988) (citing William W. Schwarzer, Sanctions Under the New Federal Rule 11 – A Closer Look, 104

F.R.D. 181, 204 (1985)); *Donaldson v. Clark*, 819 F.2d 1551, 1555 (11th Cir. 1987).
Thus, "[a]lthough dismissal of baseless claims is theoretically available under Rule 11, it
is better to deal with those arguments on the merits under a rule like Rule 56." *Marble
Bridge Funding Grp. v. Liquid Capital Exch., Inc.*, 2016 U.S. Dist. LEXIS 75545, *5-6
(N.D. Cal. June 8, 2016) (quoting *In re New Motor Vehicles Canadian Exp. Antitrust
Litig.*, 244 F.R.D. 70, 74 (D. Me. 2007)).

　　　　By ignoring that hornbook principle, the motion (on its face) violates the intent of
Rule 11's own drafters.  The 1983 drafters expressly "anticipated that in the case of
pleadings the sanctions issue under Rule 11 normally will be determined at the end of the
litigation …."  Fed. R. Civ. P. 11, Notes of Advisory Committee on 1983 Amendments.
This case is still at its beginning.  *See* Order Setting Scheduling Conference (Dkt. 36).
Ten years after the landmark 1983 amendments to Rule 11, the drafters emphasized that:

> Rule 11 motions … should not be employed as a discovery device or to test
> the legal sufficiency or efficacy of allegations in the pleadings; other
> motions are available for those purposes.  Nor should Rule 11 motions be
> prepared to emphasize the merits of a party's position, … to create a conflict
> of interest between attorney and client, or to seek disclosure of matters
> otherwise protected by the attorney-client privilege or the work-product
> doctrine.

Fed. R. Civ. P. 11, Notes of Advisory Committee on 1993 Amendments.  Violating those
principles, Defendants merely rush prematurely to pursue the two-prong Rule 11 test of
*Holgate v. Baldwin*, 25 F.3d 671, 676 (9th Cir. 2005) – "(1) whether the complaint is
legally or factually baseless from an objective perspective, and (2) if the attorney has
conducted a reasonable and competent inquiry before signing and filing it" – without first
getting any discovery to learn the actual (and non-privileged) basis for ENTTech's
allegations, and without bothering to obtain the Court's rulings on any of the "other
motions that are available" to challenge those allegations, such as moving for summary
judgment under Rule 56.

The Court addressed challenges raised by Defendants under Rule 12(b)(6).  *See* Order Re Defendants' Motion to Dismiss (Dkt. 40) (partly denying the motion to dismiss, and partly dismissing the FAC with leave for amendment by ENTTech).  Their request to apply the two-part Rule 11 test now is (itself) objectively frivolous, because:

> [a]pplying that test is not feasible at this stage of the litigation, as it is not possible to determine on this record if the allegations in the complaint are objectively frivolous in view of the law and facts, whether Plaintiff and its counsel should have been aware that the allegations were frivolous after making a reasonable inquiry, and whether [Plaintiff's complaint] is baseless.

*Almeida v. Bennet Auto Supply, Inc.*, 335 F.R.D. 463, 466 (S.D. Fla. 2020) (citations and quotation marks omitted).  Objectively, that is not yet feasible, precisely because the parties have not yet conducted any discovery and because (as a result) the Court has not yet finally decided the merits of ENTTech's claims nor any defenses to those claims.

## B. The TAC Accurately Alleges Okularity's Deficient Fair Use Analysis

Defendants' main argument revolves around the allegations in the TAC that Okularity's fair use analysis was deficient, and seek sanctions because "Tauler has now been informed no fewer than three times that Okularity considered fair use before sending DMCA takedown notices." (Dkt. 63 at 3.) Defendants have no feasible basis for asking the Court to assess the factual investigation undertaken by ENTTech's counsel Mr. Tauler before signing the TAC, because Defendants have not sought or obtained any discovery concerning the investigation that Mr. Tauler conducted.  Instead, Defendants rely entirely upon Nicolini's self-serving declaration. Defendants' argument fails for a number of reasons.

First, Defendants' claim that "Okularity considered fair use" is false on its face. A copyright agent, such as Okularity and Nicolini, must make a full and adequate fair use determination for each DMCA notice transmitted. An agent that does not conduct a complete fair use analysis is subject to liability under Section 512(f). *Lenz*, 815 F.3d at 1154 ("To be clear, if a copyright holder ignores or neglects our unequivocal holding that

it must consider fair use before sending a takedown notification, it is liable for damages under § 512(f). . . . A copyright holder who pays lip service to the consideration of fair use by claiming it formed a good faith belief when there is evidence to the contrary is still subject to § 512(f) liability.")

Fair use requires a four factor analysis. Consideration of all four factors is mandatory for an adequate fair use analysis. 17 U.S.C. § 107 ("In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include . . ."); *See L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 939 (9th Cir. 2002) ("Fair use requires individualized weighing of the equities of a given use of a given work. The Copyright Act gives some shape to the inquiry, listing four mandatory but nonexclusive factors.") (emphasis added); *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018) ("The factors are non-exclusive, but consideration of each is mandatory.").

