1                UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3

4

5   ENTTECH MEDIA GROUP, LLC,        )
                                     )
6                  PLAINTIFFS,       )
                                     )
7                                    )
            vs.                      ) CASE NO. 2:20-CV-06298
8                                    )           JWH (EX)
                                     )
9                                    )
    OKULARITY, INC.; JON             )
10  NICOLINI; BACKGRID USA, INC.;    )
    SPLASH NEWS AND PICTURE          )
11  AGENCY, LLC; AND XPOSURE PHOTO   )
    AGENCY, INC.,                    )
12                                   )
                   DEFENDANTS.       )
13  _____)

14

15

16

17       VIDEOTAPED DEPOSITION VIA ZOOM OF ROBERT TAULER

18             THURSDAY, JANUARY 14, 2021

19

20

21

22

23

24  REPORTED BY:
    TISHA C. OKUMA
25  CSR NO. 9774

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4

5    ENTTECH MEDIA GROUP, LLC,          )
                                        )
6                    PLAINTIFFS,        )
                                        )
7                                       )
             vs.                        ) CASE NO. 2:20-CV-06298
8                                       )            JWH (EX)
                                        )
9                                       )
     OKULARITY, INC.; JON               )
10   NICOLINI; BACKGRID USA, INC.;      )
     SPLASH NEWS AND PICTURE            )
11   AGENCY, LLC; AND XPOSURE PHOTO     )
     AGENCY, INC.,                      )
12                                      )
                     DEFENDANTS.        )
13   _____)

14

15

16

17        VIDEOTAPED DEPOSITION VIA ZOOM OF ROBERT TAULER,

18        TAKEN ON BEHALF OF THE DEFENDANTS THROUGH WATSON

19        COURT REPORTERS, INC., IN LOS ANGELES, CALIFORNIA,

20        COMMENCING AT 12:04 P.M., THURSDAY, JANUARY 14,

21        2021, BEFORE TISHA C. OKUMA, CSR 9774.

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFFS:

 4           TAULER SMITH, LLP
             BY:  ROBERT TAULER, ATTORNEY AT LAW
 5           626 Wilshire Boulevard
             Suit 510
 6           Los Angeles, California  90017
             (310) 590-3927
 7           rtauler@taulersmith.com

 8

 9   FOR THE DEFENDANTS AND COUNTERCLAIMANTS BACKGRID USA,
     INC., SPLASH NEWS AND PICTURE AGENCY, LLC, AND XPOSURE
10   PHOTO AGENCY, INC.:

11           ONE LLP
             BY:  JOANNA ARDALAN, ATTORNEY AT LAW
12               DAVID QUINTO, ATTORNEY AT LAW
             9301 Wilshire Boulevard
13           Penthouse Suite
             Beverly Hills, California  90210
14           (310) 866-5157
             jardalan@onellp.com
15

16   FOR THE DEFENDANTS OKULARITY, INC., AND JON NICOLINI:

17           PERKOWSKI LEGAL, PC
             BY:  PETER E. PERKOWSKI, ATTORNEY AT LAW
18           445 S. Figueroa Street
             Suite 3100
19           Los Angeles, California  90071
             (213) 426-2137
20           peter@perkowskilegal.com

21

22   ALSO PRESENT:

23           CHRIS CONTRERAS, VIDEOGRAPHER

24           JON NICOLINI, DEFENDANT

25           STEVEN GINSBURG, ATTORNEY AT LAW
```

```
 1                         INDEX

 2

 3   DEPONENT:               EXAMINATION BY:          PAGE:

 4   Robert Tauler          Ms. Ardalan

 5                          Mr. Perkowski

 6

 7

 8

 9

10   MARKED PORTIONS:

11   (None.)

12

13

14

15   QUESTIONS INSTRUCTED NOT TO ANSWER:

16   (None.)

17

18

19

20

21

22

23

24

25
```

```
 1   EXHIBITS FOR IDENTIFICATION:                    PAGE:

 2   DEFENDANTS

 3

 4   Exhibit 1       Declaration of Robert              8
                     Tauler in Response to Order
 5                   to Show Cause Re Sanctions
                     Under Rule 11(c)(3) of the
 6                   Federal Rules of Civil
                     Procedure [DKT. 54], 172
 7                   pages

 8   Exhibit 2       Color photocopy of a             115
                     photograph, 1 page
 9
     Exhibit 3       Counterclaims to Complaint       117
10                   by BackGrid USA, Inc.,
                     Splash News and Picture
11                   Agency, LLC, and Xposure
                     Photo Agency, Inc., 148
12                   pages

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
         1              LOS ANGELES, CALIFORNIA

         2         THURSDAY, JANUARY 14, 2021, 12:04 P.M.

         3                        -OOO-

         4

12:02:09 5         THE VIDEOGRAPHER:  Good afternoon.  My name is

         6    Chris Contreras.  I'm the legal video specialist for

         7    today.  I represent Watson Court Reporters in Los

         8    Angeles, California.  I'm not financially interested in

         9    this action, nor am I a relative or employee of any of

12:02:21 10   the attorneys or any of the parties.

         11           Today's date is January 14th, 2021.  The time

         12   is approximately 12:04 p.m.  This deposition is being

         13   held via Zoom/Remote Counsel.  The case number is

         14   2:20-CV-06298 JWH(ex) in the United States District

12:02:48 15   Court, Central District of California.

         16           The case is entitled Enttech Media Group, LLC,

         17   versus Okularity, Incorporated.  This deposition is

         18   being taken on behalf of the defendant.

         19           Here begins the deposition of Robert Tauler.

12:03:04 20   The court reporter is Tisha Okuma.

         21           Will each of the attorneys present please

         22   state their appearance for the record.

         23           MS. ARDALAN:  Good morning.  Joanna Ardalan on

         24   behalf of BackGrid USA, Inc., Splash News and Picture

12:03:19 25   Agency, LLC, and Xposure Photo Agency, Inc.
```

```
12:03:24    1              MR. PERKOWSKI:  Good afternoon.

            2    Peter Perkowski for defendants Okularity, Inc., and

            3    Jon Nicolini.

            4              MS. ARDALAN:  Mr. Tauler?

12:03:38    5              THE VIDEOGRAPHER:  Thank you.

            6              Will the court reporter now please administer

            7    the oath to the witness, and we can begin.

            8              MR. TAULER:  I'll also note that there's other

            9    folks here.  Steven Ginsburg and Jon Nicolini.

12:03:54   10              Do you want them on the record, too?

           11              THE VIDEOGRAPHER:  Sure.

           12              Tisha, you can swear in the witness.

           13

           14                        ROBERT TAULER,

12:04:06   15               having been first duly sworn, was

           16                examined and testified as follows:

           17

           18                        EXAMINATION

           19    BY MS. ARDALAN:

12:04:20   20    Q.        Good afternoon, Mr. Tauler.

           21    A.        Thank you.

           22    Q.        Is there any reason why you can't give your

           23    best testimony today?

           24    A.        I don't think so.

12:04:31   25    Q.        Okay.  Thank you.
```

| | | |
|---|---|---|
| 12:04:32 | 1 | I'd like to mark as an exhibit your |
| | 2 | Declaration.  We'll mark it as Exhibit No. 1. |
| | 3 | (Defendants' Exhibit No. 1 was marked |
| | 4 | for identification and is attached hereto.) |
| 12:04:43 | 5 | MS. ARDALAN:  Let me go ahead and screen |
| | 6 | share. |
| | 7 | Q.       BY MS. ARDALAN:  Mr. Tauler, do you see that |
| | 8 | in front of you? |
| | 9 | A.       Yes. |
| 12:04:56 | 10 | Q.       The caption to your Declaration? |
| | 11 | A.       Yes. |
| | 12 | Q.       Okay.  It's 172 pages.  I want you to feel |
| | 13 | comfortable this is a true and correct copy of it.  Do |
| | 14 | you want me to just scroll through it, or what would you |
| 12:05:06 | 15 | like to be satisfied? |
| | 16 | A.       With respect to this document, I'll be |
| | 17 | satisfied by simply looking at the filing stamp. |
| | 18 | Q.       Okay.  And you see that the filing stamp is |
| | 19 | indeed on this document, and it looks accurate to you? |
| 12:05:27 | 20 | A.       Yeah. |
| | 21 | Q.       Okay.  Let's take a look at Exhibit A of this |
| | 22 | Declaration.  And I will rotate this clockwise so you |
| | 23 | can see it in a more meaningful way. |
| | 24 | So this is Exhibit A.  The first page of |
| 12:05:54 | 25 | Exhibit A appears to all be redacted.  The second page |

| | | |
|---|---|---|
| 12:05:58 | 1 | is mostly redacted.  The third page, we have some |
| | 2 | redactions, and then we get into some Westlaw searches. |
| | 3 | I'm going to scroll to the bottom so we get them |
| | 4 | earliest in time. |
| 12:06:24 | 5 | Okay.  So it starts on July 9th, 2020.  It |
| | 6 | looks like your first search related to the Paper |
| | 7 | Magazine case, which is the Enttech case; is that |
| | 8 | correct?  This was the first time you did any legal |
| | 9 | research for this case? |
| 12:06:41 | 10 | A.      As far as I recollect, yes, because this is |
| | 11 | how I keep track of -- so this is just a report from |
| | 12 | Westlaw.  So I don't have an independent recollection of |
| | 13 | what I searched for first, but I assume this document |
| | 14 | accurately reflects it, because it was printed from |
| 12:07:00 | 15 | Westlaw. |
| | 16 | Q.      Okay.  And when you do searches on Westlaw, do |
| | 17 | you typically -- when you search for something, do you |
| | 18 | typically go through each of the search results first |
| | 19 | and then review them, or do you cherry pick what you |
| 12:07:15 | 20 | think looks interesting and then review them? |
| | 21 | A.      I guess it depends. |
| | 22 | Q.      Okay. |
| | 23 | A.      I don't think I looked at every single one, |
| | 24 | because since it's obvious from the synopsis that it's |
| 12:07:30 | 25 | not relevant to the search. |

```
12:07:34    1              MS. ARDALAN:  Okay.  Just for the record,

            2    Mr. Quinto is joining me in the room.  He's also an

            3    attorney for the photo agencies BackGrid, Splash, and

            4    Xposure.

12:07:44    5    Q.        BY MS. ARDALAN:  Okay.  So let's start with

            6    this Beckham versus Splash News and Photo Agency case.

            7    Do you recall anything in this case being relevant to

            8    the fair use analysis that you may or may not have

            9    conducted in this case?

12:08:01   10    A.        Exhibit A to that case is a letter from

           11    Okularity written by Peter Perkowski that contains the

           12    same cut and paste fair use statement that Nicolini used

           13    in his DMCA notices.

           14    Q.        Okay.  Did you do any further research other

12:08:20   15    than reading Exhibit A in this case about fair use in

           16    the context of Beckham versus Splash News?

           17    A.        I don't understand what you mean.  In regards

           18    to that particular case?

           19    Q.        Yes.

12:08:40   20    A.        I think Peter, on behalf of Okularity, sent a

           21    letter, three pages long, I want to say, maybe four,

           22    that said, you know, this picture of Odell Beckham

           23    getting out of his car in crutches is actually copy

           24    written by a paparazzi that was stalking him on his

12:09:11   25    property and is owned by Splash News.
```

| | | |
|---|---|---|
| 12:09:17 | 1 | And then Odell Beckham filed a claim against |
| | 2 | Splash News for trespassing, I believe.  I don't |
| | 3 | remember exactly what the claims were.  I know those |
| | 4 | were litigated pretty deep. |
| 12:09:32 | 5 | I don't know that they went into a fair use |
| | 6 | analysis in their defense of the case, and I don't |
| | 7 | recall if there was counterclaims asserted.  So I don't |
| | 8 | think that was litigated.  I don't remember that it was |
| | 9 | litigated, anyhow. |
| 12:09:47 | 10 | Q.      Okay.  Is there anything about the Beckham |
| | 11 | versus Splash News case that informed you that |
| | 12 | Mr. Nicolini typically does not review for fair use |
| | 13 | prior to sending a notice? |
| | 14 | A.      Well, yeah.  I think the fact he's cutting and |
| 12:10:02 | 15 | pasting the research that -- I apologize for the noise. |
| | 16 | I'll put it on mute.  Sorry. |
| | 17 | Q.      No problem. |
| | 18 | A.      Do you guys hear that there was a helicopter? |
| | 19 | Q.      Yeah. |
| 12:10:17 | 20 | A.      All right.  Yeah.  It was the same statement |
| | 21 | that was in the DMCA notices.  It referenced it had the |
| | 22 | same analysis, and it was written by Peter Perkowski on |
| | 23 | behalf of Okularity. |
| | 24 | And he sent a letter, cease and desist letter, |
| 12:10:34 | 25 | and then he turned around and got sued.  And I want to |

| | | |
|---|---|---|
| 12:10:38 | 1 | say this was in -- it was a few years back, maybe 2018. |
| | 2 | Q.      Okay. |
| | 3 | A.      Or '17. |
| | 4 | Q.      So other than the fact that the text of the |
| 12:10:52 | 5 | letter was similar to Mr. Nicolini's DMCA notices with |
| | 6 | respect to Enttech, is there any other information that |
| | 7 | you have that suggests that Mr. Nicolini did not review |
| | 8 | fair use prior to sending the notices in the Enttech |
| | 9 | case? |
| 12:11:13 | 10 | A.      You just mean with respect to this? |
| | 11 | Q.      Yeah.  Thank you for clarifying.  Yes.  With |
| | 12 | respect to the Beckham versus Splash News case. |
| | 13 | A.      There is the fact that, from what I |
| | 14 | understand, Mr. Perkowski stopped sending letters after |
| 12:11:31 | 15 | this case. |
| | 16 | Q.      How do you know that? |
| | 17 | A.      I believe it's Exhibit C and D in my |
| | 18 | Declaration. |
| | 19 | Q.      I want to go back to what you said.  You said |
| 12:11:49 | 20 | that there was the fact that Mr. Perkowski stopped |
| | 21 | sending letters in this case. |
| | 22 |        By "this case," do you mean Enttech or do you |
| | 23 | mean the Splash News case, the Beckham/Splash News case? |
| | 24 | A.      I think Okularity stopped sending cease and |
| 12:12:03 | 25 | desist letters as part of their modus operandi around |

| | | |
|---|---|---|
| 12:12:07 | 1 | 2018, because I think this case spooked them. |
| | 2 | Q.        I'm sorry.  What is "this case"?  I'm just |
| | 3 | trying to make a clear record. |
| | 4 | A.        I'm sorry.  About that Beckham versus Splash |
| 12:12:18 | 5 | News, because if you send a demand letter, and you get |
| | 6 | sued for dec relief or whatever additional claims, that |
| | 7 | would be instead of sending letters and adopt a |
| | 8 | different approach. |
| | 9 | Q.        How does that relate to whether Mr. Nicolini |
| 12:12:34 | 10 | reviewed fair use prior to sending notices in the |
| | 11 | Enttech case? |
| | 12 | A.        Well, I don't think it's a direct -- there's a |
| | 13 | direct correlation between what Mr. Nicolini did in |
| | 14 | June of 2020 and the letter that his confederate wrote |
| 12:12:57 | 15 | for Odell Beckham in 2018. |
| | 16 | Q.        Okay.  So other than that, is there any other |
| | 17 | information that you gathered from the Beckham versus |
| | 18 | Splash News case that informed you that Mr. Nicolini did |
| | 19 | not review for fair use prior to sending notices in the |
| 12:13:11 | 20 | Enttech case? |
| | 21 | A.        I think that was more just to develop an |
| | 22 | understanding of the overall scheme as opposed to |
| | 23 | whether or not Mr. Nicolini engaged in a fair use |
| | 24 | analysis. |
| 12:13:25 | 25 | Q.        Okay.  Thank you. |

| | | |
|---|---|---|
| 12:13:27 | 1 | Now, with respect to Andrew Johnston versus |
| | 2 | Splash News and Picture Agency, this is the next entry, |
| | 3 | did you learn anything from this document or from this |
| | 4 | case with respect to whether Mr. Nicolini reviewed fair |
| 12:13:43 | 5 | use prior to sending the DMCA notices in the Enttech |
| | 6 | case? |
| | 7 | A.         I don't remember that case. |
| | 8 | Q.         Okay.  The next entry looks like you're |
| | 9 | searching for Splash News Agency.  And so I'm just going |
| 12:14:01 | 10 | to ask about researches with respect to Splash News |
| | 11 | Agency, and it looks like for at least -- looks like |
| | 12 | it's related to at least four entries here, would you |
| | 13 | agree with that, the entry at 1:56, another one at 1:56, |
| | 14 | 3:45, and 3:47 all relate to Splash? |
| 12:14:23 | 15 | A.         Those do.  Yeah. |
| | 16 | Q.         Is there anything from this search that |
| | 17 | related to Mr. Nicolini not reviewing fair use prior to |
| | 18 | sending DMCA notices? |
| | 19 | A.         Not that I recall. |
| 12:14:38 | 20 | Q.         Now we get to the Lenz decision.  Is there |
| | 21 | anything about Mr. Nicolini in the Lenz decision that |
| | 22 | you recall? |
| | 23 | A.         Well, the Lenz decision wasn't about |
| | 24 | Mr. Nicolini.  It's the case that says you have to |
| 12:14:51 | 25 | conduct a fair use analysis, that you can't pay lip |

```
12:14:54    1    service when you submit a DMCA notice.

            2    Q.        Okay.   Thank you.

            3              So you have these other searches relating to

            4    Lenz.   It goes up until the next page.   Now I'm halfway

12:15:06    5    through page, it looks like, 19 of the document,

            6    according to the ECF.

            7              So all these searches related to the Lenz

            8    decision, did any of them relate to Mr. Nicolini at all?

            9    A.        I don't think Mr. Nicolini's name shows up in

12:15:28   10    any shepardizing of the Lenz case, at least, at that

           11    time, it didn't, to me, no.

           12    Q.        Okay.   Next, let's go to Hughes versus

           13    Benjamin.   Did you learn anything about Mr. Nicolini's

           14    DMCA notice practice in this case?

12:15:46   15    A.        I don't remember that case.

           16    Q.        Okay.   Let me go back to the Lenz decision.

           17    We've already talked about that.   I assume that it's

           18    also true that with respect to these two Lenz searches,

           19    there was nothing about Mr. Nicolini; is that correct?

12:16:02   20    A.        Yeah.   That's my recollection.   Yes.

           21    Q.        Okay.   And now we go to Weinberg versus Dirty

           22    World.   Did you learn about Mr. Nicolini in this case?

           23    A.        I don't remember.   I think Dirty World could

           24    have been like -- because I know Nicolini worked for --

12:16:16   25    he was taking down perverts that were, like, downloading
```

```
12:16:21    1   pornography off of file sharing sites.  That was, like,

            2   his livelihood, I think, in 2012.

            3            So he would send -- this scam is still going

            4   on with Malibu Media, as you probably know.  They find

12:16:42    5   people that are downloading porn and send them demand

            6   letters, and so they get so embarrassed that they just

            7   pay out so that their loved ones aren't embarrassed by

            8   their downloading pornography.

            9            So that's Mr. Nicolini's background.

12:17:00   10   Q.       And --

           11   A.       I assume from the title "Dirty World" that

           12   that's a pornographer.

           13   Q.       Do you have a recollection of this case in

           14   particular, though?

12:17:09   15   A.       No.

           16   Q.       Okay.  Did you find out anything about

           17   Mr. Nicolini's DMCA practice from this case?

           18   A.       I don't know.  I don't think this is the case

           19   where I got the Declaration from, so I don't recall.

12:17:24   20   Q.       Okay.  If you're talking about the Declaration

           21   that you attached to your Declaration, you're correct.

           22   It's not the same.

           23   A.       All right.

           24   Q.       Okay.  Next case is Planned Parenthood

12:17:38   25   Federation of America versus Center for Medical
```

```
12:17:39   1   Progress.  Did you learn anything about Mr. Nicolini

           2   from this case?

           3   A.        You mean Jon Nicolini?

           4   Q.        Yes.  Jon Nicolini.  When I say,

12:17:47   5   "Mr. Nicolini," I mean Jon Nicolini.

           6   A.        I thought you said "Peter" Nicolini for some

           7   reason.

           8   Q.        I apologize.  No.  If you have trouble hearing

           9   me, please let me know, and I'll be happy to try

12:17:58  10   something else.

          11   A.        I don't remember this case.

          12   Q.        Okay.  The next case is Global Telemedia

          13   International, Inc., versus Doe 1.  Do you have any

          14   information about Mr. Nicolini from this case?

12:18:12  15   A.        It looks like that's where I found out about

          16   Copyright Enforcement Group.

          17   Q.        Okay.

          18   A.        They refer to themselves as CEG Tech.

          19   Q.        Okay.

12:18:23  20   A.        And CEG stands for Copyright Enforcement

          21   Group, and Tech, I think that stands for tech.  And it's

          22   a doe case, which tells me that that's what these guys

          23   would do.

          24          They would sue these -- they would file

12:18:41  25   federal cases against John Does.  Oftentimes, it would
```

```
12:18:47   1   be, like, dozens of these fellows, I assume they're

           2   fellows, but it could be women as well, who were

           3   downloading pornography, and they would ask the court

           4   for subpoenas so they get their IP addresses and send

12:18:59   5   them demand letters to embarrass them, also, to pay

           6   money.

           7   Q.        Is there anything from this case that informs

           8   you that Mr. Nicolini did not review for fair use prior

           9   to sending a notice?

12:19:14  10   A.        Yeah.  Well, I mean, he makes no mention of

          11   it.  His background is in technology, so he has no legal

          12   training.  That's how I find that.

          13   Q.        You said he makes no mention it of.  You mean

          14   he makes no mention of reviewing for fair use?

12:19:27  15   A.        Correct.

          16   Q.        Okay.  And that informs you that he did not

          17   review for fair use?

          18   A.        I think it informs me he doesn't have any

          19   legal background.  He's not equipped to conduct a fair

12:19:36  20   use analysis more so than what he did with respect to

          21   DMCA submissions in that particular case.

          22   Q.        I want to make sure I'm getting this right.

          23   So it's your understanding that because he has a

          24   technical background, he's, therefore, precluded from

12:19:54  25   having the ability to make a fair use analysis?
```

12:19:58  1   A.          Well, absolutely not.  I mean, I think a lot

          2   of people -- one could have both a technical background

          3   and a legal background.

          4   Q.          Okay.  But what about this case in particular

12:20:09  5   informed you that Mr. Nicolini was unable to do a fair

          6   use analysis?

          7   A.          The fact he was a CTO, and his only

          8   responsibilities were to determine what photos match

          9   using software.

12:20:24  10  Q.          What document did you review in this case in

          11  particular?  It says, "document review," so you reviewed

          12  a document.  Do you remember what it was?

          13  A.          I probably reviewed various entries in the

          14  docket.

12:20:37  15  Q.          Okay.  And was there anything in particular

          16  talking about Mr. Nicolini's background in these

          17  documents?

          18  A.          Yeah.  His Declaration of 2012.

          19  Q.          Okay.  So there's a Declaration that you found

12:20:59  20  from the search relating to the Global Telemedia case;

          21  is that what you're saying?

          22  A.          I'm not sure if it was this search or one of

          23  the other ones on here.  But, yeah, that's how I found

          24  out about that.

12:21:13  25  Q.          Are you talking about the Declaration that you

```
12:21:15    1    attached to your Declaration?

            2    A.        Yes.

            3    Q.        Okay.  So the Declaration you attached to your

            4    Declaration is not from this case.  Were there multiple

12:21:30    5    Declarations?  Was there just one Declaration?  I'm just

            6    trying to figure out how many Nicolini Declarations --

            7    A.        There's only one Declaration I remember.

            8    Q.        I'm sorry?

            9    A.        There's only one Declaration that I recall.

12:21:40   10    Q.        Okay.  There's only one Declaration you

           11    recall.  That's the one you attached to your

           12    Declaration --

           13    A.        Correct.

           14    Q.        -- is that right?

12:21:45   15              Okay.  So other than a Declaration, can you

           16    remember learning about Mr. Nicolini's background with

           17    respect to his role at Copyright Enforcement Group?

           18    A.        I don't recall.

           19    Q.        Next you do a search -- let me say that again,

12:22:16   20    because I think I put my water down when I was talking.

           21              Next you do a search for Copyright Enforcement

           22    Group, LLC.  What is Copyright Enforcement Group, LLC?

           23    A.        As I just said, it's CEG Tech, and they would

           24    troll people downloading pornography and try to

12:22:32   25    embarrass them and extort them.  It's still going on.
```

```
12:22:35    1    Now it's Malibu Media and Strike 3 Holdings doing the

            2    same gambit, except now they moved to Florida State

            3    Court, because, apparently, it's easier to get a

            4    subpoena.  There, the federal courts have gotten wise to

12:22:48    5    it, and, as you know, some people got in trouble for

            6    that --

            7                THE COURT REPORTER:  I'm sorry.  Mr. Tauler,

            8    can you speak up a little bit for me, please?

            9                THE WITNESS:  Yes, ma'am.

12:23:00   10                I said I believe that this practice has moved

           11    to Florida State Court, and, as you know, some people --

           12    the Prenda Law Group got in criminal trouble for doing

           13    this, because they created fake companies, created their

           14    own pornography, believe it or not.

12:23:23   15                I don't think Mr. Nicolini did, or I don't

           16    think CEG did, but it just goes to show this sort of --

           17    that it was a lucrative racket at that time.

           18    Q.          BY MS. ARDALAN:  Do you know whether

           19    Copyright Enforcement Group and Okularity have the same

12:23:38   20    address?

           21    A.          I don't think copy -- CEG Tech exists anymore.

           22    Q.          Okay.  So is that a no, they don't have the

           23    same address, or you don't know?

           24    A.          Like, right now?

12:23:53   25    Q.          Well, do they share an address?  So if CEG
```

```
12:23:56    1    doesn't exist anymore, does Okularity have the same

            2    address?

            3    A.        Have they ever shared an address?

            4    Q.        Yes.

12:24:02    5    A.        I think CEG group was based in Beverly Hills

            6    as well, and I don't remember if it was this same

            7    Camden Drive address.

            8    Q.        Okay.  Do you know if they have the same

            9    owners?

12:24:18   10    A.        Jon Nicolini is chief technology officer of

           11    both organizations.

           12    Q.        Do you know if they have the same owners?

           13    A.        Huh?

           14    Q.        Do you know if they have the same owners?

12:24:28   15    A.        I would have no way of knowing --

           16    Q.        I'm sorry.  I can't hear you.

           17    A.        I have no way of knowing the ownership

           18    structure of CEG group.

           19    Q.        Did you ever look into that?

12:24:37   20    A.        Yes.

           21    Q.        What did you do to research that?

           22    A.        I looked on the Secretary of State website, as

           23    I recall, and there was -- you don't have to list

           24    ownership information there.