For example, in *Pacific & S. Co. v. Duncan*, 744 F.2d 1490 (11th Cir. 1984), the Eleventh Circuit overturned a district court opinion that rejected a fair use defense because the district court did not consider all four fair use factors. The Eleventh Circuit held:

> We agree with TV News Clips that the district court should have considered the four factors set out in the statute. The statute uses mandatory language to the effect that in a fair use determination, the "factors to be considered *shall* include" (emphasis added) the four listed.

*Id.* at 1495.

Described above, Nicolini lacked even a basic understanding of fair use. Nicolini could not articulate the four fair use factors and could not provide a single example of a course, legal case, or other educational material that he read to educate himself on fair use. When asked how he applied fair use to the Instagram posts at issue in this matter, Nicolini testified to a vague standard that, at best, touches on two of the four fair use factors. As a designated "copyright agent" that submits thousands of takedown notices,

Nicolini's complete lack of fair use education is particularly egregious. None of the copyright notices submitted by Nicolini could possibly have considered fair use, as Nicolini does not understand what an adequate "fair use" consideration entails.

Second, Tauler's investigation into the matter was adequate and extensive.  Tauler spent extensive time researching Nicolini's background and prior cases. (Tauler Dec., ¶ 2). Tauler also spoke on the phone with Nicolini, where it became apparent that he was uneducated in copyright and fair use law. (Tauler Dec., ¶ 10).Tauler also reviewed the Instagram posts at issue in this case, which contain commentary that would qualify for fair use protection. Tauler's analysis, confirmed by Nicolini's deposition, is more than sufficient to form the basis of the allegations in the TAC.

Finally, Nicolini's self-serving declaration does nothing to cure his defective fair use understanding. The Declaration asserts that Nicolini conducted a "fair use" analysis without any foundation, background, or description of what that entailed. As we learned in Nicolini's deposition, the analysis conducted was wholly inadequate. Nicolini's Declaration carries no evidentiary value and must be disregarded.

**C. The TAC Properly Alleges Defendants' Scheme**

Pointing again to Nicolini's self-serving and conclusory declaration, Defendants argue that "[s]ince the allegations that fair use was not considered lack evidentiary support, there is no evidentiary support that the DMCA notices were fraudulent or that Defendants engaged in a scheme." (Dkt. 63 at 6).   In reality, there is ample evidence of a scheme which has been amply detailed above.

**D. The True Amount of Takedown Notices Cannot be Known Without Discovery**

Defendants argue that "[t]here is no evidentiary support" for the amount of takedown notices alleged in the TAC." (Dkt. 63 at 7). The TAC alleges that Okularity filed "at least thirty-four (34)" takedown notices and "possibly as many as (48) such notices, or more . . ." TAC ¶ 34. Defendants again point to Nicolini's self serving declaration as "evidence" that "there were only 35" notices. (Dkt. 63 at 7).

OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS

Defendants' arguments on this point serve no purpose. Discovery has not commenced, and ENTTech could not know the full extent of Okularity's conduct at this stage of the case. Defendants admit that the TAC's allegations of "at least thirty-four" takedown notices, because defendants claim to have submitted 35. Further, Defendants do not deny that Nicolini himself refused to provide Tauler with any of the DMCA notices.  *See* TAC ¶ 33.  Instead, Nicolini sent ENTTech executives a spreadsheet containing 51 rows of information that supposedly provide support for the DMCA notices.  *See* Nicolini Dec., Exhibit B (Dkt. 39-9).  Three of those rows are duplicates of other rows in the spreadsheet, which leaves 48 unique DMCA claims, according to Nicolini's own spreadsheet. As Nicolini concedes, "Mr. Tauler even incorporated information from the spreadsheet into the lawsuit."  Nicolini Dec., ¶ 8. The ultimate amount of notices will be uncovered through discovery and Defendants' liability will be based on the accurate amount of notices submitted.

**E. Defendants Improperly Attempt to Turn this Motion into a Summary Judgment Motion**

In a procedurally improper argument, and without providing evidence in support, Defendants argue that "the TAC includes newly sanctionable allegations" which "concern the Photo Agencies' right to enforce their copyrights in the images." (Dkt. 63 at 8). Defendants seek sactions because "the new theory – that somehow the Photo Agencies' right to enforce the copyrights is in question – has no factual support." (Dkt. 63 at 9).

Defendants' argument has no place in a Rule 11 motion, because it addresses the merits of the case and factual issues that will be addressed during discovery. "[U]nlike a motion for summary judgment or other established means for addressing the merits of a case, Rule 11 lacks a framework under which factual issues may be settled." *Ross v. Mukasey*, 2009 U.S. Dist. LEXIS 130020, * 5 (D. Colo. Nov. 24, 2009); *see also Safe-Strap Co., Inc. v. Koala Corp.*, 270 F. Supp. 2d 407, 417-21 (S.D.N.Y. 2003) (discussing that Rule 11 sanctions are not a substitute for motions for summary judgment).