12:24:55   25    Q.        Did they have the same board members?
```

| | | |
|---|---|---|
| 12:25:00 | 1 | A.        They don't list that either. |
| | 2 | Q.        I'm sorry.  I can't hear you. |
| | 3 | A.        They don't list that either.  I doubt they |
| | 4 | have a board of directors.  We're not talking about a |
| 12:25:07 | 5 | Fortune 500 company here.  It's, like, just a bunch of |
| | 6 | dudes trying to make money, so -- |
| | 7 | Q.        You have no information whether Okularity has |
| | 8 | a board of direction? |
| | 9 | A.        Okularity, according to their website, has a |
| 12:25:19 | 10 | board of directors.  Yes. |
| | 11 | Q.        Okay.  And you have no information to whether |
| | 12 | anyone who's a board member for Okularity was also |
| | 13 | involved with Copyright Enforcement Group; is that |
| | 14 | right? |
| 12:25:30 | 15 | A.        It seems that the board members listed on |
| | 16 | Okularity's website just seem to be a random mix of |
| | 17 | people, you know. |
| | 18 | Q.        That's a no, you have no information that they |
| | 19 | are overlap in any way? |
| 12:25:46 | 20 | A.        I don't recall.  No. |
| | 21 | Q.        Okay.  Do you know whether Copyright |
| | 22 | Enforcement Group and Okularity have the same clients? |
| | 23 | A.        I think that those clients moved on to |
| | 24 | Malibu Media and Strike 3 Holdings, and that was around |
| 12:26:09 | 25 | the same time Nicolini decided to start his own shop. |

```
12:26:16    1   Q.        You have no information that they have the

            2   same clients?

            3   A.        I don't know that they do or do not.

            4   Q.        Okay.  Do you know whether Copyright

12:26:24    5   Enforcement Group and Okularity code in the same

            6   language?

            7   A.        Like, English, you mean?

            8   Q.        No.  Java, C plus plus, C?

            9   A.        You mean the software they use to track?

12:26:45   10   Q.        Yes.

           11   A.        I assume it is the same -- it seems to me like

           12   it's the same exact software.

           13   Q.        Okay.  And why does it seem to be the same

           14   software to you?

12:26:58   15   A.        It's the same function developed -- it's used

           16   by the same person.

           17   Q.        Okay.  You said they have the same function,

           18   and they are used by the same person; is that what you

           19   said?

12:27:10   20   A.        Yes.

           21   Q.        Okay.  And how is it that they have the same

           22   function?

           23   A.        They're used to match images with existing

           24   images.  The software used by CEG group was used to

12:27:26   25   track images and other copyrighted material that matched
```

| | | |
|---|---|---|
| 12:27:32 | 1 | the database. |
| | 2 | Q.        And where did you learn about how the function |
| | 3 | of the CEG software works or what the function is?  Let |
| | 4 | me rephrase that question. |
| 12:27:45 | 5 | How is it that you learned about the function |
| | 6 | of the Copyright Enforcement Group software? |
| | 7 | A.        Mr. Nicolini details it in great detail in his |
| | 8 | Declaration. |
| | 9 | Q.        Okay.  And the Declaration you're talking |
| 12:27:55 | 10 | about is the Declaration that's attached to your |
| | 11 | Declaration; is that right? |
| | 12 | A.        Yes. |
| | 13 | Q.        Okay.  Do you know whether the Copyright |
| | 14 | Enforcement Group ever updated their software? |
| 12:28:23 | 15 | A.        No.  I have no idea.  I would have no way to |
| | 16 | know that. |
| | 17 | Q.        Do you know whether Okularity ever updates |
| | 18 | their software? |
| | 19 | A.        From when to when? |
| 12:28:43 | 20 | Q.        At any point? |
| | 21 | A.        Like at any point in Okularity's existence? |
| | 22 | Q.        Yes. |
| | 23 | A.        Software is constantly iterated, and there are |
| | 24 | always changes made to software, whether it's, you know, |
| 12:29:07 | 25 | billing software or whether it's software design to |

| | | |
|---|---|---|
| 12:29:13 | 1 | crawl the Internet. |
| | 2 | There are always changes, because particularly |
| | 3 | when you're dealing with two dynamic systems, as the |
| | 4 | dynamic system you're supposed to crawl is changing and |
| 12:29:24 | 5 | constantly iterating, and the marketplace is changing, |
| | 6 | the software has to keep up with it.  So it's obvious to |
| | 7 | me that there are changes to the software. |
| | 8 | Q.       Okay.  Other than the Declaration that you |
| | 9 | attached to your Declaration, the Declaration of |
| 12:29:43 | 10 | Mr. Nicolini, what information do you have that the CEG |
| | 11 | software and the Okularity software works the same? |
| | 12 | A.       Well, the CEG software was very advanced.  It |
| | 13 | actually -- this is in 2012, so it was eight years ago. |
| | 14 | Actually, no.  Wait.  Nine years ago, I guess. |
| 12:30:03 | 15 | And what it was able to do was to determine |
| | 16 | that pornographic videos were being copied using CMI, |
| | 17 | which is content management information, that's embedded |
| | 18 | in the images.  And so, you know, this is, like, a much |
| | 19 | easier version of that. |
| 12:30:27 | 20 | The images in this case, tracking those, |
| | 21 | albeit it's a different platform, is a lot easier, |
| | 22 | because what they were doing in 2012 was going on to |
| | 23 | sites, like, file sharing sites which had an actual |
| | 24 | layer of complexity to it, because you had to -- at that |
| 12:30:46 | 25 | time, BitTorrents were popular, and what a BitTorrent |

12:30:51   1   is, it basically downloads only a portion of content to

2   various users and assembles it back together, so it

3   makes it much more difficult to search for content that

4   is a match.

12:31:07   5          So if Mr. Nicolini was capable creating that

6   software in 2012, he'd be certainly be able to do

7   something much easier eight years on.

8   Q.          Okay.  So you're making an assumption that

9   because it's an easier search, that the software is the

12:31:29   10   same; is that what you're saying?

11   A.          No.

12   Q.          So you remember that it's probably very

13   different software between the software from Copyright

14   Enforcement and Okularity?

12:31:40   15   A.          I tried to get an understanding of what the

16   software was like from Mr. Nicolini.  He didn't share a

17   lot of that with me.  And I'm not a software expert, so

18   I don't know exactly how they're different.

19   Q.          Okay.  When you said when Mr. Nicolini shared

12:31:55   20   it with you, when was that?  Do you mean at his

21   deposition?

22   A.          Correct.

23   Q.          Okay.  Were there any other instances where

24   you asked about his software?

12:32:06   25   A.          Yeah.  We had a phone call where I asked him

| | | |
|---|---|---|
| 12:32:13 | 1 | whether or not it was automated, and he was quite proud |
| | 2 | of the fact that it was. |
| | 3 | Q.      Did you ask him -- you're talking about the |
| | 4 | phone call that happened between July 9th and 14th? |
| 12:32:26 | 5 | A.      I don't remember the dates offhand, but, yeah, |
| | 6 | whatever -- I believe that's right. |
| | 7 | Q.      Okay.  Did you have -- how many phone calls |
| | 8 | did you have with him? |
| | 9 | A.      I understand from the Declarations there were |
| 12:32:38 | 10 | two. |
| | 11 | Q.      You don't have an independent recollection of |
| | 12 | two conversations? |
| | 13 | A.      As I think about it now, I think there was one |
| | 14 | with him and, like, some junior attorney they had that |
| 12:32:54 | 15 | no longer works for them who was, like, a recent grad, |
| | 16 | maybe got -- passed his bar, like, a couple months |
| | 17 | prior.  He's no longer with them.  And, at that |
| | 18 | juncture, we talked mostly about settlement, I think. |
| | 19 |           And then the second call was after I had done |
| 12:33:19 | 20 | this research, and I asked him about his abilities as |
| | 21 | software engineer. |
| | 22 | Q.      Okay.  So on the first call, it's fair to say |
| | 23 | that it was about settlement and not about either his |
| | 24 | software or about fair use review; is that right? |
| 12:33:39 | 25 | A.      I don't remember that being part of the first |

```
12:33:41    1   phone call.  Correct.

            2   Q.         Okay.  And now let's talk about the second

            3   phone call.  Was anyone else on the second phone call

            4   other than Mr. Nicolini?

12:33:49    5   A.         I know Peter was on the call.  I don't

            6   remember if this third fellow was on the call.

            7   Q.         Okay.  And during that phone call, did you

            8   discuss fair use review?

            9   A.         I believe we discussed how the --

12:34:16   10   Q.         I'm sorry.  Can you repeat that?  I can't hear

           11   you.

           12   A.         I'll talk a little closer.

           13              I believe where he talked about how the

           14   software was automated.  I don't remember exactly

12:34:30   15   talking about the factors of fair use and so forth.

           16   Q.         Okay.  So you discussed the software was

           17   automated, but you have no recollection of fair use

           18   coming up either way?

           19   A.         Well, correct.  Yeah.

12:34:46   20   Q.         Okay.  Did you ask him whether he reviewed

           21   fair use?

           22   A.         I believe I did and --

           23   Q.         I'm sorry?

           24   A.         I believe I did.

12:34:53   25   Q.         You did?
```

```
12:34:54    1    A.        Yeah.

            2    Q.        Okay.

            3    A.        Because I used it -- I knew that he was

            4    required to conduct an analysis, and so I asked both of

12:35:05    5    them, Peter Perkowski and Jon Nicolini, what sort of

            6    analysis was undertaken, and Mr. Perkowski deferred to

            7    Mr. Nicolini.

            8              And Nicolini said that, you know, the software

            9    is automated, and I shouldn't worry about that sort of

12:35:27   10    thing, or something to that effect.  I don't remember

           11    verbatim what happened on that call to be sure.  It was

           12    six months ago.

           13    Q.        So your Declaration discusses how you asked --

           14    or how you discussed whether it was automated with

12:35:40   15    Mr. Nicolini and Mr. Perkowski, and Mr. Perkowski

           16    deferred and went to Nicolini.

           17              Are you saying that you also asked about fair

           18    use, and you just didn't include that in your

           19    Declaration?

12:35:54   20    A.        I remember -- I didn't include it in my

           21    Declaration, because I don't remember exactly what was

           22    said, but I do remember discussing that.

           23    Q.        "Discussing that," meaning fair use?

           24    A.        Yes.

12:36:06   25    Q.        But you don't remember Mr. Nicolini's response
```

| | | |
|---|---|---|
| 12:36:09 | 1 | to whether he did review fair use or not? |
| | 2 | A.       I don't think he gave me a response.  He was |
| | 3 | very cavalier at that point.  He was very proud of his |
| | 4 | software and his efforts.  He said it wasn't his first |
| 12:36:23 | 5 | rodeo and so forth.  And it was just -- it was all bad. |
| | 6 | Q.       Did he say that at the phone call, or was that |
| | 7 | in an earlier e-mail with Mr. Florio (phonetic)? |
| | 8 | A.       Yes.  To be clear, he said that in an earlier |
| | 9 | e-mail.  But, you know, he had a similar attitude, I |
| 12:36:42 | 10 | guess I'd say. |
| | 11 | Q.       So he didn't really address fair use one way |
| | 12 | or the other with you; is that your best recollection? |
| | 13 | A.       No.  He did not go over fair use. |
| | 14 | Q.       I'm sorry.  You're muffled. |
| 12:36:53 | 15 | A.       He did not go over fair use of these images, |
| | 16 | because, you know, he didn't even give me the actual |
| | 17 | notices.  He refused to. |
| | 18 | Q.       Did you get the notices from Instagram? |
| | 19 | A.       Yeah.  I thought it was suspicious that this |
| 12:37:13 | 20 | guy wouldn't give us the notices, and yet he's demanding |
| | 21 | a million dollars, and he won't even say what he did. |
| | 22 | So, I mean, that's major. |
| | 23 | Q.       Did you have the notices from Instagram when |
| | 24 | you filed the counter notifications? |
| 12:37:30 | 25 | A.       I don't recall. |

```
12:37:37    1   Q.          Did you get communication from Instagram after

            2   you sent the counter notifications?

            3   A.          I did not.  I don't remember.

            4   Q.          Okay.

12:37:48    5   A.          I think they send, like, an automated

            6   response.

            7   Q.          Okay.

            8   A.          But other than that, I don't remember.

            9   Q.          Okay.  You don't remember getting the

12:37:59   10   notifications after you getting an automated response

           11   from your counter notification; is that right?

           12   A.          Other than the automated response, they didn't

           13   reach out to me.

           14   Q.          Okay.

12:38:15   15   A.          But, eventually, I did speak to Instagram

           16   counsel, and they told me that this was a serious

           17   problem for them, and, you know, that they wish

           18   companies like Okularity and BackGrid didn't exist,

           19   basically.

12:38:35   20   Q.          And who did you speak with?

           21   A.          I beg your pardon?

           22   Q.          Who did you speak with at Instagram?

           23   A.          Her name was Randi Singer.  She's a partner of

           24   Weil Gotshal.

12:38:50   25   Q.          Do you remember when you had this
```

```
12:38:51    1    conversation?

            2            Let me first ask, how many conversations did

            3    you have with Ms. Singer?

            4    A.         Probably three.

12:39:07    5    Q.         Okay.  Do you remember when you had those

            6    three conversations?

            7    A.         Not at all.

            8    Q.         Was it after you filed the lawsuit?

            9    A.         I believe so.

12:39:30   10    Q.         Okay.  You said that Mr. Nicolini told you

           11    that his system was automated during your phone call,

           12    your second phone call with him, sometime between

           13    July 9th and 14th?  Do I have that right?

           14    A.         I beg your pardon?

12:39:45   15    Q.         You said that Mr. Nicolini told you that his

           16    system was automated on your second phone call with him

           17    that happened sometime between July 9th and 14th.  Do I

           18    have that correctly?

           19    A.         Sounds about right.  Yeah.

12:39:57   20    Q.         Okay.  And did you ask him what that meant, an

           21    "automated system"?

           22    A.         I understand what it means.

           23    Q.         What does it mean?

           24    A.         It means that it uses its software, that the

12:40:12   25    system uses software to generate notices and to
```

```
12:40:16    1    aggregate data that is part of the contents of the

            2    notice.

            3    Q.        Did you ever ask him if a human reviews the

            4    aggregated infringements?

12:40:32    5    A.        I don't remember.

            6    Q.        Did you ever ask him, after this conversation,

            7    whether the automated systems -- excuse me.  Strike

            8    that.

            9              Did you have ever ask him, after this

12:40:48   10    conversation, whether he had any person review the

           11    aggregated infringements?

           12    A.        Yes.

           13    Q.        When was that?

           14    A.        That was at his deposition last week.

12:41:02   15    Q.        Okay.  Other than at his deposition, did you

           16    ever -- did you ask him that same question?

           17    A.        No.

           18    Q.        All right.  So going back to Exhibit A of your

           19    Exhibit 1, Exhibit 1 to this deposition, your

12:41:39   20    Declaration, we learn that from this search, from

           21    Copyright Enforcement Group, that -- well, actually, let

           22    me back up for a moment.

           23              So you did a search, it looks like, on

           24    July 9th at 6:32 on Copyright Enforcement Group.  Now,

12:41:57   25    in this search, did you find anything about Mr. Nicolini
```

12:42:00    1    not reviewing fair use prior to sending a notice?

            2    A.        No.

            3    Q.        Okay.  The next search or the next document

            4    you reviewed was Cobbler Nevada, LLC, versus Anonymous

12:42:18    5    Users of Popcorn Time.

            6              Did you learn about Mr. Nicolini from these

            7    cases, these documents, these sites?

            8    A.        I don't remember those cases in particular.

            9    Q.        Now, you did an advanced search on

12:42:37   10    Mr. Nicolini.  Did you find anything from this search

           11    that revealed that he did not review fair use prior to

           12    sending the DMCA notices?

           13    A.        I mean, it wouldn't -- it's not -- this is the

           14    search of someone's, like, assets and, like,

12:42:54   15    organizations, so it's not going to say, like, "Jon

           16    Nicolini doesn't do fair use."

           17    Q.        Sure.  Fair enough.

           18              But I just wanted to see if there was anything

           19    that, perhaps, you uncovered that might be helpful to

12:43:07   20    this discussion.  Fair to say that you did not?

           21    A.        Just he started a bunch of companies having to

           22    do with so-called rights enforcement.

           23    Q.        How many companies did he start?

           24    A.        I want to say there's at least three or four.

12:43:25   25    There was one started really recently that he started

12:43:27   1    with Mr. Ginsburg using the same Camden address, which

           2    you, Ms. Ardalan, are the registered agent.

           3    Q.      What company is that?

           4    A.      I forget the name.

12:43:37   5    Q.      Okay.  What's "rights fix"?

           6    A.      I don't remember.  I think it was one of the

           7    entities he may have started, but I could be wrong.

           8    Q.      Did you learn anything about Mr. Nicolini

           9    reviewing for fair use prior to sending DMCA notices

12:43:56  10    from your rights fix research?

         11    A.      Again, I thought -- it's just confirmed

         12    organization's name.  It's not going to be, like, you

         13    know, Jon Nicolini doesn't do fair use research as part

         14    of, like, a corporate search.

12:44:11  15    Q.      I understand that.  I just want to make sure

         16    that --

         17    A.      Why are you asking it?  It's like --

         18    Q.      -- there was something revealed that, perhaps,

         19    would be helpful to this discussion.

12:44:18  20         Okay.  Then you also searched Jon/2 Nicolini.

         21    So you're searching for Jon Nicolini within two words of

         22    each other in California in the 9th Circuit.

         23         Is there anything from this search that

         24    revealed to you that Mr. Nicolini does not review for

12:44:33  25    fair use prior to sending DMCA notices?

```
12:44:38    1    A.         I don't recall.

            2    Q.         Okay.  Let's look at the next document,

            3    Diabolic Video Productions versus Does.  Anything from

            4    this document that revealed to you that Mr. Nicolini

12:44:53    5    does not review for fair use prior to sending DMCA

            6    notices?

            7    A.         I don't remember what that case says, but I

            8    think that's a pornographer that he represented --

            9    Q.         Okay.

12:45:04   10    A.         -- popped up somewhere, but I think given how

           11    old it was, I wasn't able to download the document.

           12    Q.         Okay.  So there was nothing here that was

           13    helpful to determining that Mr. Nicolini does not review

           14    for fair use prior to sending DMCA notices; is that

12:45:23   15    right?

           16    A.         Not that I recall.

           17    Q.         So let's take a look above this.  We have

           18    assistance for Brian Matlock.  It looks like "Matlock K.

           19    Brian."

12:45:38   20               Anything from this search that reveals that

           21    Mr. Nicolini does not review for fair use prior to

           22    sending DMCA notices?

           23    A.         You gotta remember that, like, I could save us

           24    some time.  The Lenz case didn't come out until 2018, so

12:45:51   25    it wasn't a thing until then.  So all these cases before
```

```
12:45:54    1    that, they're not going to say much about fair use.

            2    Q.        Okay.  So the Lenz decision informed you that

            3    you have to review for fair use prior to sending out

            4    DMCA notices; is that right?

12:46:12    5    A.        Correct.

            6    Q.        Did you weigh the fact that the Declaration

            7    that you are depending on that you've attached to your

            8    Declaration, the Declaration of Mr. Nicolini, that that

            9    was from 2012 prior to the Lenz decision?

12:46:29   10    A.        Correct.

           11    Q.        Okay.  In your analysis, did you address the

           12    issue that the Declaration is older than the Lenz case?

           13    A.        No, because he -- so when you conduct an

           14    investigation, which is, when I'm doing it, I'm trying

12:46:48   15    to get an understanding of the person and their

           16    background and their abilities, and put all those pieces

           17    together, eventually, after a lot of painstaking work to

           18    develop a composite of who this person is and what their

           19    capabilities are.

12:47:02   20            So even though Lenz wasn't ruled on in 2012,

           21    you can get a sense from 2012 of what Mr. Nicolini's

           22    training is in, and it's in creating software.

           23    Q.        Okay.  Was there anything about -- how can

           24    you -- it seems to me that you're making an assumption

12:47:24   25    that the Lenz decision would come out, and that he would
```

```
12:47:31   1   not change, assuming -- strike this.  Let me start over.

           2              Assume for a moment that the Declaration that

           3   he wrote in 2012 contends that he did not review for

           4   fair use prior to sending DMCA notices, I'm not saying

12:47:43   5   that's what it says, but let's just assume for a moment

           6   it did, how can you then use that as a basis to say that

           7   he does not review for fair use when the law changed in

           8   the meantime?

           9   A.        Objection.  Argumentative.

12:47:57  10              I will say, again, it's really his background

          11   as to his abilities and what he has knowledge of.  Lenz

          12   was decided in 2018, and so it didn't become a form --

          13   it did not become part of the submission protocol until

          14   after it was decided.

12:48:17  15   Q.        Okay.  So you then did acknowledge the fact

          16   that the Declaration from 2012 isn't necessarily helpful

          17   to determine whether Mr. Nicolini reviewed for fair use

          18   prior to sending DMCA notices in 2019-2020; is that

          19   right?

12:48:33  20   A.        Of course not.  I think it's very important.

          21   Q.        Why is that important?

          22              You're muted.

          23   A.        I'm sorry.

          24   Q.        Why is it important?

12:48:48  25   A.        Again, I'll say it again, it provides his
```

| | | |
|---|---|---|
| 12:48:51 | 1 | background as chief technology officer and developer of |
| | 2 | software; in other words, he didn't have a legal |
| | 3 | background. |
| | 4 | Q.      But it doesn't speak to the fair use review, |
| 12:49:04 | 5 | does it? |
| | 6 | A.      I believe it does, because fair use is a legal |
| | 7 | analysis conducted typically by lawyers and judges. |
| | 8 | Q.      Do you have to be a lawyer to do a fair use |
| | 9 | analysis? |
| 12:49:16 | 10 | A.      No.  Of course not.  Any idiot can do a fair |
| | 11 | use analysis.  They just can't -- you know, I think |
| | 12 | it's -- to do an accurate one, I think you should know |
| | 13 | what you're talking about, though. |
| | 14 | Q.      Okay.  And what information did you have to |
| 12:49:34 | 15 | say that Mr. Nicolini does not know what he's talking |
| | 16 | about with respect to fair use? |
| | 17 | A.      Well, the fact that he had no legal training, |
| | 18 | the fact that he had two lawyers on his staff that were |
| | 19 | not associated with the submission of the notices means |
| 12:49:51 | 20 | he did it himself. |
| | 21 | And he didn't have any legal training, and it |
| | 22 | appears that without any legal training and by cutting |
| | 23 | and pasting the same thing for every single image, in |
| | 24 | other words, not conducting an analysis. |
| 12:50:15 | 25 | An analysis to me is, like, look at the image, |

| | | |
|---|---|---|
| 12:50:18 | 1 | you know, go through the elements and explain why.  Not |
| | 2 | cutting and pasting something about what the 2nd Circuit |
| | 3 | said five years ago. |
| | 4 | Q.      So I'm using your words here, but you said, |
| 12:50:34 | 5 | "any idiot can do a fair use analysis." |
| | 6 | You're now giving a hard time for having no |
| | 7 | training.  So if anybody can do it, why does his any |
| | 8 | training have any relevancy to whether he can or cannot |
| | 9 | do a fair use analysis? |
| 12:50:49 | 10 | A.      I want to be clear, I'm not calling him an |
| | 11 | idiot in any way. |
| | 12 | Q.      I know you're not.  I know you're not.  You're |
| | 13 | saying any idiot can do it.  Those were your words |
| | 14 | earlier, "any idiot can do a fair use analysis." |
| 12:50:59 | 15 | My question is, why is training relevant if |
| | 16 | it's something that is just so simple? |
| | 17 | A.      Well, it's, like, anyone could ski a double |
| | 18 | black diamond course.  It doesn't mean that they're |
| | 19 | going to make it to the end of it.  It doesn't mean |
| 12:51:17 | 20 | they're going to do it successfully, right?  That's kind |
| | 21 | of what my point is. |
| | 22 | Q.      I see.  Okay. |
| | 23 | So is it your understanding that the Lenz |
| | 24 | decision says that, to use your analogy, you need to |
| 12:51:33 | 25 | make it to the very end of the double diamond and do it |

| 12:51:36 | 1 | with accurate precision.  Is that what the case holds in |
| | 2 | your mind? |
| | 3 | A.        No.  It states you have to have a good faith |
| | 4 | belief and not pay lip service.  When you cut and paste |
| 12:51:47 | 5 | a statement, you're paying lip service, in my opinion. |
| | 6 | Q.        Okay.  And, in your opinion, was it fair use |
| | 7 | analysis -- strike that.  We'll get to that. |
| | 8 | So you said that he had no legal training. |
| | 9 | How did you learn that he had no legal training? |
| 12:52:12 | 10 | A.        Well, I found it suspicious in his |
| | 11 | communications to Tom Florio that he wrote FRE 408, and |
| | 12 | he referred to the Clearing House defendants as |
| | 13 | "clients," quote/unquote, when, really, he's just their |
| | 14 | copyright agent. |
| 12:52:24 | 15 | So I looked him up on the State Bar, and I |
| | 16 | confirmed that he was not a lawyer.  And I researched |
| | 17 | whether or not that was the unauthorized practice of |
| | 18 | law, and it was.  So I knew for sure he was not a |
| | 19 | lawyer. |
| 12:52:39 | 20 | Q.        Is there legal training one can have that does |
| | 21 | not result in a license to practice law? |
| | 22 | A.        Of course. |
| | 23 | Q.        Okay.  So how do you know that Mr. Nicolini |
| | 24 | didn't have other types of legal training? |
| 12:53:00 | 25 | A.        He said so last week. |

12:53:03   1   Q.        Prior to last week at his deposition, how did

           2   you know he didn't have any other type of legal

           3   training?

           4   A.        I would think that's something he would tell

12:53:11   5   on his website, but he doesn't.  He only touts his

           6   software experience.

           7   Q.        Okay.  Other than not putting it on his

           8   website, do you have any basis to say that he doesn't

           9   have any legal training?

12:53:22  10   A.        Yeah.  He's never worked at a law firm.

          11   He's -- looking at his employment history, he's never

          12   worked at a law firm.  He's only done software work.

          13   There's no indication, based on my exhaustive research,

          14   that he's had any legal training whatsoever.

12:53:38  15   Q.        Okay.  I want to go back to your Exhibit A of

          16   Exhibit 1.  We're now on page 16 of the ECF, and now

          17   we're getting into -- oh, SBO Pictures versus Does.

          18           Was there anything here that informed you

          19   about Mr. Nicolini's fair use review prior to sending

12:53:58  20   notices?

          21   A.        I don't remember that case in particular.

          22   Q.        Okay.  Now, you do some searches on the

          23   unauthorized practice of law.  Is there anything here

          24   that informs you as to whether Mr. Nicolini reviewed for

12:54:15  25   fair use prior to sending notices?

| | | |
|---|---|---|
| 12:54:16 | 1 | A.        Well, in order to -- according to the |
| | 2 | California statute, you cannot apply law to fact |
| | 3 | without -- on behalf of a client unless you are a |
| | 4 | lawyer.  So if you connect the dots with that, it would |
| 12:54:38 | 5 | indicate that you would have to be a lawyer in order to |
| | 6 | act -- |
| | 7 |        THE COURT REPORTER:  I'm sorry.  Mr. Tauler, |
| | 8 | you froze, "you would have to be a lawyer" -- |
| | 9 |        THE WITNESS:  You have to be a lawyer in |
| 12:54:55 | 10 | California in order to apply law to facts on behalf of a |
| | 11 | client, and in order to conduct a fair use analysis on |
| | 12 | behalf of the Clearing House defendants BackGrid UK and |
| | 13 | AKM/GSI, or whoever, BackGrid London, that is a |
| | 14 | necessary function he would have to apply law to factual |
| 12:55:27 | 15 | matter, so -- |
| | 16 | Q.        BY MS. ARDALAN:  Have you made allegations |
| | 17 | that Mr. Nicolini practiced law without a license? |
| | 18 | A.        Yes.  That was part of our initial complaint. |
| | 19 | Q.        Okay.  Why did you make the allegations that |
| 12:55:39 | 20 | Mr. Nicolini -- or what basis did you have that |
| | 21 | Mr. Nicolini practiced law without a license? |
| | 22 | A.        Because he's pretending to be a lawyer, and |
| | 23 | it's part of the scam, and it's wrong.  You can't |
| | 24 | pretend you're a lawyer, say, "FRE 408," say, "Let me |
| 12:55:55 | 25 | get back to my clients with a settlement authority." |

```
12:55:59    1              All of those things indicate to an

            2    unsophisticated person that you are an attorney, but

            3    you're not.  And so when you're acting like an attorney,

            4    but you're really not, it is fraud, basically.  It's

12:56:13    5    also illegal in California, and it served as a predicate

            6    for our UCL claim under the unlawful prong.

            7    Q.        Did you contend that Mr. Nicolini was

            8    practicing law without a license because he applied

            9    facts to law?

12:56:36   10    A.        The primary basis is the e-mail he sent that

           11    makes it seem like he's a lawyer.  And he said he has

           12    clients, and he reserves all rights for those clients.

           13    That's far outside of the scope of what a copyright

           14    agent is.

12:56:51   15              A copyright agent doesn't have the ability to

           16    assert reserve rights for his client, doesn't have the

           17    ability to obtain settlement authority for a client.

           18    Those abilities are reserved for lawyers.

           19              And this was part of the scheme, is to make

12:57:08   20    victims of the scheme, and there are others, think that

           21    Mr. Nicolini is an attorney, so that they get scared and

           22    pay.

           23    Q.        So I just want to go back to my question which

           24    was --

12:57:21   25              Madam Court Reporter, can you read back my
```

```
12:57:23    1    question, please?

            2              (Record read by the reporter as follows:

            3              "Q.  Did you contend that Mr. Nicolini was

            4              practicing law without a license because

12:57:35    5              he applied facts to law?")

            6              THE WITNESS:  In part, yes.

            7    Q.        BY MS. ARDALAN:  Okay.  And was that in the

            8    context of fair use?

            9    A.        I don't recall the contents of the complaint.

12:57:47   10    I think the complaint focused more on the so-called

           11    settlement demands.

           12    Q.        Okay.  So is that a "no," or is that a "yes"?

           13    A.        I don't recall what I wrote back then.

           14    Q.        So if it's not in the complaint, then it's not

12:58:07   15    part of your contention; is that right?

           16    A.        No.  It could be in a draft.

           17    Q.        We don't have the draft.

           18              All right.  So take a look at the cases that

           19    are in the document, part of your search on page 16 ECF,

12:58:24   20    starting with, looks like it's Khai versus County of

           21    Los Angeles.  You also look at Christo, Tensor Law, and

           22    Metabolife International.

           23              Are those all unauthorized practice of law

           24    cases?

12:58:43   25    A.        I don't remember those at all.
```

| 12:58:47 | 1 | Q. | So now I'm going to go to page 14 of the ECF. |

12:58:47  1  Q.        So now I'm going to go to page 14 of the ECF.

2  We're skipping over the redacted -- I'm assuming you

3  redacted this because it relates to other clients; is

4  that right?

12:58:57  5  A.        Yeah, so -- exactly right.  Yeah.

6  Q.        Okay.  So going to the next search for

7  BackGrid, were any of the BackGrid cases you found, did

8  any of them inform you about Mr. Nicolini's failure to

9  review fair use prior to sending DMCA notices?

12:59:21  10  A.        I don't think he was a party to those cases,

11  so no.

12  Q.        So that's a "no."

13        Did any of these cases discuss fair use with

14  respect to infringements on Instagram, that you recall?

12:59:37  15  A.        Yeah.  I think that the Sofia Richie case did.

16  All the ones with celebrities, because Okularity's been

17  going around suing celebrities for posting pictures of

18  themselves on Instagram.

19        And so with old news, these paparazzi will

12:59:55  20  file these mass filings of, like 30, 40 pictures,

21  because they happen to catch Sofia Richie walk out of a

22  restaurant, and then when she posts it, they sue her,

23  which is hilarious.

24        And then they typically settle right away,

13:00:11  25  which is the business model.  But sometimes they fight

| | | |
|---|---|---|
| 13:00:14 | 1 | it on a motion to dismiss. |
| | 2 | But fair use is -- you know, it's a very |
| | 3 | detailed factual inquiry, so oftentimes -- it's very |
| | 4 | rare to grant on as a matter of law. |
| 13:00:28 | 5 | Q.      Okay.  So are you talking about on -- you said |
| | 6 | as a matter of law, so -- |
| | 7 | A.      Yeah. |
| | 8 | Q.      -- you think it's rare to grant fair use on a |
| | 9 | summary judgment? |
| 13:00:38 | 10 | A.      No.  It's not rare for summary judgment.  It's |
| | 11 | rare for a motion to dismiss. |
| | 12 | Q.      Okay.  And so looking at these cases, so you |
| | 13 | said fair use came up in the Sofia Richie case. |
| | 14 | Anything else that caught your eye in terms of fair use |
| 13:00:53 | 15 | analysis? |
| | 16 | Let me know if you want me to move the screen |
| | 17 | up or down. |
| | 18 | A.      I don't remember every single case, so, you |
| | 19 | know -- |
| 13:01:13 | 20 | Q.      Okay. |
| | 21 | A.      -- I can't say as I sit here. |
| | 22 | Q.      With respect to the celebrity cases, were the |
| | 23 | celebrity cases, the instance of celebrity posting their |
| | 24 | own photograph, is there a different fair use analysis |
| 13:01:24 | 25 | for that compared to the Enttech case? |

13:01:27   1   A.        Well, yeah.  They have counterclaims for right

           2   of publicity.

           3           THE COURT REPORTER:  I'm sorry.  "For"?

           4           THE WITNESS:  Right of publicity.

13:01:35   5   Q.        BY MS. ARDALAN:  Okay.  Any other reason why

           6   it may be different?

           7   A.        It would be a reason not to sue them.

           8   Q.        Excuse me?

           9   A.        It would be a reason not to sue them.

13:01:45  10   Q.        It would be a reason not to sue the celebrity;

          11   is that what you're saying?

          12   A.        Yeah.

          13   Q.        Okay.  So did any of these -- I just want to

          14   make sure the record's clear.

13:01:56  15           There's nothing here that BackGrid -- none of

          16   these BackGrid filings informed you of Jon Nicolini not

          17   reviewing for fair use prior to sending notices; is that

          18   right?

          19   A.        Again, Jon Nicolini is not a part of these

13:02:10  20   cases.

          21   Q.        Okay.  So let's look up to the Splash search.

          22   You started searching for Splash, the very top of

          23   page 13 of the ECF, do any of these Splash searches

          24   inform you that Mr. Nicolini did not review for fair use

13:02:27  25   prior to sending the DMCA notices?

```
13:02:29   1   A.          Well, yeah.  I found out Splash News is

           2   actually going through bankruptcy and -- in London, that

           3   is, and based on that, they can't have any sort of

           4   communication with Mr. Nicolini with respect to the fair

13:02:56   5   use elements.  They have to report any -- all their

           6   earnings to the British Bankruptcy Court.

           7          And part of the fair use analysis that needs

           8   to be conducted is the impact on the market value of the

           9   images, and none of that was reported on the British

13:03:15  10   docket.

          11   Q.        Do you know the name of the entity on the

          12   British docket that filed for BK?

          13   A.        It's called "Splash News."

          14   Q.        Anything else?  Do you know whether it's the

13:03:31  15   same entity as Splash News and Picture Agency, LLC?

          16   A.        After Splash News UK filed for bankruptcy,

          17   that's when Splash News domestic changed its name.

          18   Q.        So when you say, "domestic," do you mean

          19   Splash News and Picture Agency, LLC?

13:03:54  20   A.        I'm still not clear which entity is operative.

          21   I believe it's the one with the and, A-N-D, as opposed

          22   to the ampersand.

          23   Q.        What information do you have that Splash News

          24   and Picture Agency, LLC, could not sign off on fair use

13:04:11  25   with Mr. Nicolini?
```

```
13:04:16    1    A.          Mr. Nicolini would have to know what the

            2    images were worth in order to conduct a fair use

            3    analysis.

            4    Q.          It's your understanding that Splash News and

13:04:27    5    Picture Agency, LLC, could not explain what it was worth

            6    to Mr. Nicolini?

            7    A.          They did not explain what they were worth.

            8    Q.          "Did not."

            9                And is this because of the bankruptcy of

13:04:43   10    another entity?  Do I have that right?

           11    A.          No.  That was what Mr. Nicolini and

           12    Mr. Ginsburg told me.

           13    Q.          Okay.  At the time --

           14    A.          That Mr. Nicolini was never informed about the

13:04:59   15    market value of the images.

           16    Q.          Okay.  Prior to Mr. Nicolini's deposition,

           17    what information did you have that Mr. Nicolini did not

           18    have the market value information with respect to

           19    Splash News and Picture Agency, LLC?

13:05:16   20    A.          It's real easy.  You do, like, an image

           21    search, and you see the images everywhere, including

           22    Getty images, and they're selling it for $300.  So then

           23    how would Mr. Nicolini say it's worth 150,000?  It's a

           24    total fraud.

13:05:33   25    Q.          What information do you have that Getty
```

```
13:05:36    1    images -- strike that.

            2           What information do you have that the rights

            3    held by Getty images are of similar value to those of

            4    Splash News and Picture Agency, LLC?

13:05:53    5    A.      It's on their website.  I saw similar a

            6    picture.  It's the one of -- I forgot.  This is

            7    really -- I'm not really good with celebrities, but it's

            8    the one of a couple walking out of a New York building,

            9    and the same image is for sale on Getty images for,

13:06:11   10    like, 300 bucks, 500 bucks.

           11    Q.      Is it the same image, or is it a different

           12    image?

           13    A.      I believe it was the same image.

           14    Q.      You're saying that Splash is selling the exact

13:06:23   15    same image as Getty?

           16    A.      I believe it's --

           17           THE COURT REPORTER:  I'm sorry.  Repeat that.

           18           THE WITNESS:  That image is alleged to have

           19    been owned by BackGrid.

13:06:37   20    Q.      BY MS. ARDALAN:  Will you be able to recognize

           21    it if you saw it?

           22           Excuse me.  You're muted.

           23    A.      Oh, yes.

           24    Q.      Okay.  Is it one of the photographs that's at

13:06:47   25    issue in this lawsuit?
```

| 13:06:48 | 1 | A. | I don't know, because the images at issue |
|---|---|---|---|

```
13:06:48   1   A.        I don't know, because the images at issue

           2   changed, but, at one point, it was.

           3   Q.        At one point, it was.  Okay.

           4             So was it attached as a registered photograph,

13:07:00   5   or was it just a photograph that was at issue in one of

           6   the DMCA notices?

           7   A.        Both, I believe.

           8   Q.        Okay.

           9   A.        I don't recall exactly, though.

13:07:17  10   Q.        Do you recall anything about the celebrity?  I

          11   know -- I'm not good with celebrity names either, so I

          12   appreciate that you can't come up with it.

          13             But is there anything that you can remember

          14   about the picture that might just help us find it

13:07:29  15   quickly?

          16   A.        Sure.  It was, like, a black lady wearing a,

          17   like, yellow, mustard yellow garment and a checkered

          18   type black and white shirt, and she was with her

          19   boyfriend.

13:07:45  20   Q.        What did the boyfriend look like?

          21   A.        He was a tall white fellow.

          22   Q.        Okay.  So other than that image that you

          23   contend is the same with Getty and with BackGrid, is

          24   there any other information you have that the market

13:08:04  25   value of the photographs is -- well, do you have any
```

```
13:08:12    1    information about the market value of the photographs?

            2    A.        Yeah.  We did extensive research on what they

            3    trade for on Getty, and when the images are several

            4    years old like these, they're worth hardly nothing.

13:08:25    5    Q.        So the images that you searched on Getty, did

            6    they have any -- did they resemble photographs that are

            7    at issue in this lawsuit?

            8    A.        Yes, although they're from different

            9    photographers.  So the only one that, as I remember, was

13:08:39   10    an exact match is the one we just talked about, but

           11    there are others that is the same, for the same event.

           12              What they have is, like, several pool

           13    photographers out there just snapping photos.  They'll

           14    snap, like, 50 photos, and they'll register them all.

13:08:54   15              And some -- those that work for BackGrid will

           16    be registered by BackGrid.  Those photographers that

           17    work for Getty will post them on Getty for sale.  Those

           18    that work for X17, who's BackGrid's competitor, will

           19    post those for sale.  But they're basically the same

13:09:13   20    image.

           21    Q.        How often does that happen?  How often did

           22    that happen in the photographs at issue in this lawsuit?

           23    A.        How often did what happen?

           24    Q.        Where a photograph that's at issue in this

13:09:25   25    lawsuit is part of a set that is not necessarily
```

13:09:31   1   exclusive to one agency?

2          Let me just clarify something.  By "set that

3   is not exclusive to one agency," I don't mean that the

4   photos are the same.  I mean that there are multiple

13:09:43   5   photographers at the same event, so they're maybe taking

6   photographs from different angles.  That's what I mean

7   by "exclusive" in this instance.

8   A.          I believe it's, like, between 28 and 31, if I

9   remember correctly, of the 35.

13:09:55   10   Q.          Okay.  Did you do any research on the value of

11   the remaining images?

12   A.          All the remaining images are, like, four or

13   five years old, so I couldn't find those anywhere.  I

14   didn't do all this research myself.  Obviously, I had a

13:10:14   15   paralegal do it.

16          But I saw the results of that investigation,

17   and the images were, like, literally five years old in

18   some cases.  So it's not exact -- you know, the

19   paparazzi photos, of course, are available to be sold on

13:10:32   20   publications based on the celebrity's fame at a

21   particular time, timeliness and rarity.  So if they're

22   not rare, and they're not timely, they have no value.

23   Q.          And when did your paralegal do this research?

24   A.          I don't remember.

13:11:02   25   Q.          What's the name of your paralegal?

```
13:11:03    1   A.          She was researching from day one, but I don't

            2   know when in particular.

            3   Q.          What's the name of your paralegal?

            4   A.          I don't know what day it was.

13:11:14    5   Q.          Excuse me?

            6   A.          I don't know what day it was.

            7   Q.          What is the name of your paralegal who did

            8   this research?

            9   A.          Daniela --

13:11:23   10               THE COURT REPORTER:  I'm sorry?

           11               THE WITNESS:  Daniela Kimble.  So she's in the

           12   billing records as "DK."

           13   Q.          BY MS. ARDALAN:  How do you spell that last

           14   name, just for the court reporter?

13:11:32   15   A.          K-I-M-B-L-E.

           16   Q.          Okay.  If you were able to find out the market

           17   value of the photographs or what you contend is the

           18   market value of the photographs, what information do you

           19   have that Mr. Nicolini didn't do something similar?

13:12:00   20   A.          Well, he never communicated with his clients.

           21   But leaving that aside, his "settlement," quote/unquote,

           22   offer was about a hundred times more than what it was

           23   worth on the market.

           24   Q.          According to your research?

13:12:23   25   A.          (Nodding head.)
```

```
13:12:24   1   Q.        Okay.  And you go into Peter Perkowski.  Was

           2   there anything about searching for Peter Perkowski that

           3   revealed that Mr. Nicolini did not review for fair use

           4   prior to sending DMCA notices?

13:12:40   5   A.        What was relevant as to Nicolini's fair use is

           6   that, basically, Nicolini cut and pasted Perkowski's

           7   letter.  And I know they work together at Okularity, so

           8   it's not hard to connect those dots.

           9   Q.        What is the information -- how is that

13:12:57  10   relevant to the notion that Mr. Nicolini did not review

          11   fair use?

          12   A.        Because if you're just cutting and pasting

          13   something, and you don't change it at all, you're not

          14   undertaking an analysis.  You're making it seem like

13:13:15  15   there's an analysis, but there's no analysis.

          16   Q.        Okay.  But just because you copy and paste

          17   doesn't necessarily mean you don't do the analysis,

          18   right?

          19   A.        I think it depends on the situation.  But if

13:13:26  20   you file 35 takedown notices, and you demand that the

          21   account be taken down, and you cut and paste the exact

          22   same thing to the image, no matter what it is, I think

          23   that indicates no analysis was done.

          24   Q.        You think that necessarily indicates that?

13:13:47  25   A.        Concerning the totality of the circumstances,
```

```
13:13:48    1    yes.

            2    Q.        What are the other totality of circumstances?

            3    What other circumstances are you looking at?

            4    A.        The fact that he didn't reach out to Paper to

13:13:57    5    try to resolve the case.  His only objective was to take

            6    down -- to obtain the ability to restore Paper's asset

            7    by issuing takedown notices.

            8         And he knew that the demand he asked -- after

            9    the third time, the software automatically asked, "This

13:14:19   10    is the fourth time.  You have to take down this

           11    account."

           12         So he's doing this only to take down the

           13    account so that he could then negotiate from an outsized

           14    position of strength based only on false statements that

13:14:34   15    were made.  That's how I see it.

           16    Q.        And how does that preclude him from having

           17    reviewed for fair use prior to sending the notices?

           18    A.        A fair use analysis is not part of the scheme

           19    as it's been revealed.  So if he did have to conduct a

13:14:57   20    fair use analysis, it would create a great deal of

           21    inefficiencies, because it's very time-consuming, right?

           22         And the Lenz core, I believe, stands for the

           23    proposition that this analysis should be done in good

           24    faith, so that it -- the DMCA process isn't abused.  But

13:15:19   25    instead of doing that, software was used, and it was cut
```

13:15:22    1    and pasted.  So I don't believe it's within the spirit

            2    of the Lenz case.

            3    Q.        Did you do your own fair use analysis of the

            4    images that are at issue in this case?

13:15:35    5    A.        I don't think so.  I don't recall.  I mean --

            6    Q.        Okay.  So prior to filing the complaint, you

            7    did not review for fair use?

            8    A.        I don't remember.  I believe that some of the

            9    images I couldn't get, because he wouldn't provide them

13:15:59   10    to me.  Some of them I could, and then -- I mean, some

           11    of them it's quite obvious that a judge would say that

           12    they're fair use.

           13              You know, obviously, I knew that Splash News

           14    is a news reporting agency, although it's, you know,

13:16:17   15    entertainment news and so forth.  So I think those

           16    factors weigh for fair use.

           17              I knew what the images -- I actually do know

           18    what the images were, because they were part of the

           19    WeTransfer file, and they were all just a bunch of

13:16:37   20    pretty much nonsense photos about what a particular

           21    celebrity was doing that day, which is, to me, that's

           22    just reporting and commentary.

           23    Q.        Are you talking about the -- you're talking

           24    about the infringement was reporting commentary because

13:16:53   25    it was describing what the celebrity was doing that day?

| | | |
|---|---|---|
| 13:16:57 | 1 | Did I get that right? |
| | 2 | A.        Well, in some instances.  Yes.  I mean, |
| | 3 | there's so many images, that without going through them |
| | 4 | one by one, it's impossible to know. |
| 13:17:07 | 5 | I think there's a handful of images that may |
| | 6 | have been the same day, and other ones are just |
| | 7 | referring back to events in the past.  Still, others are |
| | 8 | memes, which, in my mind, are -- |
| | 9 | Q.        So -- |
| 13:17:21 | 10 | A.        Go ahead. |
| | 11 | Q.        Are you doing fair use analysis right now?  Is |
| | 12 | this your fair use analysis? |
| | 13 | A.        No. |
| | 14 | Q.        Okay.  So you don't remember doing any fair |
| 13:17:31 | 15 | use analysis prior to filing the lawsuit; is that right? |
| | 16 | A.        Well, no.  As I just said, I reviewed the |
| | 17 | WeTransfer images, in my opinion, given Paper Magazine's |
| | 18 | stature as a news reporting agency, given that the |
| | 19 | images are on a transformative platform, and given that |
| 13:17:49 | 20 | some of the images didn't have the rights that they |
| | 21 | asserted, that was part of my analysis. |
| | 22 | So I guess if I can answer your question |
| | 23 | better for you, I didn't sit there and go through image |
| | 24 | one and run through the four factors. |
| 13:18:10 | 25 | Rather, what I tried to understand was the |

13:18:14    1    scheme, right, because we were in a real time crunch.

            2    Something had to be done to secure this account.

            3            So it's not important, at the time, that every

            4    image go through what ends up being a very rigorous

13:18:31    5    analysis in order to protect my clients' interests.

            6            Rather, given the over -- what I knew about

            7    the overall scheme, it was clear to me that Nicolini had

            8    not conducted a proper fair use analysis, which is the

            9    only thing at issue.

13:18:49   10    Q.       So is it fair to say that you did fair use

           11    analysis on some of them, but not necessarily all the

           12    photos that are at issue here?

           13    A.       I don't think I did a complete fair use

           14    analysis on any of them, quite frankly, because that

13:19:05   15    wasn't an issue at the time.

           16    Q.       Okay.  Have you since done a fair use analysis

           17    on them?

           18            You're muted.

           19    A.       Sorry about that.  I'm doing it because

13:19:20   20    there's a gardener out there, so hopefully he was --

           21            I've done it for some of them, but not all.

           22    Q.       Okay.

           23    A.       Because there are so many factors to consider,

           24    including when the image was first published, how it was

13:19:48   25    published, what medium it was published, and so on and

| | | |
|---|---|---|
| 13:19:50 | 1 | so forth. |
| | 2 | So we've been so busy with so many other |
| | 3 | things that I haven't, like, sat there with all these |
| | 4 | images.  Also, some of the images have gone away.  I |
| 13:20:03 | 5 | don't know what other ones are going to go away.  Maybe |
| | 6 | none.  Maybe some other ones. |
| | 7 | So when the time comes, we'll do that.  But, |
| | 8 | as I said, that's not an issue on a motion to dismiss. |
| | 9 | Q.      What do you mean "go away"?  What do you mean |
| 13:20:16 | 10 | some of the images went away? |
| | 11 | A.      My understanding is that some images that were |
| | 12 | in the Excel spreadsheet are not part of the lawsuit. |
| | 13 | Q.      Okay.  So -- |
| | 14 | A.      So it says 53 images in it, and I think you |
| 13:20:35 | 15 | said there were 30 images in the lawsuit. |
| | 16 | Q.      Okay.  Sitting here today, could you tell us |
| | 17 | what the fair use factors are? |
| | 18 | A.      I don't know them by heart, but when I |
| | 19 | typically do, like, a legal analysis, I'll look up |
| 13:20:55 | 20 | Westlaw, as you know, and look at the statute, and I |
| | 21 | know that there's four components. |
| | 22 | And I'll -- fair use is a little confusing, |
| | 23 | because the titles of each prong is not exactly |
| | 24 | descriptive. |
| 13:21:13 | 25 | But, for example, here, the first one is the |

| | | |
|---|---|---|
| 13:21:17 | 1 | nature and purpose of use, and so whether it's |
| | 2 | transformative, clearly putting it on a completely |
| | 3 | different platform like Instagram is different than |
| | 4 | putting and selling it to a tabloid that you'll find in |
| 13:21:30 | 5 | the supermarket.  So I think that's a fair use factor |
| | 6 | that notates towards fair use. |
| | 7 | Second is the nature of the use.  This is on |
| | 8 | an interactive platform that's ephemeral.  It's posted |
| | 9 | for like -- they're posted for like -- there's several |
| 13:21:49 | 10 | posts a day that every media company does this just to |
| | 11 | engage their consumers. |
| | 12 | It's not like they're making money off of this |
| | 13 | image in the same way a paparazzi would sell its image |
| | 14 | to the London Mirror or what have you for something. |
| 13:22:04 | 15 | This is just a totally different thing. |
| | 16 | And then, next, you have to consider the |
| | 17 | market value, and that -- I know that was not done at |
| | 18 | all based on the settlements and what was asserted |
| | 19 | there.  And then the type of use, whether or not it's |
| 13:22:25 | 20 | used for reporting commentary. |
| | 21 | So I think some factors are stronger than |
| | 22 | others.  And there's, like, sub-features to all this |
| | 23 | sort of thing, because it's really complicated. |
| | 24 | So I just know that Nicolini didn't do all |
| 13:22:38 | 25 | this work. |

```
13:22:40    1    Q.        So I just want to make sure I have it right.

            2    So you have the nature and character of good use.

            3    That's one thing you consider; is that right?

            4    A.        Again, without looking at a legal resource, I

13:22:54    5    can't tell you that off the top of my head.

            6    Q.        Sure.  I'm just trying to get your

            7    understanding.  Not legal terms.  Just trying to get

            8    your human understanding of what we consider when we

            9    look at fair use.

13:23:05   10              So you have the nature and character.  You

           11    have the --

           12    A.        Thank you for considering me human.  That's a

           13    compliment.

           14    Q.        I didn't mean it like that.  I just meant --

13:23:16   15    A.        No, no.

           16    Q.        -- in non-lawyer terms, what are we looking

           17    at?

           18              So you have the nature and character of the

           19    use.  You said the second prong was the use of the

13:23:30   20    copyrighted work, and then the type of work, and then

           21    the effect on the potential market; is that right?

           22    A.        Those are some of them.  And, you know, this

           23    case isn't really about my fair use analysis.  That's

           24    really work product.

13:23:42   25              It's about whether Mr. Nicolini conducted an
```

| | | |
|---|---|---|
| 13:23:44 | 1 | analysis.  And I was giving those points as elements |
| | 2 | that I'm aware of that should have been considered in |
| | 3 | this instance by Mr. Nicolini.  It was not my own |
| | 4 | analysis. |
| 13:23:57 | 5 | Q.       Okay.  Do you have anything to support the |
| | 6 | contention that putting a photo in a different medium is |
| | 7 | necessarily transformative? |
| | 8 | A.       Yes. |
| | 9 | Q.       What is that? |
| 13:24:09 | 10 | A.       The perfect 10 case.  It's cited in our |
| | 11 | opposition brief. |
| | 12 | Q.       Okay. |
| | 13 | A.       There are other cases that cite that |
| | 14 | proposition.  There's another case we cite, I forget the |
| 13:24:24 | 15 | name, having to do with use on Instagram of another |
| | 16 | image.  Of course, all these cases have some factual |
| | 17 | differences, so -- but, yeah. |
| | 18 | Q.       Okay.  Let's go back to your Westlaw search. |
| | 19 | And we have some searches about DMCA takedown notice and |
| 13:24:46 | 20 | bad faith, and we're back to the Lenz decision, and then |
| | 21 | we have some fair use investigation searches. |
| | 22 |          Fair to say?  Fair and accurate description of |
| | 23 | your searches or your filtering? |
| | 24 |          I'm trying to move this along by merging |
| 13:25:04 | 25 | things, so if you think it's not accurate, just let me |

```
13:25:07    1    know.

            2                THE COURT REPORTER:  Did we lose him?

            3                MS. ARDALAN:  I think we lost him.  Let's go

            4    off the record.

13:25:42    5                THE VIDEOGRAPHER:  Going off the record.  The

            6    time is 1:27 p.m.

            7                (Brief recess was taken from 1:27 p.m. to

            8    1:27 p.m.)

            9                THE VIDEOGRAPHER:  We're back on the record.

13:45:48   10    The time is 1:27 p.m.

           11    Q.          BY MS. ARDALAN:  All right.  Welcome back,

           12    Mr. Tauler.  It looks like you're on your cell phone

           13    now, so if you can't see anything, just let me know, and

           14    we'll make sure that you're able to see.  I don't want

13:46:02   15    you answering questions when you can't see the

           16    Declaration in front of you.

           17    A.          Okay.

           18    Q.          Okay.  So last we left off, I believe we were

           19    talking about some of your searches related to fair use

13:46:16   20    investigation and DMCA notices sent in bad faith, and

           21    it's reflected in page 12 to page 11 of ECF, of the ECF

           22    document that we have attached to this deposition as

           23    Exhibit 1.

           24                Do you see that?

13:46:35   25    A.          Yes.
```

13:46:36    1    Q.          Okay.  Throughout any of these searches, did

            2    you find any information of Mr. Nicolini not reviewing

            3    for fair use prior to sending the DMCA notices?

            4    A.          Those searches were about unauthorized

13:46:56    5    practice of law and application of law to facts, so, to

            6    that extent, they did impact my assessment.  But none of

            7    those searches yielded any cases about Mr. Nicolini

            8    specifically.

            9    Q.          Okay.  And they affected your assessment

13:47:15   10    because of why?

           11    A.          Because he was someone who's not trained to

           12    apply law to facts, and he's conducting an analysis that

           13    requires that ability.

           14    Q.          Okay.

13:47:38   15    A.          Or he's supposed to conduct an analysis using

           16    those abilities.

           17    Q.          Okay.  Is it your understanding that someone

           18    needs to be a lawyer to send a DMCA notice?

           19    A.          No.  I don't believe they have to be a lawyer.

13:47:59   20    Q.          Now, I want to take a look above this at

           21    46HK83, and it looks like this is related to key number

           22    on prohibited and permitted acts in general.

           23               Would you say it's fair enough to relate this

           24    search to the unauthorized practice of law search that

13:48:19   25    we were just discussing?

13:48:27  1   A.        I don't remember at all, but it seems that

2   way, just based on the time stamps.

3   Q.        Okay.  And so I'm just going to go up to at

4   the top page 11, ECF 11.  We have "In re Reynoso."  I

13:48:43  5   don't know if I'm saying that right.

6             But do you know what that case relates to,

7   what issue that relates to?

8   A.        I do not.  I don't recall.

9   Q.        Okay.  Do you think it has anything to do with

13:48:54  10  DMCA notices?

11  A.        I don't remember.

12  Q.        Okay.  Do you think it informed you that

13  Mr. Nicolini was sending out DMCA notices without a

14  review of fair use?

13:49:06  15  A.        I don't remember that case, as I sit here.

16  Q.        Okay.  And then what about Reger versus

17  Werner?

18  A.        Same thing.  I don't remember any specific

19  case, other than Lenz, I don't think.

13:49:21  20  Q.        Okay.  So that case did not inform you that

21  Mr. Nicolini sent out takedown notices without a fair

22  use review?

23  A.        Reynoso?

24  Q.        No.  I'm sorry.  Reger versus Werner?

13:49:46  25  A.        I don't remember what that case was about.

13:49:48  1    Q.        Okay.  Now we have, it looks like, some key

          2    numbers relating to representation of others in general,

          3    drafting or preparation of documents, administrative

          4    practice, lawyers not admitted, licensed or authorized

13:50:00  5    in jurisdiction, effect of unauthorized practice in

          6    general, in general, K11, some other numbers, civil

          7    proceedings, private actions for unauthorized practice.

          8             So this is another search.  Do you know

          9    whether this search revealed any information about

13:50:15  10   Mr. Nicolini sending out DMCA notices without fair use

          11   review?

          12   A.        Oh, I don't recall.

          13   Q.        Okay.  Next we have Benninghoff versus

          14   Superior Court.  Did this case reveal to you that

13:50:38  15   Mr. Nicolini sent out DMCA notices without a fair use

          16   review?

          17   A.        I don't remember what that case says.

          18   Q.        Okay.  Many of the cases that were

          19   Benninghoff, In re Garcia, Merco Construction Engineers,

13:50:55  20   do any of these relate to Mr. Nicolini sending a DMCA

          21   notice without a fair use review?

          22   A.        I don't think any of those cases refer to

          23   Mr. Nicolini specifically.

          24   Q.        Okay.  Do they relate to DMCA notices?

13:51:11  25   A.        I don't recall.

| | | |
|---|---|---|
| 13:51:14 | 1 | Q.       Okay.  So next we have a search about DMCA |
| | 2 | takedowns, DMCA within five words of take, within two |
| | 3 | words of down. |
| | 4 |         Did this search reveal anything about |
| 13:51:25 | 5 | Mr. Nicolini sending out DMCA notices without a fair use |
| | 6 | review? |
| | 7 | A.       I don't think so. |
| | 8 | Q.       Okay.  Now we're going to the next page, which |
| | 9 | is page number 9.  I think we're almost at the end of |
| 13:51:37 | 10 | this. |
| | 11 |         But you started doing a search of negotiating |
| | 12 | demand letters and settlement of unauthorized practice |
| | 13 | of law. |
| | 14 |         Did this search reveal anything about |
| 13:51:49 | 15 | Mr. Nicolini practicing -- excuse me, Mr. Nicolini |
| | 16 | sending out a DMCA notice without a fair use review? |
| | 17 | A.       Is this -- is that the third one from the |
| | 18 | bottom there? |
| | 19 | Q.       So the bottom has negotiating "demand letter |
| 13:52:14 | 20 | and settlement unauthorized practice of law," and then |
| | 21 | you do another search that's similar.  And I think |
| | 22 | you're limiting it by -- is it jurisdiction? |
| | 23 |         I'm not sure how you're limiting it or why it |
| | 24 | has fewer results than the other search, but they both |
| 13:52:33 | 25 | relate to negotiating demand letter and settlement |

| | | |
|---|---|---|
| 13:52:35 | 1 | unauthorized practice of law. |
| | 2 | A.        Yeah.  Same answer.  I don't remember what |
| | 3 | that search yielded. |
| | 4 | Q.        Okay.  Do you recall it revealing anything |
| 13:52:48 | 5 | about Mr. Nicolini? |
| | 6 | A.        None of these cases that I researched with |
| | 7 | respect to unauthorized practice of law mention |
| | 8 | Mr. Nicolini specifically. |
| | 9 | Q.        Okay.  And then what about People ex rel |
| 13:53:03 | 10 | Herrera versus Stender?  Did that have anything to do |
| | 11 | with Mr. Nicolini? |
| | 12 | A.        Only that I believe it was a criminal case |
| | 13 | where someone was prosecuted for unauthorized practice |
| | 14 | of law. |
| 13:53:21 | 15 | Q.        Was Mr. Nicolini involved in this case? |
| | 16 | A.        I don't -- no.  I don't think so. |
| | 17 | Q.        Okay.  Then the next case is Splash News and |
| | 18 | Picture Agency versus Lavandeira. |
| | 19 |         Do you know whether this case reveals anything |
| 13:53:37 | 20 | about Mr. Nicolini sending out DMCA notices without a |
| | 21 | fair use analysis? |
| | 22 | A.        No.  This is before he was engaged by the |
| | 23 | Clearing -- |
| | 24 | Q.        Excuse me.  Can you say that again? |
| 13:53:52 | 25 | A.        This case was before he was engaged by the |

13:53:56    1    Clearing House defendants.

            2    Q.       By "Clearing House defendants," you mean who?

            3    A.       BackGrid, Splash News and Picture Agency, LLC,

            4    BackGrid UK, and AKM/GSI -- or BackGrid London, I should

13:54:22    5    say.

            6    Q.       What about Xposure?

            7    A.       Oh, Xposure.  You're right.  Yeah.  Sorry.  I

            8    understand it's the same as BackGrid London.

            9    Q.       What gives you that understanding?

13:54:36   10    A.       The testimony of Mr. Nicolini and

           11    Mr. Ginsburg.  But, also, if you look at the Excel

           12    spreadsheet, the images were -- that were asserted were

           13    coded with BackGrid UK.

           14    Q.       By "coded," what makes you think they were

13:55:05   15    coded with BackGrid UK?

           16    A.       So on the Excel spreadsheet, there's a column

           17    for the control number, I suppose, or the internal --

           18    how those various entities number or keep track of the

           19    image.

13:55:25   20    Q.       So it's almost like a serial number associated

           21    with the set; is that right?  Because it has BKUK, you

           22    think it relates to BackGrid UK and not Xposure?

           23    A.       It's BGUK.  Yes.  So the images that were in

           24    the Excel spreadsheet as BGUK were eventually those that

13:55:49   25    Mr. Nicolini said, really, were Xposure.

| 13:55:54 | 1 | So Xposure is not listed, I don't believe, in |
|---|---|---|
| | 2 | that Excel spreadsheet.  Rather, it's BackGrid UK that |
| | 3 | registered the images -- or chronicled them, I should |
| | 4 | say and -- |
| 13:56:10 | 5 | Q.      Well, registration and chronicle are two |
| | 6 | different things, so which one is it? |
| | 7 | A.      Well, there's both words apply generally.  But |
| | 8 | I want to use "chronicle" instead of "registration," |
| | 9 | because there's copyright registration, and then there's |
| 13:56:24 | 10 | also, you know, whatever internal registration the |
| | 11 | entities do. |
| | 12 | So just to be clear, I'll use the term |
| | 13 | "chronicle."  So I'm not -- to be clear, I'm not |
| | 14 | referring to copyright registration. |
| 13:56:41 | 15 | Q.      Okay.  So this search for Silverhub Media and |
| | 16 | related searches with Splash News and Splash News |
| | 17 | Agency, did they reveal anything to you that exposed the |
| | 18 | idea that Mr. Nicolini did not review fair use prior to |
| | 19 | sending out DMCA notices? |
| 13:57:06 | 20 | A.      Yes.  I have learned some of the images he |
| | 21 | asserts the rights to didn't belong to the entity, so |
| | 22 | some of those internal control numbers or chronicle |
| | 23 | numbers refer to an entity called "AKM/GSI," and I |
| | 24 | learned it was bought out by Silverhub Media, I want to |
| 13:57:24 | 25 | say, in 2014 or through 2016, something like that. |

| | | |
|---|---|---|
| 13:57:31 | 1 | Q.        So what information do you have that Silverhub |
| | 2 | Media purchased AKM/GSI? |
| | 3 | A.        There's a bunch of articles about it, and then |
| | 4 | there's also the Secretary of State. |
| 13:57:47 | 5 | Q.        And do you have any information of what |
| | 6 | happened to the assets of AKM/GSI in that purchase? |
| | 7 | A.        I would have to no way to know.  No. |
| | 8 | Q.        Okay.  Do you have any information relating to |
| | 9 | any sort of transfer agreements between AKM/GSI and any |
| 13:58:08 | 10 | other entity that might be a party to this lawsuit? |
| | 11 | A.        Mr. Nicolini testified that there were some |
| | 12 | transfer agreements.  And, I believe, Mr. Ginsburg |
| | 13 | testified that they're, basically, the same entity.  I |
| | 14 | don't want to quote him.  But that's more or less my |
| 13:58:32 | 15 | recollection. |
| | 16 |         But other than that, no.  I was unable to |
| | 17 | locate, you know, the private merger documents and all |
| | 18 | this stuff despite searching for them. |
| | 19 | Q.        Have you asked Mr. Perkowski or anyone who |
| 13:58:46 | 20 | works with Okularity for a copy of any transfer |
| | 21 | agreements between AKM/GSI and any other entity? |
| | 22 | A.        Yeah.  I've asked all of you guys for that in |
| | 23 | the context of the notice of interested parties. |
| | 24 | Q.        You've asked us for -- is it your testimony |
| 13:59:09 | 25 | that you've asked us for transfers or assignments of |

13:59:13   1   copyrights when you have asked us for the notice of

2   interested party updates; is that right?

3   A.        I don't remember what I wrote in that e-mail,

4   but I was asking for information about the transfer and

13:59:25   5   why Silverhub wasn't listed as an owner when it was.

6   Q.        Okay.  But the certificate of interested

7   parties relates to the entity information, is that

8   right, who owns different entities?  Is that your

9   understanding?

13:59:42  10   A.        Correct.

11   Q.        Okay.  So what does that have to do with

12   assignments of copyright?

13   A.        Well, if the owner of the entity is no longer

14   AKM/GSI, and the owner is now a new entity called

14:00:02  15   "BackGrid USA," which, in turn, was created as the

16   result of a merger of Silverhub, that tells me that as

17   with any merger assets were transferred.

18   Q.        But you have no information to know that; is

19   that right?  You have no information?

14:00:23  20   A.        I do, because Nicolini's spreadsheet lists

21   control numbers for AKM/GSI dating from 2014 and 2015

22   before the merger, which I believe was in 2016, now that

23   I think about it.

24            And so the claims he asserts are for BackGrid

14:00:41  25   USA which is a spinoff entity and not AKM/GSI which was

| | | |
|---|---|---|
| 14:00:48 | 1 | the predecessor entity.  So, at some point, there had to |
| | 2 | be a transfer of that particular image in the |
| | 3 | spreadsheet. |
| | 4 | Q.      Okay.  Have you asked for a copy -- have you |
| 14:00:58 | 5 | asked for a copy of a copyright transfer between AKM and |
| | 6 | any other party? |
| | 7 | A.      Discovery is not open yet, so -- |
| | 8 | Q.      Okay.  But informally, at any time, have you |
| | 9 | just said, "Hey, guys, can you send this over?  I have a |
| 14:01:13 | 10 | question"? |
| | 11 | A.      They've not provided me any information other |
| | 12 | than they asked me to sign an NDA for giving me any |
| | 13 | information, so -- |
| | 14 | Q.      Is it your understanding that the assignment |
| 14:01:33 | 15 | was something that was covered by the NDA? |
| | 16 | A.      Yeah.  My recollection is yeah.  The NDA, if I |
| | 17 | remember, it said, like, I couldn't talk about any of |
| | 18 | this. |
| | 19 | Q.      Okay.  So this is the first time you brought |
| 14:01:55 | 20 | it up in this deposition, so I just want to understand |
| | 21 | where we are on this. |
| | 22 |         So your contention is that Nicolini asked you |
| | 23 | to sign an NDA.  This is prior to the lawsuit being |
| | 24 | filed; is that right? |
| 14:02:07 | 25 | A.      Yes. |

```
14:02:08    1    Q.        And was this over the phone or was this over

            2    e-mail or somewhere else?

            3    A.        I believe they suggested it on the first

            4    phone.  Then they sent me a draft of it over e-mail.

14:02:25    5    Q.        What information did you request when that

            6    prompted the NDA; do you remember?

            7    A.        Yeah.  I asked for information about the

            8    images.

            9    Q.        What information in particular?

14:02:41   10    A.        Registration information.  So the chart that

           11    was provided doesn't provide information as to the

           12    corresponding images and -- at least when I was able to

           13    access it.

           14              And so I asked for information about, as I

14:03:05   15    remember it, who owned the copyrights.  Many of those in

           16    that initial spreadsheet were not even registered.  Most

           17    of them were published years back.

           18              So I asked for information about transfers,

           19    and I asked for various things, and they said, you know,

14:03:28   20    "Just sign this NDA.  We'll give you" -- "we'll be

           21    willing to talk after you sign this NDA," as I remember

           22    it.

           23    Q.        So I'm just trying to figure out the complete

           24    universe of what you were asking that prompted the NDA.

14:03:41   25              So you said that the spreadsheet -- one thing
```

| 14:03:45 | 1 | you said the spreadsheet didn't have the corresponding |
| | 2 | images, so I don't really understand what you mean by |
| | 3 | that.  Can you explain what that means? |
| | 4 | A.       So for some of the images, they didn't have |
| 14:03:58 | 5 | links -- they had links -- the spreadsheet had a link |
| | 6 | to, like, where the images were housed on Okularity's |
| | 7 | website, but they didn't have images of how they |
| | 8 | appeared on Paper's Instagram account, which, of course, |
| | 9 | was an important piece of material.  And they didn't |
| 14:04:23 | 10 | have that, and, of course, Paper didn't have that |
| | 11 | because their account was down. |
| | 12 | Q.       Okay.  So other than not getting some of the |
| | 13 | screen shots of the infringement for which a takedown |
| | 14 | was sent, what other information did you request from |
| 14:04:39 | 15 | Mr. Nicolini on that phone call? |
| | 16 | A.       I asked for a copy of the DMCA notices. |
| | 17 | Q.       Anything else? |
| | 18 | A.       That's all I can remember. |
| | 19 | Q.       Okay.  So is it your testimony -- because you |
| 14:04:54 | 20 | weren't very clear about this, is it your testimony that |
| | 21 | you asked for transfers, or you didn't ask for |
| | 22 | transfers? |
| | 23 | A.       I believe I asked for ownership records which |
| | 24 | would implicate the transfers.  I don't recall |
| 14:05:06 | 25 | specifically talking about transfers during that initial |

| | | |
|---|---|---|
| 14:05:09 | 1 | call. |
| | 2 | Q.        Okay.  So do you have any information that the |
| | 3 | works at issue in this lawsuit have not been transferred |
| | 4 | to the respective party that is claiming ownership in |
| 14:05:31 | 5 | the counterclaims? |
| | 6 | A.        Yeah.  Mr. Nicolini said in his deposition |
| | 7 | that he had no idea when they were transferred, but he |
| | 8 | said that he's sure they were. |
| | 9 | Q.        Okay.  And then other than his deposition, |
| 14:05:50 | 10 | what information do you have that the works had not been |
| | 11 | transferred to the respective counter |
| | 12 | defendant/counterclaimants -- excuse me, |
| | 13 | defendant/counterclaimants in this case; i.e., the photo |
| | 14 | agencies? |
| 14:06:09 | 15 | A.        So if you do an image search, which, again, |
| | 16 | the images were housed on Okularity's server on their |
| | 17 | website.  They've since been taken down, for some |
| | 18 | reason, but at the time they were available, and you |
| | 19 | could do an image search for those, and you could see |
| 14:06:26 | 20 | they're licensed to various entities across the world. |
| | 21 | Q.        Okay.  One more time.  I didn't hear what you |
| | 22 | just said. |
| | 23 | A.        And they were on various blogs and magazines |
| | 24 | and so forth. |
| 14:06:46 | 25 | Q.        Okay.  So is there something inconsistent with |

```
14:06:47   1   having multiple outlets license an image and owning an

           2   image; in other words, what makes you believe that the

           3   defendants/counterclaimants don't own the respective

           4   photographs that are at issue in this lawsuit?

14:07:12   5   A.        There's a lot of evidence at this point.  Do

           6   you mean back then or do you mean now?

           7   Q.        Let's start with now.

           8   A.        They various images do not correspond -- the

           9   ownership as reflected in the copyright registrations do

14:07:37  10   not reflect the -- I forget the word, the monikers, the

          11   internal monikers that the agencies gave it.  So, in

          12   other words, the ones that were listed as BackGrid UK

          13   are now registered as Xposure.

          14   Q.        Other than the photographs that were given

14:08:06  15   BGUK code and the registrations, the corresponding

          16   registrations, that belonged to Xposure, are there any

          17   other photographs that you contend are not owned by the

          18   respective photo agency that's in this lawsuit?

          19   A.        Well, I don't know -- we just went over

14:08:28  20   AKM/GSI.  We also know that Mr. Nicolini testified that

          21   they were once owned by the photographers themselves,

          22   and he doesn't know when the agencies gained ownership

          23   of them.

          24             We also know some of the images are available

14:08:52  25   online with different registrants or different
```

| | | |
|---|---|---|
| 14:08:58 | 1 | attributions.  So, for example, some of the images, say, |
| | 2 | have other people's names attributed to them besides -- |
| | 3 | Q.        Okay. |
| | 4 | A.        Yeah. |
| 14:09:14 | 5 | Q.        Okay.  When they have other people's names |
| | 6 | attributed to them, do they also have the name of the |
| | 7 | photo agency? |
| | 8 | A.        In some instances, they do, but, in some |
| | 9 | instances, they don't. |
| 14:09:28 | 10 | Q.        Can you think of an instance where there was a |
| | 11 | name other than the photo agency attributed to the image |
| | 12 | but not the photo agency itself? |
| | 13 |         Mr. Tauler? |
| | 14 | A.        Sorry. |
| 14:09:47 | 15 | Q.        You're on mute. |
| | 16 | A.        I'm trying to go somewhere quieter because |
| | 17 | there's some noise. |
| | 18 |         But, yes, there's various images that have |
| | 19 | water marks for other media outlets. |
| 14:10:07 | 20 | Q.        Is an example of this the Spicy Cheeto Katy |
| | 21 | Perry thing that you showed at Mr. Ginsburg deposition? |
| | 22 | A.        An example of what? |
| | 23 | Q.        An example of what you were just describing? |
| | 24 | A.        No.  That was just an instance, I believe, |
| 14:10:28 | 25 | that came up in the context of Mr. Nicolini saying that |

| | | |
|---|---|---|
| 14:10:34 | 1 | he looked at the images visually, and that he has, |
| | 2 | apparently, 20/20 vision and can tell if an image is the |
| | 3 | same. |
| | 4 | So I showed him that, just a simple Google |
| 14:10:47 | 5 | search of that occasion, Katy Perry Halloween 2017 or |
| | 6 | whatever it was, turns up literally hundreds of images |
| | 7 | that are more or less identical. |
| | 8 | Q.   But they're not identical, are they? |
| | 9 | A.   Some of them are. |
| 14:11:07 | 10 | Q.   I apologize.  I did say Mr. Ginsburg's |
| | 11 | deposition, but, you're right, it was Mr. Nicolini's |
| | 12 | deposition. |
| | 13 | So I'm just trying to find an example of where |
| | 14 | you contend that there are other names that are given |
| 14:11:19 | 15 | attribution that are not the photo agency. |
| | 16 | Can you think of an example? |
| | 17 | A.   Not offhand. |
| | 18 | Q.   Okay. |
| | 19 | A.   I didn't memorize it. |
| 14:11:32 | 20 | Q.   I understand. |
| | 21 | How often did that happen?  Have you gone |
| | 22 | through all of the photographs? |
| | 23 | A.   A paralegal did, and I believe it probably |
| | 24 | happened a third of the time, if I had to guess, |
| 14:11:50 | 25 | estimate. |

| | | |
|---|---|---|
| 14:11:51 | 1 | Q.        Okay.  All right.  So let's go back to |
| | 2 | Exhibit 1.   Exhibit A of Exhibit 1.  We're now -- we |
| | 3 | looked at Splash News, Splash News searches. |
| | 4 |          Is there any other reason -- did this inform |
| 14:12:15 | 5 | you that Mr. Nicolini did not review for fair use for |
| | 6 | any other reason other than what you have just |
| | 7 | described? |
| | 8 | A.        Which entry? |
| | 9 | Q.        We're looking at assistance of Silverhub Media |
| 14:12:32 | 10 | and of Splash, Splash News Agency. |
| | 11 | A.        No.  I don't think those searches yielded any |
| | 12 | information about Mr. Nicolini's fair use analysis other |
| | 13 | than something was amiss with respect to when the |
| | 14 | images -- something changed between the time the images |
| 14:13:00 | 15 | were first published with respect to ownership and when |
| | 16 | he asserted claims on the different entities. |
| | 17 | Q.        Okay.  What is your understanding of -- you |
| | 18 | mentioned, at some point, you saw the images in multiple |
| | 19 | places licensed to many different outlets. |
| 14:13:24 | 20 |          How does that affect ownership?  So if |
| | 21 | BackGrid owns a photograph and licenses it out to many |
| | 22 | other places, does that affect BackGrid's ownership? |
| | 23 | A.        It could affect who owns the -- whether or not |
| | 24 | Paper Magazine got a sublicense. |
| 14:13:51 | 25 | Q.        Okay.  But does it affect ownership? |

```
14:13:57    1    A.        My understanding is there can be joint owners

            2    of a copyright, but so -- I'm not sure -- I'm not sure

            3    what your question is.

            4    Q.        You mentioned in your testimony earlier on

14:14:14    5    that one of the reasons -- and tell me if I'm wrong

            6    about this.  Tell me if I'm misstating your testimony.

            7              You testified one of the reasons why you

            8    thought that the photo agencies didn't have copyright

            9    ownership was because it was licensed to many different

14:14:30   10    outlets; is that right?  Did I get that right?

           11    A.        No.

           12    Q.        Okay.  What was the relevance of raising the

           13    idea that they had licensed it to many other outlets?

           14    A.        Obviously, it affects the market value if an

14:15:04   15    image is available hundreds of places on the Internet.

           16    Then there's less of it impact the fair use analysis.

           17    Q.        Okay.  But we were talking about ownership.

           18    We weren't talking about fair use.

           19              So how does that fact affect ownership, the

14:15:23   20    idea that it's licensed to many different outlets?

           21    A.        I don't think it necessarily affects

           22    ownership.

           23    Q.        Okay.  Could it ever affect ownership?  You

           24    said it doesn't necessarily, so what would be the

14:15:47   25    circumstances where it does affect ownership, in your
```

```
14:15:49    1   mind?

            2   A.        It would depend on the terms of the license

            3   and, you know, just who owns the image, licensed what to

            4   who or what rights were transferred.  These are all,

14:16:04    5   like, very specific facts I obviously can't -- didn't

            6   have access to before.

            7   Q.        Was this part of your claim for why the photo

            8   agencies don't own the photographs, that they've

            9   licensed it to numerous outlets?

14:16:24   10   A.        I don't think -- again, I don't think

           11   licensing -- if you own an image, you can license it to

           12   someone else.  There's no dispute there.

           13   Q.        Okay.  So what did the photo agencies do to

           14   divest ownership of the photographs that are at issue in

14:16:43   15   this lawsuit?

           16   A.        Again, I think the issue's not that they

           17   divested ownership.  It's that no one seems to know who

           18   owned the images when Mr. Nicolini served his DMCA

           19   notices and images were published and when the images

14:17:03   20   were registered.  Those are all different entities

           21   according to Nicolini's Excel spreadsheet and his

           22   testimony.

           23   Q.        And what information did you have other than

           24   the spreadsheet coding with the BGUK, other than that

14:17:17   25   issue, what information did you have prior to filing
```

14:17:20    1    this lawsuit that informed you that the agencies did not

            2    own the photographs that were at issue in either their

            3    DMCA takedown notifications or that eventually rose in

            4    their counterclaim?

14:17:40    5    A.        I don't recall.

            6    Q.        You don't recall?

            7    A.        I don't recall.  Also, I don't think that's

            8    part of my Declaration.

            9    Q.        Well, okay.  Fair enough.

14:18:01   10              It is part of your opposition, though.  Is

           11    there a reason why that wasn't part of your Declaration?

           12    A.        Because judicially noticeable.  And it's also

           13    part of -- we referenced the moving papers, so there's

           14    no need to set it forth another time.

14:18:24   15    Q.        Okay.  All right.  So let's take a look at the

           16    next case, Splash News and Picture Agency, LLC, versus

           17    Nicholai Hilton Rothschild, et al.

           18              Do you see that?

           19    A.        I don't.  Maybe you can scroll.  I'm seeing

14:18:47   20    sort of --

           21    Q.        Do you want me to make it a little bit bigger?

           22    A.        It's not the size as much I'm seeing -- I

           23    start seeing the page.  If you could just move the page

           24    over to the left a little bit.

14:18:58   25    Q.        To the left.  Hold on.  Let me see.

14:19:01  1   A.        Yeah.  Oh, that's way better.  Yeah.

          2   Q.        Is that better?  Okay.

          3             So did that case inform you about Mr. Nicolini

          4   at all in any way?

14:19:25  5   A.        Splash News v. Hilton, that one?

          6   Q.        Yes.

          7   A.        I don't remember that one.

          8   Q.        Okay.  Did anything in the Splash News and

          9   Picture Agency versus Onika Tanya Maraj -- I'm not sure

14:19:48  10  if that's right -- inform you of Mr. Nicolini's DMCA

          11  practices?

          12  A.        I don't remember what that case said.

          13  Q.        Okay.  And then you also did a search for

          14  Johnson, within five words of new, within two words of

14:20:08  15  destiny, within two words of Christian.

          16            Did this search reveal anything about

          17  Mr. Nicolini and his DMCA review prior to sending

          18  notices -- excuse me.  Let me say that again.

          19            Did anything in this search reveal anything

14:20:25  20  about Mr. Nicolini's fair use review prior to sending

          21  DMCA notices?

          22  A.        I don't remember that case.

          23  Q.        Okay.  And you also did another search for

          24  Splash News and came up with Beckham versus Splash News

14:20:43  25  and Picture Agency.  I think we've talked about this

| | | |
|---|---|---|
| 14:20:46 | 1 | before. |
| | 2 | But, in this instance, did it reveal anything |
| | 3 | to you about Mr. Nicolini's fair use review prior to |
| | 4 | sending notices? |
| 14:20:55 | 5 | A.      Other than what we discussed, I don't think |
| | 6 | so.  I think it's just kind of came full circle there. |
| | 7 | Q.      Okay.  And so then you have a bunch of |
| | 8 | redacted material after that.  Any particular reason why |
| | 9 | this is redacted, or is it just because it's other |
| 14:21:10 | 10 | clients? |
| | 11 | A.      I believe those are searches for other cases. |
| | 12 | Q.      Okay.  Okay.  So that would be Exhibit A. |
| | 13 | And let's go ahead and take a look at |
| | 14 | Exhibit E of your Declaration.  So let me just scroll to |
| 14:21:31 | 15 | it.  Just one second.  It's not Exhibit E.  My bad.  It |
| | 16 | is -- |
| | 17 | Here we go.  Excuse me.  Okay.  So this will |
| | 18 | be -- this is Exhibit G of your Declaration. |
| | 19 | A.      Uh-huh. |
| 14:21:56 | 20 | Q.      Does Exhibit G look familiar to you? |
| | 21 | A.      Sure does. |
| | 22 | Q.      Okay.  And -- |
| | 23 | A.      Too familiar.  All too familiar. |
| | 24 | Q.      Okay.  How often do you put your time in, |
| 14:22:14 | 25 | Mr. Tauler? |

| | | | |
|---|---|---|---|
| 14:22:16 | 1 | A. | Daily. |
| | 2 | Q. | And do you have any rules about how often your |
| | 3 | | staff puts in time? |
| | 4 | A. | I ask them to do it daily. |
| 14:22:42 | 5 | Q. | I'm sorry.  I didn't hear you. |
| | 6 | A. | I ask them to do it daily. |
| | 7 | Q. | Okay.  And do they do it daily? |
| | 8 | A. | I don't check typically until I -- you know, |
| | 9 | | maybe once or twice a month. |
| 14:22:52 | 10 | Q. | Okay. |
| | 11 | A. | Usually at the end of the month, to be honest. |
| | 12 | Q. | Okay. |
| | 13 | A. | I should do it more. |
| | 14 | Q. | Yeah.  Understood. |
| 14:23:03 | 15 | | Okay.  So it looks like the first time entry |
| | 16 | | for this matter, the Paper Magazine matter -- which is |
| | 17 | | the Enttech matter; is that right?  Just so we're on the |
| | 18 | | same page, the Paper Magazine matter is the Enttech |
| | 19 | | matter? |
| 14:23:19 | 20 | A. | That's correct. |
| | 21 | Q. | Okay.  So you have some time sheets with |
| | 22 | | different users here. |
| | 23 | | You mentioned that Ms. Kimble is your |
| | 24 | | paralegal; is that right? |
| 14:23:30 | 25 | A. | Correct. |

```
14:23:31    1   Q.          Okay.  So I want to take a look, as we scroll

            2   down here we see a redaction.

            3               So I'm looking at Ms. Saryan -- am I saying

            4   her name right?

14:23:48    5   A.          Saryan.

            6   Q.          Saryan's time sheet.  And there is a

            7   redaction.  I'm not going to read the entire thing,

            8   although if you want me to, that's fine.  It says --

            9   A.          If you could go up to the left again.  I can't

14:23:59   10   see it currently.

           11   Q.          Is that better?

           12   A.          No.

           13   Q.          Better?

           14   A.          No.  I can't see the entries.  It's, like, off

14:24:13   15   to the right of my screen.

           16   Q.          Okay.  Hold on.  Let me see.

           17               Is that better?  No?

           18   A.          It's actually worse.

           19   Q.          Okay.  I'm just trying to find a way to do

14:24:28   20   this without -- let me just stop screen share for a

           21   moment and close out of other things.

           22   A.          If you can do full screen, maybe --

           23   Q.          I think it was full screen.  Let me click out

           24   of things in the background because I don't want to

14:24:40   25   share my all my other documents.
```

```
14:24:46   1   A.        You guys believe I'm growing blonde hair on my

           2   flavor saver?  That is so wild, or is that white hair?

           3   Uh-oh.

           4            MR. PERKOWSKI:  Just wait for the gray,

14:25:04   5   Robert.

           6   Q.        BY MS. ARDALAN:  All right.  Let me screen

           7   share you again, and then I can move this around a

           8   little bit more.

           9            Okay.  How is that?

14:25:28  10   A.        Perfect.

          11   Q.        Okay.  Great.

          12            Okay.  So on July 8th, you have or your

          13   associate has -- Valerie has a time entry, and part of

          14   it's redacted.

14:25:40  15            Do you want me to read the whole thing, or do

          16   you want to just read the redaction, around the

          17   redaction?

          18   A.        I see -- I can read the entry, and I see the

          19   redaction.

14:25:51  20   Q.        Okay.  So the first redaction, "E-mail

          21   correspondence to partner Tauler re," then you redact

          22   it, "researched company issue takedowns."

          23            So why was this redacted?

          24   A.        I don't remember.

14:26:05  25   Q.        When did you do these redactions?
```

| 14:26:09 | 1 | A. | Last week.  It would have been, like, whenever |
| | 2 | this was due. |
| | 3 | Q. | Okay.  The same day it was due? |
| | 4 | A. | Yes. |
| 14:26:22 | 5 | Q. | Okay.  While you may not remember this |
| | 6 | particular redaction -- |
| | 7 | A. | I didn't redact them, but so -- and I don't |
| | 8 | remember, but I did review the redactions, and I don't |
| | 9 | remember this one in particular. |
| 14:26:40 | 10 | Q. | Okay.  Did you instruct -- |
| | 11 | A. | It could have been because it just had |
| | 12 | someone's name in it or something like that.  But I |
| | 13 | don't know for this specific one. |
| | 14 | Q. | Did you instruct someone else to redact this |
| 14:26:52 | 15 | document? |
| | 16 | A. | Initially, and then I reviewed it. |
| | 17 | Q. | Okay.  Who was the person who did the |
| | 18 | redactions? |
| | 19 | A. | I think it was Valerie. |
| 14:27:04 | 20 | Q. | And what instructions did you give Valerie to |
| | 21 | redact in terms of redactions? |
| | 22 | A. | Just the usual.  Just nothing privileged. |
| | 23 | Q. | Privileged. |
| | 24 | | So is it your contention that whatever the |
| 14:27:17 | 25 | redacted is privileged? |

14:27:24    1    A.          As far as I know, yes, or there are other

            2    instances where there's, like, particular software we

            3    use or something like that, that's more particular

            4    thoughts we have on the matter, there may have been an

14:27:42    5    entry that it's basically work product.

            6    Q.          Okay.  Were there any other reasons other than

            7    you don't want to disclose a particular software and

            8    work product or something of that nature, privileged

            9    communications type thing?

14:28:03   10    A.          No other reason than that.

           11    Q.          Let's take a look at the next redaction.  It's

           12    also part of the same time entry.  "Electronic file for

           13    the Okularity matter in," blank, "download and save the

           14    IG report Excel file to the electronic file."

14:28:26   15                Do you know what this redaction is about?

           16    A.          That's software we use internally.

           17    Q.          Software.  Okay.  And then --

           18    A.          Litigation management software.

           19    Q.          Okay.  Then the next thing, "Download

14:28:41   20    documents from WeTransfer create folder," and then it's

           21    redacted.

           22                Do you know what that redaction is about?

           23    A.          Same thing.

           24    Q.          It's the software?

14:28:48   25    A.          Yes.

```
14:28:49    1    Q.        Okay.  Then there's an entry from Ms. Kimble

            2    on July 9th, and there's a redaction at the very end.

            3    I'll just read the last sentence, "Downloaded and saved

            4    business registrations, news articles and docket

14:29:06    5    reports," redacted.

            6              Do you know why that's redacted?

            7    A.        I think that's also the software we use.

            8    Q.        Okay.  The next one is your time entry, and

            9    it's on July 9th.  You say, "Communications with

14:29:18   10    Okularity regarding resolution of their copyright

           11    claims, telephone call with client re same, call with,"

           12    and then you have a redaction.

           13              Do you know why you redacted that?

           14    A.        That is a third party that -- I believe it's a

14:29:37   15    third party that reached out to me about -- it was

           16    another victim of the scheme, as it were, and I -- they

           17    had signed an NDA, so I basically told them I couldn't

           18    help them.  But I didn't want to reveal their name,

           19    obviously.

14:29:54   20    Q.        Okay.  And did you get any information from

           21    this third party?

           22    A.        Just that they were the victim of the scheme,

           23    and that they signed an NDA, and that was the end of

           24    that.  I didn't feel I was able to talk to them beyond

14:30:16   25    that.
```

14:30:17  1   Q.        How long did you talk to them for?

          2   A.        Not very long.  Less than five minutes.

          3   Q.        Okay.  So you mentioned at the status

          4   conference with the judge that there might be a

14:30:36  5   circumstance where you might have gotten information

          6   from a third party who you wouldn't want to reveal

          7   because they had a confidentiality agreement.

          8           Is this the person you were talking about to

          9   the judge?

14:30:51 10   A.        I did not indicate to the judge that that had

         11   occurred.  I said that that's a potential thing that

         12   could have happened.

         13   Q.        And did that happen?

         14   A.        I didn't garner information that informed my

14:31:08 15   analysis from anyone subject to an NDA.  No.  That did

         16   not happen.

         17   Q.        Okay.  "Research authority for," redacted,

         18   "communications with attorney regarding strategy."

         19           What is the basis for that redaction?

14:31:24 20   Mr. Tauler?

         21   A.        "Research authority for" blank, is it that

         22   one?

         23   Q.        Yes.

         24   A.        I'm trying to remember.  I could probably tell

14:31:59 25   you after the deposition, but I don't remember as I sit

14:32:01   1   here or stand here.

2   Q.        Fair enough.

3            And then towards the end of your entry,

4   "Conference call with," redaction, "and clients re,"

14:32:15   5   redaction.

6            What was this redaction about, those two

7   redactions?

8   A.        I think the parties that were on the call.

9   Q.        Parties who were on the call.

14:32:41   10            So is this another call with another third

11   party that's subject to an NDA?

12   A.        No.

13   Q.        Okay.  So you have, "Conference call with,"

14   redacted, "and clients."

14:32:53   15            Who else other than the clients were there?

16   A.        Well, that's why it's redacted.

17   Q.        Would it be considered -- were they a

18   consultant of the clients?

19   A.        If I remember correctly, this is a third party

14:33:10   20   that provided information that's not one of the victims.

21   Just another third party.

22   Q.        Okay.  Are they subject to an NDA?

23   A.        I beg your pardon?

24   Q.        Are they subject to an NDA?

14:33:25   25   A.        No.

14:33:28   1   Q.        Okay.  And, I'm sorry, why aren't you

           2   revealing their information?

           3   A.        I believe -- well, if you knew the substance

           4   of the conversation, I think it's work product.

14:33:47   5   Q.        Even though a third party would be present who

           6   is not related to your claim?

           7   A.        Correct.  Because it would have to do with

           8   information, you know, my theories of the case and so

           9   forth.

14:34:09  10   Q.        Okay.  But if you reveal your theory of the

          11   case to a third party, then it's no longer privileged or

          12   work product?

          13   A.        It's not -- it wouldn't be privileged, but it

          14   could still be work product.

14:34:23  15   Q.        Okay.  Go ahead.

          16   A.        Yeah, or if it's aiding in the development of

          17   my analysis, I think it's work product.

          18   Q.        Okay.  So your contention is it's not

          19   privileged, but it is work product?

14:34:41  20   A.        Yeah.  I don't believe this call was with a

          21   represented party, so it's not privileged.

          22   Q.        Okay.  To be clear, the third party was part

          23   of this phone call which you claim is work product?

          24   A.        Yes.

14:35:03  25   Q.        Okay.  Let's take a look the next redaction,

14:35:15   1   "Read and reviewed e-mail correspondences from client re

         2   DMCA takedown, Okularity settlement demands and

         3   copyright reports," redaction, "reviewed Excel

         4   spreadsheet," which I think there may be a semicolon

14:35:30   5   between the redaction "reviewed."  So that's the end of

         6   that entry.

         7         Do you know what the basis is for this

         8   redaction?

         9   A.      Yeah.  If it's reviewing the contents of

14:35:41  10   correspondence with a client, it would be privileged,

       11   attorney-client privilege.

       12   Q.      Okay.  So is it your contention that this

       13   redaction includes privileged information?

       14   A.      I believe so.  Yes.

14:36:13  15   Q.      Okay.  "Phone call with," redacted, "and

       16   client re," redacted.

       17         Is this another third party?

       18   A.      Yes.

       19   Q.      Is this now the third third party?  So there's

14:36:28  20   three of them, or is this a repeat?

       21   A.      I think this is just a second instance.  I

       22   think it's part of the same call.  It's just a different

       23   attorney, time entry.

       24   Q.      Oh, I'm sorry.  You're right.  Okay.  Very

14:36:44  25   good.  Okay.

```
14:36:46    1              And then there's redaction section here.  Do

            2    you know the basis for this redaction?

            3              Let me just say, for the record, it's the very

            4    end of Valerie's time entry for July 9th.  There's a

14:37:03    5    paragraph redaction.  There's a billing entry redaction.

            6              Do you know what that's about?

            7    A.        I don't remember.

            8    Q.        Okay.  Now, on July 10th, Valerie has another

            9    time entry.  It says, "E-mail correspondence with client

14:37:23   10    re," redaction.

           11    A.        Yeah.  So that would be privileged.

           12    Q.        Privileged.  Okay.

           13              "Conducted Westlaw research on copyright

           14    infringement of embedded photographs," redacted.

14:37:41   15              Why is that redacted?

           16    A.        I don't recall.

           17    Q.        Now, on July 12th, you have a time entry that

           18    says, "Communications with," redacted, "re status and

           19    joint efforts to restore account."

14:38:00   20              Why is that redacted?

           21    A.        That happens to be a third-party attorney I

           22    spoke with.

           23    Q.        Okay.  Is that an Instagram attorney?

           24    A.        No.

14:38:18   25    Q.        Okay.  On July 13th, Luca Stein has a time
```

14:38:27   1   entry with a redaction.

2              Do you know why this is redacted?

3   A.        I don't.  I don't recall.

4   Q.        Okay.  All right.  I want to take a look at

14:38:55   5   Exhibit H of your Declaration, which is our Exhibit 1 to

6   this deposition.

7              This is a time entry for Valerie Sarayan; is

8   that right?

9   A.        Correct.

14:39:13   10   Q.        Okay.  She's an attorney at your firm?

11   A.        Yes.

12   Q.        Okay.  And how did she communicate the fruits

13   of her research to you?

14   A.        Generally or in this instance?

14:39:34   15   Q.        In this instance.

16   A.        I don't recall, but -- I don't recall.

17   Q.        Okay.  Is the stuff that she searched for,

18   would it necessarily be communicated to you?

19   A.        If it was relevant, of course.  Yeah.

14:39:58   20   Q.        So let's take a look on July 8th, Instagram

21   takedown.  Do you recall her communicating anything

22   about her search regarding Instagram takedown?

23   A.        Yeah.  That's work product, so --

24   Q.        Okay.  Was there anything that informed you

14:40:15   25   that Mr. Nicolini did not review fair use prior to

| | | |
|---|---|---|
| 14:40:19 | 1 | issuing a DMCA takedown notice that came as a result of |
| | 2 | this search? |
| | 3 | A.        I don't recall. |
| | 4 | Q.        Okay.  There are other lawsuits that she |
| 14:40:31 | 5 | searched for, McGucken versus News Week. |
| | 6 |          Did this case inform you at all about |
| | 7 | Mr. Nicolini's review of fair use? |
| | 8 | A.        I don't remember that case. |
| | 9 | Q.        Okay.  About what about Blizzard Entertainment |
| 14:40:44 | 10 | versus Blizzard Sports Center and the related filings, |
| | 11 | which were also searched for? |
| | 12 |          Did anything about this case inform you about |
| | 13 | Mr. Nicolini reviewing fair use prior to sending |
| | 14 | takedown notices? |
| 14:40:56 | 15 | A.        I don't recall. |
| | 16 | Q.        She also searched for a number of copyright |
| | 17 | registrations. |
| | 18 |          Do you recall getting any sort of information |
| | 19 | about Mr. Nicolini as a result of this search? |
| 14:41:13 | 20 | A.        I don't recall. |
| | 21 | Q.        There's also an SPL1555791.  I don't know what |
| | 22 | that is. |
| | 23 |          Do you know what that is, that she searched |
| | 24 | for? |
| 14:41:32 | 25 | A.        So that is a moniker Splash uses for -- |

14:41:38  1   Q.       Okay.

          2   A.       -- to name of some of their images, I think.

          3   Q.       Okay.  Anything about that moniker, the search

          4   of the moniker, that resulted in any sort of information

14:41:48  5   about Mr. Nicolini not reviewing fair use prior to

          6   sending out DMCA notices?

          7   A.       Not that I remember.

          8   Q.       Okay.  Now, here's some more searches she did

          9   on copyright registrations, and it goes up to the middle

14:42:04  10  of ECF 143.  For any of these -- and I started at the

          11  end of the exhibit, to be clear.

          12           So the searches started -- for the

          13  registrations started on ECF 144, and it goes on until

          14  143.

14:42:21  15           Do any of these copyright registrations inform

          16  you or the searches from the copyright registrations

          17  inform you about Mr. Nicolini's purported failure to

          18  review fair use prior to sending the DMCA notice?

          19  A.       I don't remember.

14:42:40  20  Q.       With respect to the search for DMCA counter

          21  notice and then also DMCA counter notice and Instagram,

          22  did anything result from that search that helped you

          23  assess whether Mr. Nicolini reviewed fair use prior to

          24  sending the DMCA notice?

14:42:57  25  A.       I don't recall.

| | | |
|---|---|---|
| 14:42:59 | 1 | Q.        Okay.  Then we have Sinclair versus Ziff |
| | 2 | Davis.  Did this case inform you at all about anything |
| | 3 | related to Mr. Nicolini? |
| | 4 |          I'm sorry.  I didn't hear a response from you. |
| 14:43:21 | 5 | A.        I didn't provide one.  That's why.  I -- |
| | 6 | Q.        I can't see you at the same time.  Let me see |
| | 7 | if I can see you.  It's hard for me to screen share and |
| | 8 | see you.  Anyway, I'm sorry. |
| | 9 |          Do you have a response? |
| 14:43:41 | 10 | A.        The case sounds familiar, but I don't remember |
| | 11 | what it was about. |
| | 12 | Q.        Okay.  What about Picture Words, Inc., versus |
| | 13 | CM Services Sales and Marketing Group, did that inform |
| | 14 | you whether Mr. Nicolini reviewed fair use prior to |
| 14:44:07 | 15 | sending DMCA notices? |
| | 16 | A.        I don't remember. |
| | 17 | Q.        Okay.  What about Batra versus PopSugar, Inc., |
| | 18 | did that case inform you whether Mr. Nicolini reviewed |
| | 19 | fair use prior to sending DMCA notices? |
| 14:44:28 | 20 | A.        I don't remember. |
| | 21 | Q.        Okay.  It looks like Valerie also did a search |
| | 22 | for DMCA counter notice that revealed some cases. |
| | 23 |          Did her search reveal any information to you |
| | 24 | that suggested that Mr. Nicolini did not review fair use |
| 14:44:45 | 25 | prior to sending DMCA notices? |

14:44:49   1   A.        I would assume so, but I don't have a

           2   recollection of that.

           3   Q.        You would assume so.  So, I mean, if it did,

           4   wouldn't you have raised it in your Declaration?

14:45:04   5   A.        No.

           6   Q.        Why not?

           7   A.        Because they're cases, so cases are put in

           8   briefs, not in Declarations.

           9   Q.        Okay.  But did any of these cases discuss

14:45:19  10   Mr. Nicolini?

          11   A.        No.  Not as an individual.  No.

          12   Q.        Okay.  Long versus Dorset, does that have

          13   anything to do with Mr. Nicolini?

          14   A.        He's not a party to that case, as far as I'm

14:45:37  15   aware.

          16   Q.        She also did a search DMCA counter notice.

          17   Did that search reveal any information about

          18   Mr. Nicolini's alleged failure to review fair use?

          19   A.        I see the Perfect 10 case there, so that's a

14:45:55  20   case with respect to fair use.

          21   Q.        Sorry.  I didn't mean to cut you off.  Go

          22   ahead.

          23   A.        Yeah.  That's a case we talked about earlier.

          24   Q.        Okay.  So this case informed your fair use

14:46:09  25   analysis; is that right?

14:46:10   1    A.         Again, it's not about my competing fair use

2    analysis.  It's whether or not Mr. Nicolini conducted a

3    fair use analysis.

4    Q.         That's right.  Actually, you said that you did

14:46:24   5    not review fair use.  I apologize for misstating that.

6               Okay.  So Long versus Dorset, did you -- we

7    already talked about that.

8               Energy Intelligence Group, Incorporated,

9    versus Kanye Anderson Capital Advisors.  Did this case

14:46:41   10   assist you in any way with respect to Mr. Nicolini's --

11   with respect to determining whether Mr. Nicolini

12   reviewed fair use prior to sending a takedown notice?

13   A.         I don't recall.

14   Q.         What about Greg Young Publishing versus

14:46:58   15   Zazzle, did that have any impact on you in terms of

16   knowing that Mr. Nicolini did or did not review fair use

17   prior to sending DMCA notices?

18   A.         I don't remember that, as I sit here.

19   Q.         Okay.  Then you or your associate searched

14:47:16   20   Section 512.  She did a search DMCA and Embed.

21              Are any of the images that are on the Paper

22   Magazine account that were taken down as a result of

23   Mr. Nicolini's takedown notice, were any of those

24   Embeds?

14:47:36   25   A.         All the ones on the Paper Magazine's website

```
14:47:39    1    are.

            2    Q.        Okay.  We already talked about Perfect 10

            3    versus Google.

            4              Automatic versus Steiner, did that assist your

14:47:52    5    analysis as to whether Mr. Nicolini reviewed fair use

            6    prior to extending the DMCA takedown notice?

            7    A.        I don't remember that case.

            8    Q.        Okay.  Then she does some searches for

            9    copyright and Embed and photo, and copyright and Embed.

14:48:07   10              Did the result of this search assist you in

           11    anyway in determining whether Mr. Nicolini reviewed fair

           12    use prior to sending a DMCA takedown notice with respect

           13    to the Paper Magazine account?

           14    A.        I don't remember this case.

14:48:24   15    Q.        Okay.  Do you remember Monge versus Maya

           16    Magazine?

           17    A.        I don't remember that one.

           18    Q.        Did she send it to you?

           19    A.        I don't remember.

14:48:37   20    Q.        Okay.  Then she searched for copyright and

           21    Instagram and photo.  Did this search assist you in any

           22    way in determining whether Mr. Nicolini reviewed fair

           23    use prior to sending DMCA notices?

           24    A.        I don't recall.

14:48:53   25    Q.        Okay.  And now she did a search of what is the
```

```
14:48:55    1    fair use doctrine which revealed Field versus Google.

            2               Did this case assist you in any way in

            3    determining that Mr. Nicolini did not review fair use

            4    prior to sending the DMCA takedown notice?

14:49:09    5    A.        I don't recall.

            6    Q.        Okay.  We're back at searching what's fair

            7    use, and back at Monge versus Maya Magazine, so I'll

            8    skip that, unless you have anything to add as to how

            9    these entries helped your review of Mr. Nicolini

14:49:30   10    reviewing fair use prior to sending DMCA takedown

           11    notices.  Did they?

           12    A.        It does not.  Thank you for streamlining that.

           13    Q.        What about Katz versus Google, did that assist

           14    you in any way to determine whether Mr. Nicolini

14:49:41   15    reviewed fair use prior to sending DMCA takedown

           16    notices?

           17    A.        I don't recall.

           18    Q.        Okay.  I'm going to skip over to Yang versus

           19    Mic Network.  Did this assist you in any way to

14:49:58   20    determine that Mr. Nicolini did or did not review fair

           21    use prior to sending DMCA notice?

           22    A.        I don't remember that case specifically.

           23    Q.        Okay.  And then I'll skip over Katz, because

           24    we already talked about it.

14:50:12   25               With respect to Embed and photograph, did this
```

| | | |
|---|---|---|
| 14:50:13 | 1 | search reveal anything that reflected to you that |
| | 2 | Mr. Nicolini did not review fair use prior to sending |
| | 3 | DMCA takedown notices? |
| | 4 | A.        I don't remember. |
| 14:50:26 | 5 | Q.        Okay.  Goldman versus Breitbart, did anything |
| | 6 | with that relate to Mr. Nicolini reviewing fair use |
| | 7 | prior to sending DMCA notices? |
| | 8 | A.        None of these cases that were published |
| | 9 | opinions dealt with Okularity and Mr. Nicolini |
| 14:50:44 | 10 | specifically. |
| | 11 | Q.        Okay.  So when you say none of these published |
| | 12 | opinions, just to streamline this, we can say Walsh |
| | 13 | versus Townsquare, the corresponding Goldman versus |
| | 14 | Breitbart, McGucken versus News Week, is that what you |
| 14:51:02 | 15 | mean?  Are there others, too? |
| | 16 | A.        As far as I remember, yes. |
| | 17 | Q.        Okay.  Philpot versus Kos Media that, too, did |
| | 18 | not reveal anything about Mr. Nicolini? |
| | 19 | A.        To be clear, my answer is that those cases -- |
| 14:51:17 | 20 | Mr. Nicolini is not a party to those cases. |
| | 21 | Q.        Okay.  So those cases did not reveal to you |
| | 22 | any information that Mr. Nicolini did or did not review |
| | 23 | fair use prior to sending DMCA notices; is that right? |
| | 24 | A.        I don't -- I don't recall. |
| 14:51:34 | 25 | Q.        Okay.  Grumpy Cat Limited, did this case |

14:51:41  1   assist you in determining that Mr. Nicolini did or did

2   not review fair use prior to sending a DMCA takedown

3   notice?

4   A.      I don't recall.  I feel like I'd remember a

14:51:51  5   case called "Grumpy Cat," so I don't remember that one.

6   Q.      Okay.  Then there's some searches for memes

7   and copyright and then memes.  Did this search result

8   assist you in any way in determining that Mr. Nicolini

9   did or did not review fair use prior to sending the DMCA

14:52:06  10  takedown notice?

11  A.      I don't know if or understood how I received

12  information as resulting in the search, but my

13  understanding is that Mr. Nicolini did not consider

14  whether or not meme was protected by fair use.

14:52:27  15  Q.      So what makes you say that Mr. Nicolini did

16  not -- I want to -- I don't want to misstate your

17  testimony, so let me just make sure.

18          Madam Court Reporter, can you read back

19  exactly what he said?

14:52:40  20          (Record read by the reporter as follows:

21          "A.  I don't know if or understood how I

22          received information as resulting in the

23          search, but my understanding is that Mr.

24          Nicolini did not consider whether or not

14:52:59  25          meme was protected by fair use.")

14:53:01    1    Q.         BY MS. ARDALAN:   Okay.  So what information do

            2    you have that supports the notion that Mr. Nicolini did

            3    not consider whether a meme was fair use?

            4    A.         He told me straight up at his depo.

14:53:15    5    Q.         Okay.  Did he tell you any other times other

            6    than at your depo?

            7    A.         No.

            8    Q.         Okay.  So do you have any other information

            9    that informs you that he did not consider whether a meme

14:53:32   10    was protected by the fair use doctrine?

           11    A.         The fact that several of the images at issue

           12    are memes, and the fact that wide dissemination of memes

           13    are widely protected as a consideration of the fair use.

           14    Q.         So what information do you have that

14:53:56   15    Mr. Nicolini did not review or consider whether memes

           16    are fair use?

           17    A.         He told me he didn't.

           18    Q.         Other than at his deposition?

           19    A.         I mean, it's clear to me, from the

14:54:32   20    submissions, they make no reference to that portion of

           21    the fair use analysis and his submissions to Instagram.

           22    The only thing that is clear from the submissions is

           23    that he wanted the account taken down.

           24    Q.         So when you say it was clear from the

14:54:50   25    submission that he did not address that portion of the

```
14:54:55   1   fair use doctrine, what portion of the fair use doctrine

           2   do you mean?

           3   A.        Transformative use and dissemination, market

           4   value.

14:55:07   5   Q.        "Dissemination," is that what you said?

           6   A.        Yeah.  Dissemination.

           7   Q.        Okay.  And does that go to a specific factor?

           8   What factor does dissemination go to?

           9   A.        It's a subfactor of the fourth prong, which is

14:55:34  10   the market analysis.

          11   Q.        So it's your contention that he did no review

          12   of the dissemination, that fourth prong, and he did no

          13   review of whether it's transformative based on the fact

          14   that it's a meme; is that correct?

14:55:50  15   A.        That's my contention.  Correct.

          16   Q.        And you said it's because he didn't address it

          17   in his takedown notice?

          18   A.        Well, also, his deposition confirmed it.

          19   Q.        Okay.  So sitting here today, would it

14:56:02  20   surprise you if he did, in fact, address

          21   transformativeness and also market harm in his takedown

          22   notice?

          23   A.        It would just be a cut and paste of the same

          24   thing he writes in --

14:56:17  25   Q.        Okay.  But that's not what you said.  You said
```

14:56:19   1    it wasn't addressed in it.  So the question isn't

           2    whether it's a copy/paste.  The question is whether it's

           3    addressed?

           4    A.       To me, addressing something means applying the

14:56:30   5    facts to the law.  Not just cutting and pasting the fair

           6    use statement.  That's three paragraphs long.  It's the

           7    exact same no matter what the photo is.  When it was,

           8    what it is, where it's disseminated, it's the same cut

           9    and paste job.  So, to me, that's not fair use analysis.

14:56:48  10    Q.       Okay.  Now, I'm going to just try to

          11    streamline this by putting some of these cases together

          12    we already talked about.

          13             But Hayes versus Minaj, Philpot versus

          14    Alternet Media, Monsarrat versus Zaiger, McGucken versus

14:57:07  15    News Week, do any of these decisions inform you whether

          16    Mr. Nicolini did or did not review fair use prior to

          17    sending DMCA notices?

          18    A.       I don't remember those cases, so I can't say

          19    as I sit here.

14:57:20  20    Q.       Okay.  What about Long versus Dorset, was that

          21    helpful to you in any way with respect to whether

          22    Mr. Nicolini sent DMCA notices prior -- excuse me,

          23    reviewed fair use prior to sending DMCA notices?

          24    A.       I don't remember this case holding offhand, so

14:57:35  25    I can't say as I sit here.

```
14:57:36   1   Q.          Okay.  What about Wolk versus Kodak Imaging

           2   Network, did that case assist you in any way to

           3   determine whether Mr. Nicolini reviewed fair use prior

           4   to sending a DMCA takedown notice?

14:57:53   5               THE COURT REPORTER:  You're on mute,

           6   Mr. Tauler.

           7               THE WITNESS:  Sorry.

           8               I don't remember the holding of that case

           9   offhand, so I can't say.

14:57:59  10   Q.          BY MS. ARDALAN:  Okay.  And then there was a

          11   search for DMCA and --

          12               THE COURT REPORTER:  Counsel, you're frozen

          13   for me.  I don't know if you're frozen for other

          14   parties.

14:58:29  15               THE WITNESS:  Yeah.  I couldn't hear that,

          16   Counsel.

          17               THE COURT REPORTER:  You're still frozen.

          18               THE WITNESS:  Can we take another break?

          19   She's frozen.  She can't say yes.

14:58:37  20               MR. PERKOWSKI:  It works for me.

          21               Let's go off the record.

          22               THE VIDEOGRAPHER:  Going off the record.  The

          23   time is 3:00 o'clock p.m.

          24               (Brief recess was taken from 3:00 p.m. to

15:06:54  25   3:12 p.m.)
```

15:10:14  1            THE VIDEOGRAPHER:  We are back on the record.

         2  The time is 3:12 p.m.

         3  Q.        BY MS. ARDALAN:  Welcome back.  I apologize

         4  for the interruption.  I had a problem.

15:10:23  5            But going back to Exhibit E of your

         6  Declaration, which is ==Exhibit 1== to this deposition,

         7  we're almost done with it, but we just had one more

         8  case, Universal City Studios versus Corley, did this

         9  case inform you in any way whether Mr. Nicolini reviewed

15:10:41 10  fair use prior to sending a DMCA notice?

        11            You're muted.

        12  A.        I don't remember that case as I sit here.

        13  Q.        Okay.  Now, we've been through the research

        14  that you and your associate have done on Westlaw.

15:11:00 15            As a result of any of this research, did you

        16  find any sort of factual information that informed you

        17  that Mr. Nicolini did or did not review fair use prior

        18  to sending a DMCA notice?

        19  A.        Other than what we've talked about?

15:11:18 20  Q.        Other than what we've talked about, is there

        21  anything I'm missing?

        22  A.        Not as I sit here today.  I can't think of

        23  anything besides, you know, we talked about the

        24  Declaration.  We talked about the Lenz case, obviously.

15:11:39 25  So, yeah, other than what we talked about, I can't --

```
15:11:43   1   without looking at these cases and everything like that,

           2   I have nothing to add.

           3   Q.        Okay.  So I want to mark as Exhibit 2 a

           4   photograph that I'm showing on the screen right now.

15:11:58   5             Do you see that, or do I need to reload it?

           6   A.        I do not see it.

           7   Q.        Okay.  Let me try this again.

           8             (Defendants' Exhibit No. 2 was marked

           9        for identification and is attached hereto.)

15:12:14  10   Q.        BY MS. ARDALAN:  Do you see it now?

          11   A.        Yes.  That's the one I was talking about

          12   earlier.

          13   Q.        Okay.  So earlier on, there was some testimony

          14   about how you believed that BackGrid did not have

15:12:26  15   certain rights -- or excuse me, that a photo agency did

          16   not have certain rights to a photograph, and you were

          17   describing a photograph with a woman in a yellow shirt

          18   and a checkered jacket with a tall guy; is that

          19   accurate?

15:12:41  20   A.        Yes.

          21   Q.        And your testimony was that the same the exact

          22   same image was on sale for Getty for, was it, $300?

          23   A.        They charge different amounts based on the

          24   size, so I think it was -- I don't remember exactly,

15:12:58  25   but, roughly, between $100, maybe 150 to 500 or
```

15:13:02  1   something like that.

2   Q.        Okay.  But you said it was the exact same

3   photograph that was on the Getty website?

4   A.        I may have said that, but, thinking back now,

15:13:16  5   I'm not sure it was the exact same.  It was -- Getty has

6   a ton of these same images.  That's just one agency,

7   obviously.

8           And I remember thinking that it was the same,

9   but I'm not sure that it's exactly the same.  It could

15:13:33  10  have just been -- could have been the same photographer

11  just, because from what I understand, they just hit the,

12  you know, flash button, takes a bunch of pictures in

13  seriatim, or it could have been a paparazzi standing

14  right next to him that took one that's very similar to

15:13:55  15  this.

16  Q.        Did you look at this photograph side by side

17  with the photograph that's up on Getty that you contend

18  are the same or similar?

19  A.        I don't remember.  I must have.

15:14:10  20  Q.        But you don't remember?

21  A.        I don't remember that instance particularly.

22  Q.        Okay.  All right.  So one thing that you

23  testified to today is that one of the reasons you

24  believed that the fair use analysis was not performed by

15:14:47  25  Mr. Nicolini was that DMCA notice had the same language,

```
15:14:54   1   is that right, between different infringements?  Do I

           2   have that correctly?

           3   A.        Yes.

           4   Q.        Okay.  So I wanted to look at Exhibit -- I'm

15:15:13   5   going to mark as Exhibit 3.

           6           (Defendants' Exhibit No. 3 was marked

           7      for identification and is attached hereto.)

           8           MS. ARDALAN:  Exhibit 3 is a copy of the

           9   counterclaims that the studios filed.

15:15:39  10   Q.        BY MS. ARDALAN:  I don't know how much you

          11   want to look through this or not, but, as you can see,

          12   there's a stamp at the very top.

          13   A.        Yeah.

          14   Q.        Okay.  So let's just look at, for example,

15:15:49  15   Exhibit B-1.  And take a look it's the first page of

          16   Exhibit B-1, which is on page 51 of ECF document number

          17   48 filed in this case.

          18           Do you see that okay?

          19   A.        Uh-huh.

15:16:09  20   Q.        Okay.  So we're just going to look at this as

          21   an example.  And I'm happy to go back and forth as you

          22   wish, but here we have one copy of one photograph, of

          23   one infringement, Mr. Bieber on his bicycle with a

          24   commentary "@justinbieber sorry for that one time we

15:16:28  25   thought you were eating a burrito sideways."
```

```
15:16:38    1   A.          Kids these days.

            2   Q.          Kids these days.

            3               So here's one example of one photo, one

            4   infringement.  I'm going to skip over the next one.

15:16:41    5   It's the same caption.  It's just on Twitter.

            6               Then I'm going to go to -- this was to a

            7   photograph that is -- I think it was posted on the --

            8   I'm going to skip that one, because I think that was

            9   posted on the Enttech website, so it might be

15:17:09   10   different -- well, we can talk about it if you like.

           11               My question is, I want to look at these two

           12   photographs.  Let's just go ahead and look at ECF number

           13   page 53.  Is the fair use analysis on page 53 different

           14   than on page 42?

15:17:29   15               That can't be right that -- oh, actually, yes.

           16   Let me start over again.

           17               Ready?  Okay.  Page 51 is a picture of

           18   Justin Bieber with the commentary that we just read,

           19   "sorry for that one time we thought you were eating a

15:17:41   20   burrito sideways."  Skip over, it's Twitter.  It says

           21   the same thing.

           22               Now we have another picture that was uploaded

           23   on the Enttech website of a woman, essentially, two

           24   different pictures.

15:17:53   25               How is the fair use analysis of these two
```

| | | |
|---|---|---|
| 15:17:56 | 1 | images, these two uses, different? |
| | 2 | You're muted, Mr. Tauler.  We can't hear you. |
| | 3 | A.      I don't understand your question. |
| | 4 | Q.      Okay.  So I guess what I'm trying to figure |
| 15:18:10 | 5 | out is, when we look at these -- especially when looking |
| | 6 | at Instagram, right?  Here's a picture of Kanye West. |
| | 7 | We're looking at page 56. |
| | 8 | Here's Kanye.  The caption says, "Meanwhile |
| | 9 | #kanyewest," and your contention, is it -- well, is it |
| 15:18:28 | 10 | your contention this is fair use? |
| | 11 | A.      Again, my contention -- the issue is not my |
| | 12 | contention.  The standard is whether or not Nicolini |
| | 13 | undertook an analysis.  Not what my perspective as a |
| | 14 | lawyer is. |
| 15:18:48 | 15 | Q.      Okay.  So how is the fair use analysis |
| | 16 | different from, say, Kanye on page 56, and let's just go |
| | 17 | to the next one, Kanye on page 57, or Kendell Jenner on |
| | 18 | page 58, "Happy birthday Kendell Jenner hope your day |
| | 19 | looks like this," how is the fair use analysis different |
| 15:19:12 | 20 | on these photos? |
| | 21 | A.      I don't understand.  I think fair use analysis |
| | 22 | is the same analysis for -- |
| | 23 | Q.      Okay.  The considerations that you think about |
| | 24 | are the same, because they all came come from the |
| 15:19:31 | 25 | statute.  Fair enough. |

```
15:19:32    1           But how is the actual applying facts to law,

            2    how is the analysis different among these photographs,

            3    let's say, Kendell on page 58 and Kanye on page 57?

            4    A.      I don't understand your question.  I mean, do

15:19:50    5    you mean the conclusion or the analysis, because the

            6    analysis should not be different?

            7    Q.      Okay.

            8    A.      Why don't we just choose one.  Maybe I can --

            9    Q.      Okay.  Let's look at Kanye on page 57.  So we

15:20:05   10    have the commentary, "Meanwhile #kanyewest," like what

           11    would your fair use analysis be on this photograph?

           12    A.      Well, it's -- first of all, it's over a year

           13    old.  It's posted over a year ago.  According to this

           14    snapshot, the actual image is several years old, and

15:20:30   15    there are probably a thousand versions of Kanye walking

           16    out from various angles and widely disseminated on the

           17    Internet in literally dozens of pages.

           18           So one of the things you consider is the

           19    market impact.  And so what I believe to be true is that

15:20:53   20    in no way is a photo agency, is the value of their

           21    artistic work monetary value, market value, damaged by a

           22    fleeting post on the social media site.

           23           It's just whatever value this image had, the

           24    back of Kanye West's head, you know, three years later

15:21:19   25    is nil, and that should be -- I'm not saying that's the
```

| | | |
|---|---|---|
| 15:21:25 | 1 | conclusion that Nicolini should have adopted, but he |
| | 2 | should have considered that, and he didn't. |
| | 3 | Q.      How do you know he didn't? |
| | 4 | A.      This was not one of the images he submitted |
| 15:21:38 | 5 | originally. |
| | 6 | Q.      It's not one of the images he submitted |
| | 7 | originally.  What do you mean by that, originally when? |
| | 8 | A.      So this is added later. |
| | 9 | Q.      Okay.  Added, you mean, after the filing of |
| 15:21:53 | 10 | the lawsuit? |
| | 11 | A.      Yeah. |
| | 12 | Q.      In other words, you didn't review this |
| | 13 | yourself? |
| | 14 | A.      Well, I reviewed it after the lawsuit was |
| 15:22:00 | 15 | filed, and the lawsuit included new images that weren't |
| | 16 | part of Nicolini's spreadsheet, and it also took out a |
| | 17 | few that were part of his spreadsheet. |
| | 18 | Q.      Okay.  So let's look for ones that were |
| | 19 | expressly part of the takedowns that you received. |
| 15:22:20 | 20 | Did you receive a takedown on Bieber?  Did |
| | 21 | Enttech receive takedown on Bieber? |
| | 22 | A.      Yes. |
| | 23 | Q.      Okay.  So let's compare this Bieber on page |
| | 24 | 51, takedown on this, because it's on Enttech. |
| 15:22:39 | 25 | How about on -- you said you did not get a |

15:22:43    1    takedown on Kanye.

2            Did you get a takedown on Kendell Jenner on

3    page 58?

4    A.       I don't remember that one.  I don't think so.

15:22:53    5    Q.       How about Leo on page 59?

6    A.       Leo, that was part of the initial ones.  I

7    know that.

8    Q.       Okay.  So let's compare that Bieber one about

9    the burrito, and that's on page 51, and Leo on page 59.

15:23:08    10           So this one says, "#leonardodicaprio getting

11   hit in the face with a volleyball.  I'm sorry but I have

12   to laugh."

13           So how does the fair use analysis differ

14   between this Leonardo Dicaprio and Justin Bieber

15:23:26    15   comparing 59 to 51?

16   A.       Okay.  Well, let's start with 41, I guess

17   first.

18   Q.       Fifty-one.

19   A.       Or would you like me to start with the one --

15:23:42    20   Q.       Whatever you're comfortable with.

21   A.       Well, this one's already up.  So, yeah, this

22   is one of the images that was registered to AKM/GSI.  I

23   believe it's several years old.  It was posted years ago

24   on Instagram website.

15:23:57    25           So it's been dormant on this Instagram site

15:24:01   1   for years.  The photographer didn't even know about it

2   until Nicolini pointed his software at it.  So I don't

3   think anyone could say with a straight face that

4   whatever photographer took this is damaged, and that

15:24:13   5   BackGrid is damaged by this, because they didn't even

6   know about it for years and years.

7   Q.        This was not posted years ago.  This is 49

8   weeks.

9   A.        The image is older.  Yeah.  The image was

15:24:26  10   originally --

11   Q.        You said it was posted on Instagram years ago.

12   That's not correct, is it?

13   A.        I think it was posted, yeah, 49 weeks from

14   whenever this image was downloaded, so probably sometime

15:24:41  15   in 2019.

16   Q.        Okay.  So how is it fair use analysis?  What

17   is the fair use analysis in this -- for this

18   infringement?

19   A.        Well, for example, with the Justin Bieber

15:25:01  20   photo, you have a photo that's two years old of him on a

21   bike, and, again, there's literally thousands of these

22   images out there.

23          And part of the fair use analysis requires the

24   person doing the analysis to assess the amount of the

15:25:24  25   image that's out in the marketplace and how readily

| | | |
|---|---|---|
| 15:25:27 | 1 | accessible it is, and that simply wasn't taken into |
| | 2 | account. |
| | 3 | In fact, I think for this Leo image, Nicolini, |
| | 4 | and to this day even, wants $150,000 for posting an |
| 15:25:44 | 5 | image of Leonardo Dicaprio getting hit in the face on an |
| | 6 | Instagram account.  So, to me, that's preposterous. |
| | 7 | Q.      Okay.  But that isn't your fair use analysis, |
| | 8 | right? |
| | 9 | A.      Again -- |
| 15:25:57 | 10 | Q.      What is the fair use analysis? |
| | 11 | A.      I don't -- the issue is not my fair use |
| | 12 | analysis.  And I don't want to tell you my fair use |
| | 13 | analysis, because that's work product. |
| | 14 | Q.      Go ahead. |
| 15:26:13 | 15 | A.      What I can tell you is what should have been |
| | 16 | considered and was not, because he charged -- like, when |
| | 17 | he made his offer, Nicolini that is and Mr. Ginsburg as |
| | 18 | well, there was a flat number for all of them. |
| | 19 | First, it was 150,000 each.  Nicolini said it |
| 15:26:32 | 20 | could fetch 150,000 each for a total of 5 million |
| | 21 | dollars, and then he came back 16 minutes later, and he |
| | 22 | said, "I've talked to my co-clients, and they're such |
| | 23 | nice guys that it's going to be $30,000 each," and, to |
| | 24 | me, it's absolutely ridiculous to destroy a company like |
| 15:26:50 | 25 | Paper, take down their main asset like an Instagram |

```
15:26:54    1    account based on lame images that are years old that are

            2    used for completely different purpose than what they are

            3    actually monetized for.

            4          This image of Leo Dicaprio is monetized so it

15:27:08    5    can be sold to tabloids the day it happens.  Not some

            6    random post years ago.  It's not worth the same amount.

            7    It's worth a lot less if it's worth anything.

            8          So that's my view of it.  And I think using

            9    all these flat numbers like 150,000, 30,000, 400 grand,

15:27:31   10    it just shows they have no idea what these images are,

           11    let alone have they conducted a fair use analysis that

           12    they should have done a long time ago.

           13          I mean, Mr. Ginsburg said that he didn't even

           14    know what images were at issue in this case, because he

15:27:52   15    deals with millions of images.

           16          So, imagine that, so he has millions of

           17    images, and he gets 150,000 each for just aggregating

           18    these random paparazzi images.  I mean, to me, that is

           19    untenable, and that is certainly not what the Copyright

15:28:09   20    Act was for.

           21          You know, there's nothing artistic about a

           22    paparazzi waiting outside a restaurant, snap a photo of

           23    someone, when there's a pool of photographers taking 30

           24    snapshots of the same occurrence.

15:28:31   25          In other words, it's a pure coincidence that
```

| 15:28:37 | 1 | an image has their face or has the position.  It's not |
| | 2 | the result of any artistic work on the part of the |
| | 3 | photographer. |
| | 4 | And if you don't believe me, you can ask |
| 15:28:46 | 5 | Mr. Arshkyan (phonetic) who's one of the authors who |
| | 6 | said as much in his sworn affidavit, and so did miss -- |
| | 7 | I think it's Max Lopes who swore under oath, "There's |
| | 8 | absolutely nothing to this job.  We get paid less than |
| | 9 | minimum wage.  We wait outside restaurants, and we snap |
| 15:29:07 | 10 | a hundred photos, and we send them to our employer." |
| | 11 | Now, that was X17.  It was a different |
| | 12 | employer, but it's the same business.  And the other |
| | 13 | paparazzi in the pool are doing the exact same thing. |
| | 14 | I'm not certainly not accusing BackGrid of |
| 15:29:23 | 15 | paying their employees below minimum wage.  From what I |
| | 16 | understand, they don't even employ these people. |
| | 17 | Q.     What information do you have about whether any |
| | 18 | of the photo agencies who are parties to this lawsuit |
| | 19 | license photographs for use on Instagram? |
| 15:29:51 | 20 | A.     I don't understand.  Could you say that again? |
| | 21 | Q.     Sure. |
| | 22 | Tisha, do you want to read it back? |
| | 23 | (Record read by the reporter as follows: |
| | 24 | "Q.  What information do you have about |
| 15:30:13 | 25 | whether any of the photo agencies who are |

15:30:13     1              parties to this lawsuit license

             2              photographs for use on Instagram?")

             3              THE WITNESS:  Well, I know they file lawsuits,

             4     and they send DMCA notices, and as part of the

15:30:25     5     settlements they issue licenses.  That's all I know.

             6     Q.        BY MS. ARDALAN:  So do you know whether they

             7     have or have you looked into whether they have licensed

             8     photographs for use on Instagram without -- that was not

             9     initiated by filing a lawsuit?

15:30:51    10     A.        The images that are obtained are images that

            11     are licensed to tabloids like People Magazine and

            12     National Enquirer and so forth that are dated as of the

            13     date, a day or two or the same day, as the event

            14     happened.  That's what makes it valuable.

15:31:16    15              And so some post on an Instagram account, you

            16     got to understand, people -- Instagram is different than

            17     someone purchasing a People Magazine as they check out

            18     with their groceries.  It's a different market.  It's

            19     valuable.

15:31:38    20              This Leo getting hit in the face, maybe it's

            21     on the cover of the magazine, maybe it's worth

            22     something, or people read People Magazine, they laugh

            23     when it happened.

            24              But years later on a different platform like

15:31:50    25     Instagram where there's literally dozens of posts every

15:31:55   1   day from every media outlet for a different purpose to

2   engage their audience, not to make money off of it in

3   the same fashion, but to keep an audience engaged.

4        So the uses couldn't be more different.  And

15:32:12   5   it's clearly -- to me, clearly this is abusing the DMCA

6   and the Copyright Act.

7   Q.     Do you have any information that any of the

8   photo agencies who are parties to this lawsuit license

9   photographs to media outlets who distribute content

15:32:33   10   through the Internet?

11   A.     Yes.

12   Q.     Okay.  And does that include social media?

13   A.     I typically do web searches, so I haven't

14   looked at like -- it's very hard to look.  I don't have

15:32:53   15   the software to crawl social media sites.  I don't know

16   the CMI information to find this on social media

17   platforms.

18        But I would assume that some of the People

19   Magazine, let's say, would get a license to use it

15:33:13   20   across all platforms.

21   Q.     Would it, then, undercut the notion that

22   Mr. Nicolini did not review market harm if the photo

23   agencies, in fact, do license photographs to social

24   media outlets or to third parties for their use on

15:33:33   25   social media outlets?

15:33:35    1   A.          No, because he doesn't know the market value.

            2   He doesn't have the information to make that assessment.

            3   Q.          What makes you say that?

            4   A.          His own testimony.

15:33:47    5   Q.          Anything else other than his testimony?

            6   A.          Mr. Ginsburg's testimony.

            7   Q.          Anything else other than Mr. Ginsburg's and

            8   Mr. Nicolini's testimony?

            9   A.          The fact that he made an offer of a hundred --

15:34:03   10   30,000 for each image irrespective of its use.

           11   Q.          Okay.   Any other information that you have

           12   other than his settlement offer, the testimony of

           13   Mr. Ginsburg and the testimony of Mr. Nicolini that

           14   support the idea that Mr. Nicolini did not review market

15:34:21   15   harm prior to sending the DMCA takedown notices at issue

           16   in this lawsuit?

           17   A.          Yeah.   There's a lot of things that we've gone

           18   over some of them.   I could repeat them, if you want.

           19   Q.          Yes, please.

15:34:37   20   A.          I mean, the manner in which the software

           21   operates, automatically sending them, the fact that he

           22   targets an account and then looks for images and asks

           23   the account to be taken down before he even starts to

           24   negotiate.

15:34:53   25               That's not -- someone who really cares about

```
15:34:56    1   an image being proliferated doesn't try to destroy a

            2   business first so then they can negotiate an outsized

            3   number.  That's just not what people -- what artists do.

            4        I'm sure it's not what these artists want.  No

15:35:11    5   reasonable person wants to destroy a business,

            6   especially during Covid just because they're greedy.

            7   People don't like that.  People don't like that.  It's

            8   awful.

            9   Q.        And what about the fact being that you claim

15:35:29   10   software's automatic, how does that inform the notion

           11   that Mr. Nicolini did not review fair use?

           12   A.        So if the software automatically does matches

           13   and automatically generates a notice, then there's no

           14   one else helping Mr. Nicolini, then there's no analysis.

15:35:57   15   Q.        What information do you have that Mr. Nicolini

           16   did not review fair use prior to causing the software to

           17   send the notices?

           18   A.        He says he didn't know the elements of fair

           19   use.  He said he may have read an opinion about it years

15:36:19   20   ago, and, other than that, he has no legal training.

           21   So, to me, that says he is unqualified to conduct a fair

           22   use analysis.

           23   Q.        Okay.  So other than that, any other reason?

           24   A.        I mean, we've covered a lot of this stuff.  I

15:36:40   25   just don't want to keep repeating it, or we'll be here
```

```
15:36:42   1   forever, so --

           2   Q.       Is there any reason you haven't mentioned

           3   earlier in this deposition that you want to raise now,

           4   anything else we're missing?

15:36:51   5   A.       Not that I can think of.

           6   Q.       Okay.  So you said that the market harm for

           7   this photograph on page 59 of Exhibit No. 3 is you

           8   really just focused on the market harm.  You said, well,

           9   the market isn't very harmed because -- I don't want to

15:37:15  10   misstate you, but words to the effect that there are

          11   lots of other people who have these photographs, and

          12   it's a different type of medium than what you think the

          13   photo agency licenses the photograph with; is that

          14   right?  Did I have that right?

15:37:32  15            You're on mute.

          16   A.       Sorry.  Yeah.  I would add to that

          17   Mr. Ginsburg doesn't even know what these images are,

          18   so --

          19   Q.       Okay.  That's not part of the fair use

15:37:43  20   analysis?

          21   A.       No one knows.  No one cares.  It's just a flat

          22   number.

          23   Q.       Okay.

          24   A.       It is.  If you have a copyright, the whole

15:37:51  25   idea behind it is that you have an artistic work that
```

```
15:37:54    1   our founding fathers for -- you know, for Christ's sake,

            2   put in our Constitution to protect artistic works, not

            3   so that -- you know, obviously, they didn't know the

            4   advances in technology that we have let alone the wide

15:38:14    5   sharing of -- incurred sharing of information on social

            6   media.  So this is a complete aberration of those

            7   ideals.

            8          There is -- no one knows the names of the

            9   authors when I ask them.  They don't know them from

15:38:28   10   Adam.  They don't care about them.  They just care about

           11   making money, and that's not --

           12   Q.       During the deposition --

           13          THE COURT REPORTER:  I'm sorry.

           14   Q.       BY MS. ARDALAN:  Are you getting this

15:38:40   15   information from when you took Mr. Ginsburg's

           16   deposition?

           17   A.       I don't know what you mean by "this

           18   information."

           19   Q.       Well, you're claiming that -- you're making an

15:38:49   20   allegation that Mr. Ginsburg doesn't know photographers

           21   associated with which picture.

           22          But my question is, are you getting that from

           23   Mr. Ginsburg's deposition or from something else?

           24   A.       That's my only interaction with Mr. Ginsburg.

15:39:04   25   So, yeah, that's the only time.  He's told me he has no
```

| | | |
|---|---|---|
| 15:39:09 | 1 | idea what these images are.  When I asked him about who |
| | 2 | the authors were, he knew some of the names in passing, |
| | 3 | but said they didn't work for him, if I remember |
| | 4 | correctly. |
| 15:39:19 | 5 | Q.      So I know your position on this photograph, |
| | 6 | which is page number 59 to Exhibit No. 3.  I want to go |
| | 7 | back to the other image of Justin Bieber on page 51. |
| | 8 | My question is, everything you said about that |
| | 9 | Leonardo Dicaprio photograph with respect to fair use, |
| 15:39:41 | 10 | does that also apply here with Mr. Bieber, or is the |
| | 11 | analysis different for some reason? |
| | 12 | A.      I'd have to look at the how widely this has |
| | 13 | been disseminated in the market and whether or not this |
| | 14 | is, like, the only photographer that took it, you know |
| 15:40:01 | 15 | what I mean? |
| | 16 | Like, fair use is complicated.  That's why the |
| | 17 | Lenz case makes it -- tries to protect people from DMCA |
| | 18 | notices, in my opinion, so that people will actually do |
| | 19 | some work before DMCA bonding and company taking away |
| 15:40:18 | 20 | and asking for a million dollars to give back. |
| | 21 | Q.      Other than how widely disseminated the picture |
| | 22 | of Mr. Bieber is, on page 51, what other things would |
| | 23 | you look for that make -- would you look at that makes |
| | 24 | this fair use analysis different than the one of |
| 15:40:37 | 25 | Leonardo Dicaprio? |

```
15:40:39    1    A.        I would look at the market value of this

            2    knowledge if it's been sold anywhere.

            3    Q.        Okay.  Anything else?

            4    A.        For example, there's -- I asked Mr. Ginsburg

15:40:52    5    about one of the images.  He said, you know, he didn't

            6    know what they would charge for it, maybe a couple

            7    grand.

            8    Q.        Okay.

            9    A.        And, you know, like, I think he should have

15:41:05   10    told Nicolini that, right?  Because if Nicolini's going

           11    to assess the elements of fair use, he needs that

           12    information.  It was never provided to him.

           13    Q.        Okay.  Anything else you can think of that

           14    would make this a different analysis?

15:41:24   15    A.        Again, without doing research on each specific

           16    image, I can't -- I can't do a fair use analysis.  It

           17    takes time.

           18    Q.        All right.  I'm going to stop sharing this

           19    exhibit, and I'm going to go back to Exhibit No. 1.

15:41:55   20              And you see this right now, or no?

           21    A.        Yes.

           22    Q.        Okay.  I want to go back to Exhibit G, when

           23    you testified earlier on, you testified earlier that on

           24    July 9th you had a communication with some third party.

15:42:32   25              I want to be clear, this party reached out to
```

```
15:42:35    1    you or you reached out to this party?

            2    A.        I'm not sure which one you're referring to.

            3    Is it the one --

            4    Q.        On July 9th, there's "call with," and there's

15:42:49    5    a redaction, and you said what you thought this was a

            6    third party who had signed an NDA, and it was a very

            7    short phone call.

            8              Do you remember that?

            9    A.        Yeah.  That's not this entry.

15:43:00   10    Q.        Oh, okay.  Which entry was it?

           11    A.        It was the next page up.

           12    Q.        Okay.  Was it this, on July 8?

           13    A.        No.

           14    Q.        Was it further down?

15:43:28   15    A.        I think you were right.  I'm sorry.

           16    Q.        That's okay.

           17              Did this person reach out to you, or did you

           18    reach out to this person?

           19    A.        Yeah.  I would have no way to reach out to a

15:43:38   20    person.  I did not reach out to anyone.

           21    Q.        Okay.  And how did this person who reached out

           22    to you find out about the Enttech issue to begin with?

           23    A.        I don't recall.

           24    Q.        Okay.  Had you publicized the claims prior to

15:44:03   25    filing this litigation?
```

| | | | |
|---|---|---|---|
| 15:44:07 | 1 | A. | Have I publicized what claims? |
| | 2 | Q. | The claims you have against Okularity? |
| | 3 | A. | I mean, after the lawsuit, I was contacted by |
| | 4 | | reporters. |
| 15:44:19 | 5 | Q. | Okay.  What about prior to the lawsuit? |
| | 6 | A. | No. |
| | 7 | Q. | Can you explain why a third party would call |
| | 8 | | you about Okularity's DMCA claims before it was publicly |
| | 9 | | known? |
| 15:44:36 | 10 | A. | Well, like, people know people.  I talk to my |

11   friends about work that I'm doing.  The client also

12   knows people, and they're talking to people about what's

13   going on with their life and what's going on with their

14   business, the fact they have to fire people because of

15:44:54   15   this scam.  So any one of those people could have found

16   out before filing.

17            It's not like it's a big secret that Paper

18   Instagram was shut down.  The instant it was shut down,

19   there was an article about it in on page six, I think.

15:45:15   20   Q.        Okay.

21   A.        So that was -- it was, like, pretty big news.

22   So it's not like the filing of the lawsuit, like, all

23   these people read the dockets of the Central District,

24   they were like, "Oh, my God."  You know, the truth is,

15:45:33   25   you know, whatever's known about this, Paper is a pretty

15:45:39  1    big company.  They used to have a lot of employees.

          2    Q.          I want to look at Exhibit B of **Exhibit 1** to

          3    this deposition.  This is your Declaration.  Let's

          4    rotate this.  This is Exhibit B to your Declaration, and

15:46:02  5    Exhibit B to your Declaration is a Declaration of

          6    Jon Nicolini.

          7              Are you able to see that okay?

          8    A.        Yes.

          9    Q.        Okay.  This is a Declaration you referred to

15:46:13  10   several times when we were going through your legal

          11   research; is that right?

          12   A.        Yes.

          13   Q.        Do you know how you found this Declaration?

          14   A.        I just searched for Jon Nicolini's name in

15:46:31  15   Westlaw.

          16   Q.        Okay.  But this Declaration doesn't look like

          17   it's Westlaw format, so how did you find this?

          18   A.        I don't know what Westlaw format means.  I

          19   mean, it's from 2012 and from a different court, so they

15:46:48  20   all format things differently.

          21   Q.        Okay.  But Westlaw doesn't give you court

          22   image documents.  It gives you something that says

          23   "Westlaw" on it, and the caption pages on it, it looks

          24   like a normal Westlaw document, right?

15:47:03  25   A.        No.  That's not true.  They have a dockets

```
15:47:04    1    feature.

            2    Q.          Okay.  So that was from dockets features of

            3    the Westlaw research; is that right?

            4    A.          Yes.

15:47:10    5    Q.          Okay.  And that leads to PACER.  Is that where

            6    you got it from?

            7    A.          No.  It's an independent feature of Westlaw.

            8    You should use it.  It's really good.

            9    Q.          I always thought it linked to PACER

15:47:24   10    separately.

           11               Okay.  So with respect to this Declaration,

           12    which is Exhibit B of Exhibit 1 to this deposition, how

           13    many times did you read Mr. Nicolini's Declaration?

           14    A.          I don't remember how many times I read it.

15:47:46   15    Q.          More than once?

           16    A.          I don't remember.

           17    Q.          Did you read --

           18               THE COURT REPORTER:  I'm sorry.  I can't hear

           19    you.

15:47:57   20    Q.          BY MS. ARDALAN:  Did you read the entire

           21    Declaration?

           22    A.          I believe so.

           23    Q.          But you're not certain --

           24               THE COURT REPORTER:  Can you repeat that?

15:48:11   25    You're going in and out on your audio.
```

```
15:48:13    1              MS. ARDALAN:  I'm sorry.  Let me lean forward.

            2    Q.        BY MS. ARDALAN:  You're not certain whether

            3    you've read it all the way through?

            4    A.        I don't see why I wouldn't read everything all

15:48:20    5    the way through.

            6    Q.        Okay.  Do you think you read it more than

            7    once?

            8    A.        I don't recall.  I mean, I don't know why I

            9    would read it over and over again.  I mean, it's like

15:48:38   10    you read something, and you understand it.  Maybe --

           11    Q.        Okay.

           12    A.        -- like I referred back to it later, like, but

           13    I don't have a recollection of that.  It's not like I

           14    read it when I went to bed or something.

15:48:51   15    Q.        Was this Declaration what gave you your

           16    information about the software used by Copyright

           17    Enforcement Group?

           18    A.        I believe so.

           19    Q.        Okay.  So I want you to take a look at this

15:49:21   20    and tell me what your understanding of the -- how about

           21    this.

           22              Is it your understanding that the software

           23    that's described in this Declaration, it's your

           24    understanding that it relates to finding motion pictures

15:49:40   25    on a BitTorrent -- I'm sorry about that.  Let's back up
```

```
15:49:47    1    for a second.

            2            Is it your understanding that that the

            3    software used or described in this Declaration of

            4    Mr. Nicolini relates to peer-to-peer networks,

15:50:04    5    BitTorrent peer-to-peer networks?

            6    A.       Yes.

            7    Q.       And is it your understanding that it relates

            8    to searching of motion pictures?

            9    A.       I don't remember.  But, yeah, that's certainly

15:50:17   10    part of it.

           11    Q.       Okay.  Do you recall seeing anything in this

           12    Declaration that relates to works other than motion

           13    pictures?

           14    A.       I don't remember if it includes images as

15:50:30   15    well.

           16    Q.       Okay.

           17    A.       I mean, no.  I don't remember.

           18    Q.       So what about this Declaration informed you

           19    that Mr. Nicolini did not review fair use prior to

15:50:43   20    issuing a DMCA notice or anyone else at Copyright

           21    Enforcement Group?

           22    A.       Again, they didn't have to, because it was

           23    2012.  Lenz case was in 2018.

           24    Q.       Okay.  So how does this Declaration assist you

15:50:59   25    in understanding that Mr. Nicolini does not review fair
```

```
15:51:02   1   use prior to sending DMCA notices?

           2   A.        I believe I've answered this already.  It

           3   provides background as to his training and the software

           4   that he's developed that's very sophisticated, and that

15:51:16   5   it also states he submits DMCA notices on behalf of CEG.

           6   Q.        Do you recall anything in this Declaration

           7   discussing human review of works prior to issuing a DMCA

           8   notice?

           9   A.        Again, that was not a requirement back then.

15:51:36  10   Q.        Okay.  So do you recall this Declaration

          11   discussing whether a human reviewed the infringement

          12   prior to sending a DMCA notice?

          13   A.        I don't remember.

          14   Q.        Okay.  So that's a no, you don't remember.

15:51:52  15             Would it be surprising to you, then, if it

          16   does disclose that a human reviewed the infringement

          17   prior to sending the notice?

          18   A.        You know, humans review a lot of things.  But

          19   what we're talking about here is, like, a legal analysis

15:52:06  20   that needs to be done, so it doesn't matter that a human

          21   reviewed something.  What matters is that a fair use

          22   analysis was undertaken in good faith after the Lenz

          23   case.

          24   Q.        Okay.  Let's go ahead and take a look at

15:52:30  25   Exhibit D to Exhibit 1 of this deposition.
```

| | | |
|---|---|---|
| 15:52:51 | 1 | So Exhibit D, the first page has "Embed a |
| | 2 | Tumblr post." I'm going to skip that. And then there's |
| | 3 | some -- there's some text here written by -- I think |
| | 4 | it's written by "books and cats lover," and this is |
| 15:53:12 | 5 | something you attached to your Declaration. |
| | 6 | Do you recognize this? |
| | 7 | A.     Yes. |
| | 8 | Q.     How does this blog inform you that |
| | 9 | Mr. Nicolini did not review fair use prior to sending |
| 15:53:22 | 10 | the DMCA notices? |
| | 11 | A.     If I remember correctly, it says that he used |
| | 12 | his software to automatically do the takedowns. |
| | 13 | Q.     Okay. |
| | 14 | A.     A company whose business it is to find |
| 15:53:33 | 15 | protected -- use special software, then they make these |
| | 16 | copyright claims -- |
| | 17 | THE COURT REPORTER:  I'm sorry.  That went |
| | 18 | super fast.  If you can repeat that. |
| | 19 | THE WITNESS:  I apologize. |
| 15:53:48 | 20 | It refers to Okularity as a company whose |
| | 21 | business it is to find copyright protected images and |
| | 22 | video software, and then they make these copyright |
| | 23 | claims on behalf of their clients. |
| | 24 | Q.     BY MS. ARDALAN:  Okay.  And so what about that |
| 15:54:03 | 25 | addresses whether fair use is or is not addressed prior |

```
15:54:07    1    to sending the notices?

            2    A.          It indicates that Okularity's a software

            3    company.

            4    Q.          Okay.  And so did using software necessarily

15:54:18    5    preclude one from doing fair use analysis prior to

            6    issuing a notice?

            7    A.          Of course not.  Why would software -- you

            8    arguably need software to assess the relevant documents

            9    to conduct the analysis.

15:54:41   10    Q.          Okay.  So they're not mutually exclusively.

           11    You can conduct a fair use analysis and use software; is

           12    that right?

           13    A.          Well, I think the difference is how -- what

           14    software is used and how it is deployed.  If software is

15:54:59   15    being used to crawl the Internet and to crawl specific

           16    targets, Instagram page as Mr. Nicolini attested, and

           17    then, in turn, a copyright notice is automatically

           18    generated with a script that is identical for each

           19    image, then there's no room for a fair use analysis.

15:55:31   20    Q.          Why is there no room --

           21               THE COURT REPORTER:  I'm sorry.  Counsel, you

           22    froze for me, your question.

           23    Q.          BY MS. ARDALAN:  I think I said, why is there

           24    no room for a fair use analysis?

15:55:51   25    A.          Because it takes a long time, and Nicolini is
```

```
15:55:54    1    not trained to do it.

            2    Q.        What precludes Nicolini reviewing for fair use

            3    and then having a software send the notice?

            4    A.        You'd have to ask him.

15:56:15    5    Q.        Well, I'm asking you.  What information do you

            6    have that says or that suggests that using software

            7    precludes one from reviewing fair use initially?

            8    A.        I never said that.

            9    Q.        Okay.  So what prevents -- what information do

15:56:40   10    you have that says that Mr. Nicolini could not have

           11    reviewed fair use and then sent it to the software to

           12    issue the notice?

           13    A.        I mean, I could just -- you know, I almost

           14    want to quote a complaint, "I hereby incorporate the

15:57:00   15    foregoing paragraphs by reference," but, you know, for

           16    all the reasons I've stated.

           17              He doesn't know how to do it.  He's a software

           18    person.  He has no legal training.  He doesn't

           19    understand the elements.

15:57:20   20    Q.        Is that it?  Do you have any other

           21    information?

           22    A.        Do you need more?

           23    Q.        Yes.  I need more.  If you have more, I'd like

           24    to hear more.

15:57:29   25    A.        Yeah.  I think that about covers it.
```

```
15:57:31    1   Q.        Okay.  Let's take a look at Exhibit E.  It's

            2   an article from InStyle, and it's titled, "Hundreds of

            3   Instagram account Have Been Shut Down Over Photos Like

            4   This."

15:57:51    5             Do you recognize this document?

            6   A.        Yep.

            7   Q.        Okay.  This is attached to your Declaration,

            8   which is marked as Exhibit 1 to this deposition, and

            9   it's attached to your Declaration as Exhibit E.

15:58:03   10             How does this article inform you that

           11   Mr. Nicolini did not review fair use prior to issuing a

           12   DMCA takedown notice?

           13   A.        This article says that BackGrid started

           14   outsourcing their enforcement to Okularity.

15:58:16   15   Q.        Okay.  And how does that inform you that

           16   Okularity does not review fair use prior to sending out

           17   DMCA notices?

           18   A.        Well, if Okularity outsourcing it to a third

           19   party who doesn't have information about the

15:58:29   20   marketplace, for example, they're --

           21   Q.        I think you meant BackGrid.  You said

           22   "Okularity," but I think you meant BackGrid.

           23   A.        Oh, yeah.  Pardon me.

           24             I think this article says BackGrid started

15:58:39   25   outsourcing its enforcement, or whatever it says,
```

15:58:45   1   policing to Okularity and --

2   Q.        What about -- okay.  Go ahead.

3   A.        No.  That's all right.

4   Q.        What about outsourcing copyright enforcement

15:58:57   5   to a third party suggests that fair use analysis was not

6   completed?

7   A.        It means they're not involved.

8   Q.        So when one outsources, it necessarily means

9   they're not involved; is that your understanding?

15:59:15   10   A.        That's the implication of that phrase.  Yeah.

11   Q.        Okay.

12   A.        This article doesn't say, "I hired a copyright

13   agent to do it for me."  It says, "I outsourced it to a

14   software company," and that's where there's thousands of

15:59:29   15   Instagram accounts being taken down.  So it's --

16   Q.        What other research did you do about whether

17   BackGrid outsourced the extent that they had no

18   communication with Okularity during Okularity's

19   copyright enforcement efforts of the Enttech case?

15:59:58   20   A.        One indication is that Mr. Nicolini offered

21   $5 million -- sorry, suggested that these images of

22   Justin Bieber riding a bike and so forth, years old are

23   worth $5 million or could fetch $5 million, and then he

24   comes back 16 minutes later from three clients, which

16:00:25   25   don't correspond to the clients in his Excel

16:00:27   1   spreadsheet, with a round number for each, that tells me

2   that there was not a robust conversation about what

3   these images were worth.

4   Q.      So the settlement demand informs you that

16:00:43   5   there was no discussion between Okularity and BackGrid;

6   is that what you're saying?

7   A.      The thing about a fraudulent scheme, it's not

8   one thing.  If it was one thing, people wouldn't be

9   deceived.  It's the totality of the circumstances.

16:00:59   10          It's the fact that BackGrid is now outsourcing

11   it to Okularity.  Okularity is a soft -- Jon Nicolini

12   only has training in software.  Thousands of Instagram

13   accounts have now been taken down right after this

14   happens.

16:01:15   15          Nicolini doesn't try to resolve the dispute.

16   Instead, he tries to take down the account and tries to

17   settle for a thousand times more than the image is

18   worth.  That's fraud.  That's extortion.

19   Q.      Okay.  I'm going to go back to my question.

16:01:32   20   My question is, what information do you have that by,

21   quote/unquote, "outsourcing" to Okularity that there

22   have been no communications between parties with respect

23   to the value of the photographs?

24   A.      There's no way that they had a conversation

16:01:51   25   before Nicolini suggested they could fetch 150,000 each.

```
16:01:56    1    So it could have only happened in the 16-minute period,

            2    and there's no way on the planet they could have

            3    conducted a robust analysis of the value of the images

            4    before that point in 16 minutes, especially considering

16:02:14    5    there's allegedly three parties involved.

            6    Q.      How do you know that they didn't have a

            7    discussion before Mr. Nicolini responded to you or

            8    responded to Mr. Florio?

            9    A.      Because that would have been his initial

16:02:29   10    offer.

           11    Q.      Is it your contention his initial offer was

           12    $150,000 per photo?

           13    A.      It wasn't an offer, according to Mr. Nicolini.

           14    He suggested that they could fetch 150 grand per, which

16:02:54   15    is false, knowingly false.

           16    Q.      So how do you know that they did not -- that

           17    the photo agencies and Mr. Nicolini did not have a

           18    conversation prior to that e-mail where he explained

           19    that the upper limits of statutory damages of $250,000

16:03:12   20    per photo regarding the settlement value of the case?

           21    A.      Because, at the time, only, like, seven of the

           22    images were registered -- actually, six.  So that's just

           23    an outright lie.

           24    Q.      Okay.  Do you have any understanding that

16:03:32   25    there were applications pending for registration?
```

| 16:03:38 | 1 | A.        There were six pending before each respective |
|---|---|---|
| | 2 | takedown notice -- sorry.  There were six registered |
| | 3 | before the takedown notices were sent.  And then in |
| | 4 | June, he registered five more once he felt like he was |
| 16:04:01 | 5 | on to something, I assume. |
| | 6 | And then it was only after the account got |
| | 7 | taken down on July 9th that Nicolini registered another |
| | 8 | six, and the day after he registered, like, another 12 |
| | 9 | after he filed the lawsuit on July 16th. |
| 16:04:20 | 10 | Q.        So I really just want to get an answer to the |
| | 11 | question, which is, what information do you have that |
| | 12 | Okularity did not discuss with the photo agencies prior |
| | 13 | to sending you an e-mail about the upper limits of |
| | 14 | damages regarding settlement value of the case? |
| 16:04:39 | 15 | A.        Because any part of that conversation, they |
| | 16 | would have had to discuss what images were registered |
| | 17 | and whether or not statutory damages were available |
| | 18 | considering -- |
| | 19 | Q.        How do you -- go ahead. |
| 16:04:52 | 20 | A.        Considering that -- well, they wouldn't have |
| | 21 | offered a million dollars, because there weren't that |
| | 22 | many registered images, and, also, none of them are |
| | 23 | attorneys. |
| | 24 | Q.        So the only information you have is the |
| 16:05:06 | 25 | settlement offer; is that right? |

```
16:05:08    1   A.          No.

            2   Q.          What is it?  What other information do you

            3   have?

            4   A.          About what?

16:05:17    5   Q.          About why it is that you think that the photo

            6   agencies and Okularity were not able to confer about a

            7   settlement payment number prior to Mr. Nicolini

            8   e-mailing you about the upper limits of statutory

            9   damages?

16:05:37   10   A.          Ginsburg said so in his deposition.

           11   Q.          Other than his deposition, what makes you

           12   think that?

           13   A.          Again, I've been over this a lot.  The Excel

           14   spreadsheet, the fact images weren't registered, the

16:05:50   15   outsized demand, the fact that they waited until the

           16   asset was taken away before negotiating.

           17              It's a criminal act, in my opinion, and it's

           18   stealing, and it's extortion, and that's why I brought

           19   the claims I did.

16:06:06   20              And fair use?  Are you kidding?  Do you really

           21   think an extortionist considers fair use in the manner

           22   Lenz envisioned?  It's not even close.

           23   Q.          What about the Excel spreadsheet made you

           24   think that they, meaning the photo agencies, did not

16:06:23   25   confer with Mr. Nicolini prior to Mr. Nicolini
```

| 16:06:27 | 1 | communicating the settlement offer to you? |
| | 2 | A.        Again, the images were logged to different |
| | 3 | entities.  The DMCA notices were brought on behalf of |
| | 4 | entities that were not asserted in the subsequent |
| 16:06:43 | 5 | e-mails. |
| | 6 |        So no one knew what the heck was going on. |
| | 7 | They pointed some software at a website, and they gave |
| | 8 | flat numbers.  And they knew Paper needed their account |
| | 9 | back right away, so they knew they could demand way more |
| 16:06:59 | 10 | than they deserve, and that's a crime. |
| | 11 | Q.        Okay. |
| | 12 | A.        Or as they say in civil law, a predicate act |
| | 13 | under RICO. |
| | 14 | Q.        Let's go to Exhibit F to ==Exhibit No. 1== |
| 16:07:18 | 15 | attached to the deposition.  This is, it looks like, a |
| | 16 | print screen from the Okularity website; is that true? |
| | 17 | A.        Uh-huh. |
| | 18 | Q.        Okay.  And how does this print screen assist |
| | 19 | you in determining whether Mr. Nicolini did or did not |
| 16:07:34 | 20 | review fair use prior to sending the DMCA takedown |
| | 21 | notices? |
| | 22 | A.        Well, first of all, they're an image company, |
| | 23 | and the only thing that talks about, it actually says |
| | 24 | explicitly at the bottom, "We are not a law firm."  So, |
| 16:07:49 | 25 | "No matter what, you know, I don't want anyone here to |

16:07:54   1   think we're a law firm," so that tells me that there's

2   no legal analysis taking place.

3   Q.        Because they said they're not a law firm and

4   they do not do legal analysis, is that your contention?

16:08:05   5   A.        If they're not a law firm, they should not be

6   practicing law.  Yes.

7   Q.        Okay.  Is there any other way this screen

8   capture assists you in determining whether Mr. Nicolini

9   reviewed fair use prior to sending the DMCA takedown

16:08:19   10   notices?

11   A.        It describes only the software deployed, and

12   it doesn't describe in any fashion the fact that they

13   complied with fair use.

14   Q.        Okay.  So the fact that they did not disclose

16:08:36   15   fair use review in these -- in this description, "Who We

16   Are" --

17           Are you there, Mr. Tauler?  Did we lose him?

18   A.        No.  I'm here.  One sec.  Can you hear me?

19   Q.        I can hear you.  I can't see you.  Now I can

16:08:50   20   see you.

21           Okay.  So the fact that they didn't mention

22   fair use in the "Who We Are" section informed you that

23   no fair use analysis was conducted; is that right?

24   A.        Yeah.  I mean, it touts their expertise as

16:09:08   25   image experts.  It says they represent thousands of

| | | |
|---|---|---|
| 16:09:14 | 1 | photographers, and they protect millions of photographs. |
| | 2 | That tells me they're not sitting there in some law |
| | 3 | library trying to figure out fair use. |
| | 4 | Q.    Okay.  Any other way this screen capture |
| 16:09:29 | 5 | informs you that fair use was not reviewed by |
| | 6 | Mr. Nicolini prior to sending the notices? |
| | 7 | A.    Well, again, it says they specialize in |
| | 8 | finding images, photography and video, on the Internet |
| | 9 | and in print. |
| 16:09:46 | 10 | Q.    Okay. |
| | 11 | A.    There's nothing about this website that |
| | 12 | indicates that they, Jon Nicolini specifically, |
| | 13 | engaged -- engages in a fair use analysis. |
| | 14 | Q.    Okay.  Very good. |
| 16:10:02 | 15 | All right.  Let's take a break for ten |
| | 16 | minutes.  And I will be back soon.  So let's -- does |
| | 17 | anyone need more than ten minutes?  Is ten minutes okay |
| | 18 | for everybody? |
| | 19 | THE WITNESS:  Ten minutes is fine.  We're |
| 16:10:15 | 20 | almost done, yeah? |
| | 21 | MS. ARDALAN:  We're almost done. |
| | 22 | THE WITNESS:  All right.  So it's going to be |
| | 23 | five minutes?  I have some calls to return and stuff, so |
| | 24 | I'd like to know for that reason. |
| 16:10:26 | 25 | MS. ARDALAN:  I don't have -- I don't really |

| | | |
|---|---|---|
| 16:10:27 | 1 | have very much more. |
| | 2 | Peter, did you say something?  I didn't hear |
| | 3 | you. |
| | 4 | MR. PERKOWSKI:  I will have questions. |
| 16:10:32 | 5 | MS. ARDALAN:  You will.  Okay. |
| | 6 | So I don't know how long Peter is going, |
| | 7 | honestly, but let me stop share for a moment. |
| | 8 | THE VIDEOGRAPHER:  Off the record.  The time |
| | 9 | is 4:12 p.m. |
| 16:10:41 | 10 | (Brief recess was taken from 4:12 p.m. to |
| | 11 | 4:26 p.m.) |
| | 12 | THE VIDEOGRAPHER:  We are back on the record. |
| | 13 | The time is 4:26 p.m. |
| | 14 | MS. ARDALAN:  Good afternoon.  Mr. Tauler, I'm |
| 16:24:56 | 15 | actually done with my questions, so I'm going to hand it |
| | 16 | over to Mr. Perkowski. |
| | 17 | |
| | 18 | EXAMINATION |
| | 19 | BY MR. PERKOWSKI: |
| 16:25:05 | 20 | Q.    Hi, Mr. Tauler.  I just want to make sure -- |
| | 21 | this is really in the nature of a review, so I'll make |
| | 22 | sure that I understand your testimony correctly.  So I'm |
| | 23 | just going to walk you through and make sure my |
| | 24 | understanding is right, and feel free to correct me as |
| 16:25:17 | 25 | we go along. |

16:25:18   1          So you agree that a non-lawyer can do a fair

           2   use analysis, correct?

           3   A.         I believe that a copyright agent is authorized

           4   to do so.  I believe that a copyright agent should have

16:25:36   5   the ability to conduct one.  But there's nothing

           6   explicit in the statute that says a lawyer has to

           7   conduct it, and Lenz doesn't say it either.

           8   Q.         Okay.  So a non-lawyer can do it?

           9   A.         I believe so.  Yes.

16:25:52  10   Q.         And, in fact, you said any idiot can do it

          11   earlier, right?

          12   A.         Well, no.  I said -- please don't use that

          13   against me.  All right?  I didn't mean that against for

          14   any of you guys.

16:26:03  15   Q.         Well, no, no, no.  Like --

          16   A.         Anyone -- yeah.  Well, anyone can say they do

          17   it.  But I think the relevant inquiry here is whether

          18   they've done one in the manner that they're required to

          19   do by law.

16:26:21  20   Q.         Okay.  So you also said that a non-lawyer can

          21   do a DMCA takedown notice, right?

          22   A.         Sorry about that.

          23   Q.         No problem.  Do you need that question back?

          24   A.         I'm sorry.  What was the question?

16:26:52  25   Q.         So you also agree that a non-lawyer -- you

| | | |
|---|---|---|
| 16:26:54 | 1 | said earlier, you testified earlier, that a non-lawyer |
| | 2 | can do a DMCA takedown, right? |
| | 3 | A.        My understanding of the law is that they can. |
| | 4 | Yeah. |
| 16:27:08 | 5 | Q.        Okay. |
| | 6 | A.        There's no case law in point that I've seen -- |
| | 7 | maybe that's an issue that we'll re-litigate in this |
| | 8 | case if it goes that far. |
| | 9 | But there's no case that I'm aware of |
| 16:27:20 | 10 | interpreting the Lenz case in conjunction with the |
| | 11 | ability of a copyright agent to file a DMCA notice. |
| | 12 | Q.        Okay.  You would also agree that a non-lawyer |
| | 13 | can form a good faith belief as to infringement under |
| | 14 | Section 512F as interpreted by Lenz, right? |
| 16:27:47 | 15 | A.        I believe if that individual has the resources |
| | 16 | to do it, they can do that.  Yes. |
| | 17 | Q.        Okay.  Because forming a good faith belief as |
| | 18 | infringement would require doing the fair use analysis, |
| | 19 | right? |
| 16:28:04 | 20 | A.        Yes. |
| | 21 | Q.        And you would agree that there's nothing wrong |
| | 22 | with using automated systems in this process as long as |
| | 23 | a human being is doing that fair use analysis? |
| | 24 | A.        I mean, I believe there is something wrong |
| 16:28:18 | 25 | with it.  I just -- you know, I'm not sure that it's |

| 16:28:22 | 1 | unlawful under any of the current claims, but -- |
| | 2 | Q.        I'm sorry.  Did you finish? |
| | 3 | A.        I was just going to say, I don't think that -- |
| | 4 | I mean, it happens.  It's been happening for a very long |
| 16:28:36 | 5 | time, and it's a modern reality. |
| | 6 | But, you know, I don't think the copyright was |
| | 7 | designed so that a prospective litigant could point |
| | 8 | software to a target and then, you know, use that |
| | 9 | software to generate claims. |
| 16:29:00 | 10 | Q.        Let me ask it this way.  Could a lawyer or |
| | 11 | non-lawyer use an automated system to find an |
| | 12 | unauthorized use and then do the fair use analysis that, |
| | 13 | in your view, is adequate and then use the automated |
| | 14 | system to submit the DMCA notice?  Is that permissible |
| 16:29:25 | 15 | in your view? |
| | 16 | A.        Without knowing the features of the automated |
| | 17 | system, it's hard to say.  But, generally, I would |
| | 18 | agree, just to make things move along, I guess. |
| | 19 | Q.        And that would be true regardless of the text |
| 16:29:44 | 20 | used in the DMCA notice, as long as the fair use |
| | 21 | analysis is done by a human being adequately, it doesn't |
| | 22 | matter what the DMCA notice actually says; would you |
| | 23 | agree? |
| | 24 | A.        I believe the notice only requires you to |
| 16:29:58 | 25 | attest that one has been conducted, so yeah. |

16:30:04   1   Q.        Okay.  So your position is that it's really

2   about the quality or the nature of the -- or the

3   adequacy of the DMCA, excuse me, of the fair use

4   analysis; would you agree?

16:30:17   5   A.        I disagree.  I think it's the manner in which

6   the operation has been running is what makes it unlawful

7   under RICO, also what makes it fraudulent.

8   Q.        All right.  My question does not pertain to

9   the particular challenged process here.  I'm speaking

16:30:37   10   generally in your position or your view of 512F as

11   interpreted by Lenz requires a fair use analysis that is

12   adequate in terms of the quality of the analysis; would

13   you agree?

14   A.        I believe the requirement is that it's done in

16:31:01   15   good faith.  I don't think there's a particular

16   threshold as to, like, you know, quality.

17   Q.        Okay.  Fair enough.  Thank you.

18            Now, at the time that you filed the First

19   Amended Complaint, you knew that Jon Nicolini had

16:31:19   20   reviewed the images in question here for fair use before

21   submitting the DMCA takedowns; isn't that true?

22   A.        No.  It's a contested fact in the case.

23   Q.        Jon Nicolini told you on the phone that he

24   conducted a fair use analysis before submitting the DMCA

16:31:39   25   takedown notices?

16:31:45   1   A.          People that are --

           2   Q.          Correct?

           3   A.          People that are accused of fraud sometimes lie

           4   to get out of the fraud to get out of a lawsuit for

16:31:48   5   fraud.  I hate to break the news to you.

           6   Q.          My question was whether he said those words to

           7   you on the phone before you filed the First Amended

           8   Complaint?

           9   A.          I don't believe he said those exact words, but

16:32:04  10   I don't remember exactly as I sit here.

          11   Q.          He said some words to the effect that he

          12   conducted a fair use analysis or he reviewed the images

          13   for fair use before submitting DMCA takedowns, correct?

          14   A.          That's not my recollection.

16:32:20  15   Q.          Before you filed the First Amended Complaint,

          16   you received a letter from me that told you that

          17   Okularity reviewed the images for fair use before

          18   submitting the DMCA takedown notices, correct?

          19   A.          Yeah.  But you're also demanding a million

16:32:38  20   dollars, so it's not -- it doesn't make it true just

          21   because you put it in a letter.

          22   Q.          You received that letter, but you just didn't

          23   believe it, correct?

          24   A.          If I believed everything the opposing side

16:32:49  25   said in a case, I don't think I would be a very good

```
16:32:51    1    lawyer.

            2    Q.        You received the letter, but you didn't

            3    believe it, right?

            4    A.        I don't know what letter you're referring to.

16:32:57    5    I don't remember it.  But, you know, any time someone's

            6    trying to get out of a lawsuit, they'll say whatever

            7    they can.

            8    Q.        You received a letter from me before filing

            9    the First Amended Complaint that said Okularity reviewed

16:33:14   10    the images for fair use before submitting DMCA takedown

           11    notices, correct?

           12    A.        I don't remember that.

           13    Q.        Okay.  Now --

           14    A.        How would you even know that?

16:33:28   15    Q.        How would I even know what?

           16    A.        That Jon Nicolini conducted a fair use

           17    analysis?

           18    Q.        Okay.  I'm asking the questions here.

           19    A.        Make you a witness, you know what I mean?

16:33:44   20    Q.        No.  I don't know what you mean.

           21    A.        You're saying your client didn't break the

           22    rules, so, you know, it's not how lawsuits work.

           23    Q.        No.  Listen, my question was -- my only

           24    question was whether you received a letter from me that

16:33:57   25    said certain things before you filed a complaint.
```

16:34:00     1     That's all the question is.

             2     A.        I don't remember that letter.

             3     Q.        Okay.  Fair enough.

             4               Okay.  You had no information before you filed

16:34:12     5     the First Amended Complaint about what Jon Nicolini did

             6     between receiving automated generated notices and

             7     submitting those notices; isn't that true?

             8     A.        No.  I don't think that's true.

             9     Q.        What information do you have about what

16:34:39    10     Jon Nicolini did between receiving a generated notice

            11     and submitting that notice?

            12     A.        Well, I looked at the time stamps for every

            13     DMCA notice, and I noticed that they were filed

            14     sometimes minutes apart, one or two minutes apart, and

16:34:59    15     that is evidence that there was no analysis conducted

            16     that on top of the fact that it's automated.

            17     Q.        You have no information about what analysis

            18     Jon Nicolini did before pressing the submit button for

            19     each of those DMCA takedown notices, correct?

16:35:21    20     A.        Well, like, I wasn't there.  And, you know, as

            21     the lawyer for the plaintiff, like, you don't have to,

            22     like, be there when all the wrongdoing happens.  You

            23     just have to have sufficient evidence to support your

            24     claims.  And I think --

16:35:34    25     Q.        Fair enough.  I'm just asking what you know

```
16:35:36    1    and what you don't know.

            2    A.         Yeah, I mean.

            3    Q.         So all that you have --

            4    A.         I don't have to be there to --

16:35:40    5    Q.         All that you have --

            6    A.         -- to make claims.

            7    Q.         All that you have are a 2012 Declaration,

            8    right, two phone calls with Jon Nicolini, right, and the

            9    DMCA takedown notices themselves, right?

16:35:59   10         That's all the information that informs what

           11    Jon Nicolini did to enforce the many DMCA takedown

           12    notices, correct?

           13    A.         No.

           14    Q.         What else?

16:36:10   15    A.         What we've gone over all day.  I mean, it's

           16    what you announced on your website, what Jon Nicolini's

           17    expertise is, the fact that the software matches and

           18    automatically fills in the content, the fact that it's

           19    cut and pasted from a letter you drafted, the fact that

16:36:30   20    it doesn't talk about the images at all, all of those

           21    things indicate that there was no investigation.

           22         And when putting in broader context of the

           23    insistence in every single DMCA notice, that Paper

           24    Magazine's Instagram account be taken down, and that

16:36:50   25    negotiations didn't commence until, in fact, that
```

| | | |
|---|---|---|
| 16:36:55 | 1 | portion of the scheme was fulfilled all points to the |
| | 2 | fact that this was not done in good faith. |
| | 3 | This was done to extort by taking away an |
| | 4 | asset and getting as much money as possible without |
| 16:37:13 | 5 | referencing to the images or the rights or the authors |
| | 6 | or anything of that sort. |
| | 7 | Q.        Objection.  Non-responsive. |
| | 8 | Let me ask you this.  In the First Amended |
| | 9 | Complaint, you alleged that Okularity automatically |
| 16:37:26 | 10 | generated and submitted takedown notices; isn't that |
| | 11 | true? |
| | 12 | A.        Yes. |
| | 13 | Q.        And you allege that in the Second Amended |
| | 14 | Complaint as well, right? |
| 16:37:38 | 15 | A.        I believe.  I mean, if you're saying it, then |
| | 16 | I'll take your word for it. |
| | 17 | Q.        Now, the basis for that conclusion that |
| | 18 | Okularity automatically generates and submits DMCA |
| | 19 | takedown notices is the 2012 Declaration that |
| 16:37:55 | 20 | Mr. Nicolini filed in another case about a system used |
| | 21 | by a different company, right? |
| | 22 | A.        No.  All the other things I've been talking |
| | 23 | about.  I had a lot of information.  I mean, my staff |
| | 24 | researched this for over 50 hours.  We conducted |
| 16:38:15 | 25 | hundreds of Westlaw searches. |

16:38:18    1    Q.        Okay.

            2    A.        You know, it's like there's a lot of evidence

            3    we had, and there are people complaining about the very

            4    same thing on the Internet, so it's like -- it's not

16:38:27    5    just this 2012 Declaration.

            6    Q.        And you don't know what occurs between the

            7    time that a notice is automatically generated, in your

            8    words, and the time that it's submitted, correct?

            9              Let me ask it this way.  Sorry.  I withdraw

16:38:46   10    the question.

           11              You don't know whether Jon Nicolini takes five

           12    minutes or five hours to analyze fair use, do you?

           13    A.        I know that his DMCA notices are submitted

           14    within one to three minutes of each other.

16:39:00   15    Q.        That wasn't my question.

           16              You don't know how much time Jon Nicolini

           17    takes in reviewing fair use for each image, do you?

           18    A.        I don't think he does anything.  That's my

           19    position.

16:39:13   20    Q.        That's not my question.

           21              You don't know how much time he spends in

           22    reviewing fair use, do you?

           23    A.        I don't think he reviews it at all.  I mean --

           24    Q.        You don't know whether Jon Nicolini consults

16:39:25   25    with anybody else in reviewing an image for fair use, do

```
16:39:29    1    you?

            2    A.        I do.

            3    Q.        Let me rephrase.

            4              At the time you filed your First Amended

16:39:35    5    Complaint, you had no idea whether Jon Nicolini

            6    consulted with anybody else in reviewing images for fair

            7    use, did you?

            8    A.        When I asked him, he did not indicate that he

            9    consulted with someone.

16:39:52   10    Q.        At the time you filed the First Amended

           11    Complaint, you had no information about whether Jon

           12    Nicolini consulted with anybody in analyzing fair use,

           13    correct?

           14    A.        It's in his Declaration.

16:40:09   15    Q.        At the time you filed the First Amended

           16    Complaint, you had no information about whether

           17    Jon Nicolini consulted with anybody in analyzing fair

           18    use for these images, correct?

           19    A.        I'm trying to tell you, it's in his

16:40:27   20    Declaration.

           21    Q.        What does his Declaration say about consulting

           22    with anybody else?

           23    A.        It says, "I did it all myself."

           24    Q.        Okay.  I don't think it does, but we'll leave

16:40:37   25    it at that.
```

| | | |
|---|---|---|
| 16:40:38 | 1 | At the time you filed the First Amended |
| | 2 | Complaint, you had no information about how much time |
| | 3 | Jon Nicolini spends in reviewing each image for fair |
| | 4 | use, did you? |
| 16:40:50 | 5 | A.        Again, I don't think he spent any time. |
| | 6 | Q.        At the time you filed the First Amended |
| | 7 | Complaint, you had no idea how Jon Nicolini conducts a |
| | 8 | fair use analysis whether it's with a list of the fair |
| | 9 | use factors or anything else, correct? |
| 16:41:14 | 10 | A.        I don't understand the question.  It's |
| | 11 | compound. |
| | 12 | Could you rephrase? |
| | 13 | Q.        I'll rephrase. |
| | 14 | At the time you filed the First Amended |
| 16:41:20 | 15 | Complaint, you had no information about the manner in |
| | 16 | which Jon Nicolini conducts a fair use analysis, |
| | 17 | correct? |
| | 18 | A.        Again, your question assumes facts that I |
| | 19 | don't believe are true. |
| 16:41:38 | 20 | Q.        Your assumption is that Jon Nicolini does no |
| | 21 | fair use analysis, correct? |
| | 22 | A.        My belief. |
| | 23 | Q.        That's your belief.  Okay. |
| | 24 | Other than your belief or your assumption, you |
| 16:41:59 | 25 | don't have any information that Okularity uses the same |

16:42:04   1   system as described in the 2012 Declaration, correct?

2   A.          I don't think it would be.  I'm not sure that

3   it's the same system.

4   Q.          But you don't have any information otherwise

16:42:16   5   either way?

6   A.          If he built software that in 2012 that does

7   the same thing, I presume that he can build that now.

8   He's had Okularity for a while, announces the ability of

9   the software to do this very same analysis on the

16:42:35   10   website, on your website.  That's not a secret.

11   Q.          You are assuming that it's the same software?

12   A.          No.  I'm not.  It doesn't matter if it's the

13   same software.

14   Q.          It doesn't matter.  Then what is the relevance

16:42:50   15   of the 2012 Declaration if it doesn't matter if it's the

16   same software?

17   A.          It shows that Nicolini has been trained in

18   building software that has the ability to do exactly

19   what he testified he did.

16:43:04   20   Q.          And other than the 2012 Declaration, you have

21   no information about how Mr. Nicolini's approach to

22   conducting -- or excuse me, how Mr. Nicolini's process

23   for processing DMCA takedown notices has changed since

24   2012, correct?

16:43:26   25   A.          I presume it would not change until the Lenz

16:43:33   1   case came out.

2   Q.        Your Declaration submitted in this case, which

3   you looked at earlier in that Declaration, paragraph 10,

4   you stated that Mr. Nicolini confirmed your belief that

16:43:51   5   Okularity uses automated software to generate DMCA

6   notices on the telephone call he had with you, right?

7   A.        (Nodding head.)

8   Q.        You need --

9   A.        Yes.

16:44:02   10   Q.        -- to state it.   Okay.   Thank you.

11          Your Declaration does not state that

12   Mr. Nicolini confirmed your belief that Okularity used

13   automated software to submit DMCA notices; isn't that

14   true?

16:44:18   15   A.        I think they're one and the same.

16   Q.        Your Third Amended Complaint differs from the

17   First and Second Amended Complaints in that regard;

18   isn't that true?   The First and Second -- let me ask it

19   this way.

16:44:32   20          The First and Second Amended Complaints state

21   that Okularity automatically generates and submits.   The

22   Third Amended Complaint states that Okularity

23   automatically generates; would you agree?

24   A.        I don't know the differences between -- I

16:44:48   25   don't remember the differences in the two.   I didn't

16:44:50   1   edit that particular document.

           2              But it's now true that they're both correct,

           3   they're automatically generated and submitted by a

           4   script, according to Mr. Nicolini's testimony.

16:45:07   5   Q.        According to Mr. Nicolini's what, testimony?

           6   A.        Correct.

           7   Q.        At the time you filed the First Amended

           8   Complaint, you did not have Mr. Nicolini's testimony,

           9   correct?

16:45:16  10   A.        Of course not.  No.

          11   Q.        Okay.

          12   A.        I mean, not his deposition testimony anyhow.

          13              MR. PERKOWSKI:  Give me a second.  I'm just

          14   reviewing whether I have anything else.  I think I'm

16:45:52  15   done.

          16              Jo, anything else?

          17              MS. ARDALAN:  I've got nothing.

          18              Thank you, Mr. Tauler.

          19              THE WITNESS:  Thank you.  I'll talk to you

16:46:03  20   guys soon.

          21              MS. ARDALAN:  Mr. Tauler, do you want a copy

          22   of this transcript?

          23              THE WITNESS:  Can I get back to you?  Can I

          24   get back to the court reporter on that?

16:46:16  25              THE COURT REPORTER:  Of course.

16:46:17    1                 MR. PERKOWSKI:  Can we go off the record for

            2    this?

            3                 THE VIDEOGRAPHER:  Okay.  This concludes the

            4    deposition for today.  We're going off the record.  The

16:46:22    5    time is 4:48 p.m.

            6                 MS. ARDALAN:  Tisha, I would like a copy, and

            7    I would like it expedited.  I'd also like a rough.

            8                 THE COURT REPORTER:  Okay.

            9                 Mr. Perkowski, are you ordering a copy?

16:47:13   10                 MR. PERKOWSKI:  I'll take a regular copy.

           11    Yes.

           12                 (The deposition was concluded at 4:48 p.m.)

           13                            -oOo-

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

1                       DEPONENT'S DECLARATION

2

3              I, ROBERT TAULER, hereby declare:

4              I have read the foregoing deposition

5    transcript, I identify it as my own, and I have made any

6    corrections, additions, or deletions that I was desirous

7    of making in order to render the within transcript true

8    and correct.

9              I declare under penalty of perjury, under

10   the laws of the State of California, that the foregoing

11   is true and correct.

12

13   _____,  _____
                (Date)                        (City and State)

14

15

16                                  _____
                                             (Signature)

17

18

19

20

21

22

23

24

25

```
 1   STATE OF CALIFORNIA    )
                            )   SS.
 2   COUNTY OF LOS ANGELES  )

 3

 4             I, Tisha C. Okuma, Certified Shorthand

 5   Reporter, Certificate No. 9774 in the State of

 6   California, duly empowered to administer oaths, do

 7   hereby certify:

 8             I am the deposition officer that

 9   stenographically recorded the testimony in the foregoing

10   deposition;

11             Prior to being examined, the deponent was by

12   me first duly sworn;

13             The foregoing transcript is a true record of

14   the testimony given;

15             I was relieved of my duty pursuant to Code

16   of Civil Procedure, Section 2025 (Q)(1), and therefore

17   any changes made by the deponent or whether or not the

18   deponent signed the transcript are not set forth.

19

20   Dated_____, Los Angeles, California.

21

22

23                      _____

24

25
```