Moreover, it is undisputed that many of the photographs at issue in this matter were licensed to third parties. The TAC provides evidence that the photographs were licensed to Instagram. (TAC ¶ 50.) The extent of licenses granted for each photograph will be revealed in discovery, but some of these licenses may have been exclusive, which would usurp Defendants' standing to bring this action. *See Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169 (9th Cir. 2013)("Under the Copyright Act, only the 'legal or beneficial owner of an exclusive right under a copyright' has standing to sue for infringement of that right."); *Fathers & Daughters Nev., LLC v. Lingfu Zhang*, 284 F. Supp. 3d 1160 (D. Or. 2018) (copyright owner of movie lacked standing to sue for infringement after entering into an exclusive license with a sales agent.).

While the parties have not yet entered discovery and defendants have not provided licensing or chain of title information for the copyright images at issue, ENTTech already discovered that some of the images were potentially licensed to third parties in exclusive distribution arrangements. For example Nicolini admitted during deposition that he transmitted a DMCA notice for one of the images at issue on behalf of a distributor Backgrid UK, which is not a party to this action, but held (and may currently hold) an exclusive distribution license to one of the photographs:

> Q    So then how did you come to learn that the ownership had been transferred from Backgrid U.K. to . . . to Xposure?
> A    It was not.
> Q    Oh.  So you didn't know, at any point, that the DMCA notices you sent on behalf of Backgrid U.K. were transferred to . . . Xposure?
> . . .
> A    I believe, as we've already talked about multiple times, Xposure is the copyright holder, and Backgrid London is the exclusive distributor.
> Q    So why didn't you send these on behalf of Xposure?
> . . .
> A    I don't have an answer for you.
> Q    You don't know why?
> A    Not off the top of my head, no.

(Tauler Dec. ¶ 6, Ex. C at Pages 100-101)

Defendants' arguments are entirely inappropriate for a Rule 11 motion, as they seek to dismiss claims prior to discovery and without providing complete evidence. Defendants seek to put an impossible burden on ENTTech to prove Defendants' own

exclusive copyright ownership in the pictures at issue ENTTech's allegations in the complaint are well pled and based on sufficient research and knowledge.

**F. ENTTech's Prior Complaints are Superseded by the TAC and Irrelevant.**

In a final baseless argument, Defendants argue that ENTTech's amendment of the complaint was somehow a tacit admission "that prior pleadings are sanctionable." (Dkt. 63 at 12). It is "hornbook law" that an amended complaint supersedes the prior complaint. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 925 (9th Cir. 2012). "Once a plaintiff files an amended complaint, the original pleading no longer serves any function in the case."; *Bullen v. De Bretteville*, 239 F.2d 824, 833 (9th Cir. 1956) ( "[A]n amended pleading supersedes the original, the latter being treated thereafter as non-existent . . . .Once amended, the original no longer performs any function as a pleading."); *see also Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989) (an amended pleading supersedes the original); *Loux v. Rhay*, 375 F.2d 55, 57 (9th Cir. 1967) (same).

All citations to prior amendments of the complaint serve no purpose and fly in the face of well-established law that prior amendments must be disregarded. Defendants simply cannot attempt to argue the veracity of pleadings that are legally "non-existant." *Bullen*, 239 F.2d at 833. At the same time, Defendants improper arguments in this regard provide further evidence that the Rule 11 motion is frivolous and Defendants must be sanctioned accordingly.

## IV.  CONCLUSION

The Defendants' motion for sanctions is objectively frivolous, and it was filed for the very same improper purposes that Rule 11's drafters warned against:  "as a discovery device" hoping to learn more about the factual basis for ENTTech's claims, while also aiming "to emphasize the merits of [their own] position," and "seek[ing] disclosure of matters otherwise protected by the attorney-client privilege or the work-product doctrine" concerning the factual investigation by Tauler.  *See* Fed. R. Civ. P. 11, Notes of Advisory Committee on 1993 Amendments.

Therefore, the attorney's fees reasonably incurred by ENTTech in opposing the motion should be imposed against Defendants and their counsels who signed the motion papers, under Rule 11(c)(2) ("[i]f warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.").

DATED: January 6, 2021                    TAULER SMITH LLP


                                          By:   /s/ *Robert Tauler*
                                                Robert Tauler

                                          Attorneys for Plaintiff
                                          ENTTech Media Group LLC, and
                                          for Counsel Robert Tauler, Esq. and
                                          Tauler Smith LLP

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on January 6, 2021, copies of the foregoing document were

3 served by the Court's CM/ECF system to all counsel of record in this action.

4

5 DATED: January 6, 2021                    TAULER SMITH LLP

6

7                                          By:    /s/ *Robert Tauler*

8                                                 Robert Tauler

9                                          Attorneys for Plaintiff
                                           ENTTech Media Group LLC, and
10                                         for Counsel Robert Tauler, Esq. and
                                           Tauler Smith LLP

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS